**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | | |
|---|---|---|
| JAMES COREY GOODE, individually, | § | |
| and GOODE ENTERPRISE SOLUTIONS | § | |
| INC. | § | |
|      Plaintiffs, | § | |
| | § | CIVIL ACTION NO. _____ |
|      v | § | |
| | § | |
| ROGER RICHARDS RAMSAUR, | § | JURY TRIAL DEMANDED |
| LEON ISAAC KENNEDY, | § | |
| and ADRIENNE YOUNGBLOOD | § | |
|      Defendants. | § | |

## ORIGINAL COMPLAINT

**COMES NOW**, Mr. James Corey Goode ("Mr. Goode") and Goode Enterprise

Solutions, Inc. ("GES", collectively "Goode") for their claims against defendants Roger

Richards aka Roger Ramsaur ("Richards"), Leon Isaac Kennedy ("Kennedy"), and Adrienne

Youngblood ("Youngblood") (each a "Defendant" and collectively, "Defendants"), and

respectfully prays and alleges as follows:

## INTRODUCTION

Underlying this lawsuit are years of trust that were built between Mr. Goode and each

one of the Defendants. It is not a suit brought lightly, but after much attempted engagement on

the side of Plaintiffs and their counsel with the aim of resolving unanswered questions posed by

Mr. Goode and his business advisors that were asked in an attempt to protect other-engaged

business associates and investors as well as his brand and name. These questions were

unfortunately met with threats of extortion and personal and business-related counterattacks by

the Defendants on multiple levels. The professional and personal relationships that were built

between Mr. Goode and Mr. Richards, Mr. Kennedy and Ms. Youngblood were thrown aside by Defendants due to greed and in an attempt to cover up shoddy, careless and—in some circumstances—downright fraudulent business practices through their own actions.

## NATURE OF THE ACTION

1.   This is an action at law and in equity against Defendants for various claims of breach of fiduciary duty, extortion, embezzlement, trademark infringement, counterfeiting, deceptive trade practices, unfair competition, breaches of contract, fraudulent misrepresentation, and tortious interference arising from a desire to steal from, convert, and embezzle property and monetary gain from, as well as tarnish and misappropriate the character, goodwill and work of Mr. James Corey Goode ("Mr. Goode") and that of his company, GES.

2.   Mr. Goode is a Colorado resident of Broomfield, Colorado having a business address of 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020. Mr. Goode is an educational and motivational speaker, influencer, author and media figure and is well-known and respected in the Conscious Community.[1]

3.   GES is a Colorado corporation based out of Broomfield, Colorado and formed by Mr. Goode and his wife, Stacy Renee Goode ("Mrs. Goode"). GES produces educational, spiritual, health and entertainment goods and services geared towards the Conscious Community. GES' address is 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020.

---

[1] The "Conscious Community" is a group of people focused on bettering and furthering their research and experiences in topics such as spirituality, health, wellness, the cosmic and metaphysical. *See* http://consciouscommunitymagazine.com/ [last accessed March 17, 2020] for an example of a publication catered to the Conscious Community.

4.   Upon information and belief Richards is an Oregon resident that may be served through his attorney, Ken Dandar, who has an address of 1211 N Westshore Blvd. Suite 103 Tampa, Florida 33607.

5.   Upon information and belief, Kennedy is a California resident and may be served at his office address of 827 N. Hollywood Way 551, Burbank California 91505.

6.   Upon information and belief, Youngblood is a California resident and may be served at her residence at 2036 Nevada City Hwy. #305 Grass Valley, California 95959.

## JURISDICTION AND VENUE

7.   Goode files this action against Defendants for claims arising under the Lanham Act, 15 U.S.C. 1143(a) et seq. (the "Lanham Act") thus granting this Court federal question jurisdiction under 28 U.S.C. §§1331 and 1338.

8.   This Court also has jurisdiction over this matter under 28 U.S.C. §§1337 because the parties are diverse and the amount in controversy is well over $75,000.00.

9.   This Court has supplemental jurisdiction over Goode's common law and state law claims of defamation, deceptive trade practices, breaches of contract, promissory estoppel, misrepresentation, tortious interference and harassment pursuant to 28 U.S.C. §§1367. Because these claims are so related to the claims within the Court's original jurisdiction, they form part of the same case or controversy under Article 3 of the U.S. Constitution.

10. This Court has personal jurisdiction over Defendants because they have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities and otherwise.

11. Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District. Further, the property and financial institutions connected to the action reside in this District.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

12. Mr. Goode is a motivational speaker, influencer, author, producer and public figure. Since about 2014, Mr. Goode has been publicly sharing the story of his life experiences to the world and garnering the attention of scientists, researchers and media personalities across the globe. Mr. Goode professes a message of light and love for everyone and encourages others to focus on living a life of service to others and raising their consciousness of the world around us.

13. Mr. Goode's charisma and positivity attracts a following that spans the spectrum of race, religion and nationality. For the most part, those that follow his journey are of the same mindset: that we should all, as a whole, lift each other up and be kind and loving towards one another. The Defendants named in this action profess—or, at one time, *did* profess—the same or similar messages.

14. The above-described messages and belief in love and light are qualities that Defendants sought to take advantage of, and banked on Mr. Goode's easygoing and trusting nature in order to capitalize on the business, following and brand that he built.

15. GES was formed by Mr. Goode and holds all right, title and interest to the intellectual property ("IP") that he formed and developed in addition to other work and projects he undertakes, including classes, movies, comic books and other goods and services tied to his branding and story.

### The Beginning: Mr. Goode Begins to Come Forward with His Experiences Tied to the Secret Space Program

16. When Mr. Goode first came forward with his stories and experiences as a government insider it was not as a person in the spotlight—in fact, it was his intention to stay "under the radar" but to get his experiences and information out to researchers and scientists in order to promote an understanding of the greater picture and the worlds existing beyond those that we know on a day-to-day basis.

17. Through Mr. Goode's recounting of his experiences and various events, the "Sphere Being Alliance®" ("SBA®") and its progeny came to fruition. Mr. Goode, starting as early as 2008, began to recount memories, stories and experiences involving angelic beings that he called the "Blue Avians™" that preached a love for light, inclusion and understanding of everyone and accepting of all things positive. In connection with this, he shared his story of what he termed the "20 and Back™" missions that the Secret Space Program—a top-secret military project focused on travel beyond the confines of our Earth—undertook and developed a narrative that the Conscious Community began to quickly take notice of.

18. During the early years of Mr. Goode's public dissemination of his story and testimony, he became close friends with an author and researcher by the name of David Wilcock. The two shared their experiences, knowledge and love for advanced technologies and ancient histories alike and began to work together to bring their stories to humanity.

19. After a sudden turn of events thrust him into the forefront of the "Disclosure" movement[2], Mr. Goode garnered the attention of the movie and television network by the name of Gaia, a defendant in the instant action.

**Mr. Goode's Testimony Launches the Show "Cosmic Disclosure" on Gaia**

20. In June of 2015, Gaia approached Mr. Goode and Mr. Wilcock with a proposal to star on a show premised on Mr. Goode's testimony by the name of "Cosmic Disclosure". The two agreed and the hit show took off for a roaring three-year stint that doubled Gaia's worth and brought hundreds of thousands of subscribers.

21. Indeed, taking a look at Gaia's stock price shows a constant increase starting when CD was first premiered up until June 2018, when Mr. Goode left the show—where it takes a sudden, and continued, downturn…that has yet to right itself:



---

[2] The "Disclosure" movement is a movement geared towards bringing to mainstream research evidence of interstellar travel and/or extraterrestrial existence.

22. Over the span of each year while working on CD, Mr. Goode was filming what worked out to be an episode a week—52 episodes each year. This contributed thousands of hours of content, hundreds of hours of in-person presentation and testimony, and millions of dollars of revenue.



23. While Mr. Goode was on Cosmic Disclosure, he spoke about the testimony that he had been sharing and developing prior to his involvement with Gaia regarding the Blue Avians ™, 20 and Back ™, and SBA ®.

### Mr. Goode Meets Mr. Richards

24. Mr. Goode began working with Gaia on or around 2015. Over the next few years, he continued to share his story and build his presence and brand as an influencer and leader through various speaking engagements as well as through his television appearances.

25. Mr. Goode was promised various forms of compensation in exchange for his appearance on Cosmic Disclosure ("CD") including stock options, a percentage of the revenue brought in by CD through Talent Fees, fees under an "Ambassador Program" and a monetary amount agreed to by the parties.

26. This compensation was due to Mr. Goode's story, name, goodwill and evolving brand that he was making for himself due to his recognition in the Disclosure Community.

27. Richards met Mr. Goode through an event at which Mr. Goode appeared and spoke in Mount Shasta, California in 2016. The two formed a friendship and Richards began to volunteer for Mr. Goode's mission.

28. After a short while, Mr. Goode began to trust Richards and because they seemed to work well together, introduced Mr. Richards to various people at Gaia. Indeed, after a short while Richards had introduced himself to Ms. Goode and formed a bond with the Goode family and Mr. Goode's colleagues that quickly put him in a position as Mr. Goode's "right-hand man".

29. Mr. Goode and his family grew to trust Richards in a deep way, even welcoming him to live with them at their house in Broomfield for extended amounts of time.

30. Mr. Richards often worked in Colorado with Mr. Goode, Gaia and others in Colorado on projects such as CD and some of the conferences that he attended with Mr. Goode.

31. Mr. Goode was able to secure Richards a role as a writer for CD, a role that Richards fulfilled until Gaia received word that Mr. Goode had intentions not to renew his talent contract with Gaia.

32. Gaia ceased its contract with Richards on or around early 2018 due to Mr. Goode's departure as talent for CD, a move that both Richards and Mr. Goode agreed was the "right thing to do" due to hostile work environment issues.

**Mr. Goode Files to Protect His Trademarks**

33. Just prior to Mr. Goode's departure from CD, he decided to make the wise business decision to protect his independent branding by filing for various federal trademarks with the United States Patent and Trademark Office ("USPTO").

34. Mr. Goode had worked autonomously on print, clothing and media goods and services tied to his arbitrary, protected phrases: Blue Avians ™, 20 and Back ™, Sphere Being Alliance ® and SBA®.

35. One of the goods Mr. Goode had created at that time was a graphic novel (or comic book, hereafter the "Graphic Novel") about his story and journey.

36. Mr. Richards was involved in the filing of the trademarks and in the production of the goods and services connected therewith, but because he had not been involved in the creation of them, did not have any ownership interests in the trademarks.

37. GES was the owner and the filer of the federal trademarks for which it filed in early 2018, as well as any and all subsequently-filed trademarks.

38. Goode filed for Federal Trademark Registrations for BLUE AVIANS (Application No. 87821423), 20 AND BACK (Application No. 87821401), SPHERE BEING ALLIANCE (Application No. 87821504), and SBA (Application No. 87821495) in March of 2018.

39. Goode was granted the rights to SBA ® and SPHERE BEING ALLIANCE ® in November of 2018 and April of 2019, respectively. (*See* Exhibit A).

40. After BLUE AVIANS and 20 AND BACK were published, Gaia instituted proceedings with the Trademark Trial and Appeal Board ("TTAB") against the claimed marks despite Mr. Goode having sent various Cease and Desist and Demand Letters to Gaia instructing them to cease use of his protected phrases (as further explained below).

41. Richards assisted GES' counsel in the drafting of the aforementioned Cease and Desist Demand Letters in an effort to protect GES' interests in those trademarks.

42. Richards has disclaimed any and all rights to any of the IP created by Goode. For example, in an email from Richards to Goode in early 2019, he stated:

"I will be stepping down and away from all things SBA related [sic] permanently from here on out. I gift with gratitude all my work on the SBA slate for Tracy, Above Majestic Sequels, the Graphic Novel, SBA events, and The SSP Book to you Corey [sic]. You are free to develop as you wish and reap the rewards as you wish, they are yours now."

## Richards Assists Mr. Goode and GES in Protecting their IP

43. Just prior to Mr. Goode's departure from Gaia and CD, Gaia hired additional talent to take over Mr. Goode's role on the show.  Individuals like Jason Rice, Emery Smith and others appeared on CD and, to Mr. Goode's shock and dismay, proceeded to use Goode's protected phrases and testimony that copied his.

44. Richards stepped up, as he often did, to aid Mr. Goode in protecting his IP and brand.

45. In response, and in an attempt to prevent any dilution and tarnishment of his branding and goodwill, Goode sent out multiple Cease and Desist letters to Gaia and the talent that was appearing on Gaia utilizing Goode's protected IP. In response, Gaia's attorneys and talent (in an attempt to turn the Conscious Community against Goode) launched an attack on Mr. Goode for attempting to protect his business assets.

46. Again, as usual, Richards was right by Mr. Goode's side to defend against any defamation that Gaia or its associates had focused towards Goode.

47. In fact, Richards put together a lengthy "open letter" and video about "who he is and where he came from" accessible at

https://www.facebook.com/FDN.DIRECTOR/videos/348105275592596 (last accessed April 1, 2020, hereafter "Richards' Open Letter Video").

48. In that letter, Richards admitted that the Graphic Novel was not his, but Mr. Goode's creation:

The idea of doing a Graphic Novel based on Coreys testimony was not my idea. I was asked to help organize the artist volunteers interested in participating. I saw a beautiful opportunity come together to share in the creation of art while also getting the message out there. In the time I have been asked to help organize these volunteers I have spent hours getting to know them, working with them, being humbled by their talents and honored to help. These are women and men from all over the world ranging in age from their early 20's to late 60's.

Again the notion that this group is behind some sinister plan is nothing short of a tabloid story. These are some of the most amazing people I have had the pleasure of knowing in my life.

In the past year I have spent time getting incredibly close to Corey. I have found him to be honest, shy, sincere, awkward, direct, humorous, impatient and undoubtedly human. Regarding his testimony I have seen no evidence that has lead me to feel he is being dishonest, in fact to the contrary I am continually amazed at the moments that lead me to feel he is telling the truth as he knows it? I cant explain this nor will I try. I will say that Coreys testimony triggers alot of people in this community, it calls into question their own belief systems at times and can come with an uneasy feeling. I would ask that if you have resistance to Coreys testimony it may be beneficial to look at why? What is being triggered there. If you really just felt like he was full of it why would you give him so much attention? What crusade of your own beliefs are you trying to run under the guise of "saving people" from Coreys "Agenda". If you dont like bananas dont eat them, what gives you the right to go around on an anti banana campaign? Dont give me the line either that your trying to save people from the "Banana agenda", people have the right to decide on their own, your not saving anyone, your just trying to get everyone to believe bananas taste terrible.

*Id*.

49. Additionally, Richards dispelled the great joy he received from working with Mr. Goode and went to great lengths to support the cause they both loved so dearly (or, at least that Richards claimed to). *See* Richards' Open Letter Video.


## Enter Leon Isaac Kennedy

50. On or around July of 2018, Mr. Goode met Mr. Leon Kennedy through Mr. Wilcock. Kennedy purported to be Mr. Wilcock's "manager" and insisted on taking over any communications between the two regarding any ongoing, past or potential business deals.

51. Kennedy began to insert himself into Goode's business dealings as well, and specifically positioned himself as the point of contact for anyone who was in an advisory position with Mr. Goode.

52. Kennedy inserted himself into the position of correspondent between Mr. Goode, Mrs. Goode (and, by virtue of both of their involvement and because of the nature of the issues, GES), Richards and any investor, advisor, or business contact that existed at that time or in the future.

53. Kennedy cautioned Goode against any involvement of financial advisors, legal counsel, or other business advisor, promising that he in fact had the experience and knowledge to supplant all of the aforementioned.

54. Specifically, with regard to Goode's IP strategy that had been meticulously planned out and executed, Kennedy insisted on abandoning any type of legal or court-involvement with respect to protecting Mr. Goode's brand and IP.

55. In fact, Mr. Goode—on several occasions—begged Kennedy to seek the advice of attorneys and accountants and was always told by Kennedy "we are not ready for accountants" and "attorneys ruin everything".

56. Mr. Goode, at the time relying on Kennedy's claimed knowledge and experience, followed Kennedy's statements and advice.

57. Mr. Goode, Mrs. Goode, GES, and Richards as well as GES' investors came to place their trust in Kennedy, handing over the reins to any financial entities and any contract negotiations in reliance on his representations.

58. Specifically, Kennedy came to be the point of contact between Goode and The Orchard (now known as "1091")—a production company that signed a sizable contract with Mr. Goode tied to a movies that he had directed, produced and starred in titled "Above Majestic" and "Cosmic Secret".

## The Graphic Novel, Above Majestic and Cosmic Secret

59. Mr. Goode and Mr. Wilcock hired a group of talent (the "Media Team") headed up by Richards to work on the Graphic Novel, Above Majestic and Cosmic Secret.

60. Countless hours of writing, production and editing went into Above Majestic, Cosmic Secret and the Graphic Novel by Mr. Goode, Mr. Wilcock, Richards and the Media team.

61. All of the Media Team, including Richards, were compensated for their time.

62. Even Kennedy—once he was brought on, not long after Above Majestic was finalized and licensed to the Orchard/1091—was drawing a sizable sum for his role as "manager" in discussions with the Orchard/1091, Netflix and other companies that took an interest in the various projects stemming from Goode's IP.

63. At one point during the beginning of production of Above Majestic, Mr. Goode, Mr. Wilcock, Richards, and various other contributors of time, sweat and/or money all agreed to a percentage distribution for each once Above Majestic began to bring in revenue.

64. Mr. Kennedy, who fit himself into the team after Above Majestic had been finalized and licensed to the Orchard, made sure to include himself on any and all distributions of projects

coming from Goode's IP, including—but not limited to—Cosmic Secret, Above Majestic and the Graphic Novel.

65. Concurrently, the Graphic Novel was in production.  Mr. Goode was responsible for—like with Above Majestic—guiding the expression of the story, the creation of the characters, the production of the drawings, and much more.

66. During this time, Mr. Goode was not receiving compensation for his work and creation, but was, like most producers and directors, investing in sweat equity into his IP and paying the Media Team and its heads for their work…all while continuing his speaking appearances and other engagements.

67. At one point, Kennedy and Richards agreed to take over the finalization of the Graphic Novel and Above Majestic—this included the management (or, rather, mismanagement) of the funding.

68. Above Majestic was released, but the Graphic Novel still remains to be finalized.

69. Richards were in charge of the money that was coming in from presales of the Graphic Novel and investors so that the projects could be finished.

70. Kennedy was involved in the management of the finances for Cosmic Secret. He was also involved in the distributions for the royalties from Above Majestic.

71. On information and belief, Kennedy and Richards used that power over the finances in order to embezzle funds for their own use.

72. Additionally, Kennedy used his connection (that was established through Goode via his somewhat self-delegated duty) to manage funds and finances with the Orchard to swindle funds from Goode and the investors to the tune of hundreds of thousands of dollars.

73. Kennedy has never been licensed to be a manager in California.

74. While Richards and Kennedy were turning the Graphic Novel into a complete catastrophe, Mr. Goode and Mr. Wilcock had begun work on Cosmic Secret, in addition to working on the conferences that they had put together—including Dimensions of Disclosure.

75. Goode created the outline for Cosmic Secret around his own IP, Kennedy then took that outline and gave it to Richards and claimed that Richards directed Cosmic Secret when the agreement was that Goode was co-directing it with Richards.

76. Additionally, Richards misrepresented the contents of a contract for a movie deal he was negotiating on behalf of Goode and inserted himself—secretly—as IP owner.

77. In every aforementioned occasion, Richards and Kennedy deceived Goode until the last possible minute.

## Dimensions of Disclosure and Adrienne Youngblood

78. Mr. Goode had met Youngblood back in 2017 at a conference for the Disclosure Community, and he and Mrs. Goode had developed a friendship and trust with her.

79. Youngblood owns a farm upon which she grows cannabis and wanted to start growing hemp.

80. Mr. and Mrs. Goode invested $15,000.00 into that hemp project.

81. Youngblood built three greenhouses and bought the plants with the money the Goodes supplied. Youngblood and Richards then kept the Goodes out of any info about the status of the crops.

82. Between 2017 and 2018, Mr. Goode and Youngblood began to plan a conference that they would host and would take place in Loveland, Colorado called "Dimensions of Disclosure" ("DoD").

83. Later, Richards and Youngblood told the Goodes at DoD that the whole crop died of a disease.[3]

84. Youngblood never showed any evidence of this disease to Mr. or Mrs. Goode, nor has she returned the $15,000.00.

85. Mr. Goode supplied most of the planning and infrastructure for DoD in 2018 and the following year in 2019. Both events saw great success and the DoD conference in 2019, held in California, sold out.

86. The DoD conferences pulled in close to $1,000,000.00 (one million dollars).

87. Mr. Goode never received the amount that he should have received, nor has Youngblood ever shown him an accounting of the monies that were brought in by either DoD.

---

[3] An expert later told the Goodes that a crop separated in three greenhouses should not share the same disease if separated properly and that no crop is a total loss due to disease, there is just a reduction in yield.

88. Mr. Goode should have received at the very absolute least $100,000.00 for the DoD conferences that he held. He did not receive anywhere near that. Had the DoD conferences gone forward on a yearly basis, they most likely would have continued for at least five to ten years.

89. To add insult to injury, Youngblood filed for a Trademark on DoD (the "DoD Mark") without any notice to Mr. Goode. (Exhibit B).

90. In that application, Youngblood signed a declaration that she is the only person with any right, title or interest to the DoD Mark.

91. Youngblood is not the only person with right, title or interest in the DoD Mark—Goode owns significant rights to the DoD Mark.

92. Youngblood's application for the DoD Mark is fraudulent.

93. Since Youngblood's filing of the DoD Mark, Goode has attempted to engage in settlement discussion in order to set the matter right and make it so that DoD can continue to take place and bring in revenue.

94. Counsel for Goode has spent dozens of hours negotiating the settlement only to have Youngblood renege on the settlement at the very last minute.

### Kennedy, Youngblood and Richards' Commingling of Funds, Tarnishment, Defamation and Extortion

95. On information and belief, Kennedy and Richards have commingled funds meant to be separated for Above Majestic, the Graphic Novel, and Cosmic Secret.

96. Kennedy and Richards have done this intentionally.

97. Kennedy and/or Richards have engaged in shoddy management of sending the DVD's for Above Majestic and Cosmic Secret (Exhibit C) as well as management of various websites connected to any of the herein-described projects (Exhibit D).

98. This shoddy management has tarnished Goode's name, branding and IP and caused them financial damages.

99. In retaliation to Mr. Goode asking for things such as accounting of the herein-described projects, Youngblood, Kennedy and Richards have engaged in defaming activities against Goode and his associates.

100.    Additionally, Kennedy and Richards have sent emails containing threats that amount to extortion to Goode, his associates and counsel.

101.    This extortion demands hundreds of thousands of dollars from Mr. Goode. If he does not comply, Kennedy and Richards have threatened to testify falsely against him for Gaia in an ongoing business dispute between Goode and Gaia. Additionally, they have threatened to give information and misinformation to Vice Magazine in an attempt to tarnish his name and harm Mr. Goode's business, reputation and relationships with his family, friends and followers.

102.    Kennedy and Richards continue to use Goode's protected "SBA®" and "Sphere Being Alliance ®" trademarks and pending "Blue Avians ™" and "20 and Back ™" trademarks although they are no longer related with Goode.

103.     For example, when Kennedy and Richards send out DVD's to customers and followers of Goode that have purchased his "Above Majestic" movie the do so by using "SBA" in their email address and mailing address.

104.     The shoddy quality of these packages that are sent out bearing Goode's IP, branding, trademarks and name have tarnished and harmed Goode's goodwill and image.

105.     Kennedy, Richards and Youngblood owe money to Goode that they have refused to pay back for various investments and mismanagement of funds.

106.     Upon information and belief, Defendants have gone behind Goode's back to various entities and individuals to defame and tarnish his name, branding and goodwill.

107.     The nefarious activities of each individual Defendant have taken a toll on Goode. Goode has for over a year tried every avenue to make things right outside of litigation, but alas has been forced to bring the issues in front of a tribunal that can hopefully lend some guidance.

## I.     Claim I: FEDERAL TRADEMARK INFRINGEMENT
### (Under 15 U.S.C. §§ 1114 and 1125(a))
(All Defendants)

108.     Goode incorporates by reference the allegations in paragraphs 1-107.

109.     GES is the owner of the valid and subsisting federal trademark registrations for the SPHERE BEING ALLIANCE and SBA, the federal registration documents attached hereto as "Exhibit A".

110.       GES is also the common law marks 20 AND BACK and BLUE AVIANS, currently the subject of oppositions with the TTAB but will be filing a motion to stay proceedings upon filing of this First Complaint.

111.       GES' paper, clothing and educational and entertainment goods and services are marketed and sold globally. In offering and selling its products GES uses the marks SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ (the "GES Marks").

112.       GES has invested tremendous time, effort and financial resources in developing and promoting its products and services bearing the SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ marks (the "GES Goods and Services") with the marketing and sale of GES' goods in interstate commerce. The GES Marks have become, through widespread and favorable industry acceptance and recognition, an asset of substantial value symbolizing GES, its quality products and services and its goodwill.

113.       Consumers of paper, clothing and educational and entertainment goods and services in the Conscious community recognize the GES Marks as a source indicator for Goode.

114.       As evidenced by the valid and subsisting trademark registrations, the SPHERE BEING ALLIANCE ® and the SBA ® (the "SBA Marks") are inherently distinctive. The marks 20 AND BACK ™ and BLUE AVIANS™ (the "Pending GES Marks") are also inherently distinctive and entitled to trademark protection under the Lanham Act.

115.       Defendants (and/or Defendants' agents or affiliates) wrongfully and illegally made use of GES Marks by wrongfully and illegally continuing to use the GES marks even

though they are no longer affiliated with Mr. Goode or GES. These activities were carried out without GES' or Mr. Goode's consent or knowledge.

116.     The activities in the foregoing paragraph continue today.

117.     Defendants (and/or Defendants' agents or affiliates) send existing and prospective Goode customers numerous emails and social media messages and marketing which represented that their products or services were offered under GES Marks when in fact they are not.

118.     The wrongful and illegal attribution of the GES Marks with Defendants (and Defendants' agents or affiliates) have created a likelihood that consumers will be confused or deceived as to the source of the parties' products and any quality assurance with resulting substantial and irreparable harm to GES' Marks, reputation, and goodwill residing therein.

119.     Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to trade on the reputation and goodwill associated with GES' business and Marks.

120.     Defendants' (and/or Defendants' agents or affiliates) actions are knowing, intentional, willful, and carried out with clear intent to divert and harm Goode's business and convert the reputation and goodwill associated with Goode's names and GES Marks.

121.     Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to Goode's names and GES Marks, and are entitled to injunctive relief, recovery of Defendants' profits, GES' damages, enhanced damages, costs and reasonable attorney fees.

## II.    Claim II: False Designation of Origin and Federal Unfair Competition under 15 U.S.C. § 1125
### (All Defendants)

122.    Goode incorporates by reference the allegations in paragraphs 1-121.

123.    Defendants' (and/or Defendants' agents or affiliates) made repeated representations about the source, origin, and nature of Defendants' products that have created the false and misleading impression that Defendants' goods or services are manufactured by GES, affiliated with GES, connected or associated with GES, and/or endorsed, controlled, or approved by GES when, in fact, they are not.

124.    Defendants' (and/or Defendants' agents or affiliates) have made false representations, false descriptions, and false designations of origin regarding Defendants and Defendants' goods or services in violation of 15 U.S.C. § 1125(a), and such activities have caused, and unless enjoined, will continue to cause a likelihood of confusion and deception of members of the trade and the public and, additionally, injury and harm to GES' goodwill and reputation.

125.    Defendants' (and/or Defendants' agents or affiliates) have caused and are likely to continue to cause substantial injury to the public and to GES, for which GES is entitled to obtain injunctive relief and to recover profits, actual damages, enhanced damages, and other damages as may be provided by statute. The knowing, willful, and continuing nature of Defendants' conduct makes this an exceptional case for which GES is entitled to recover its costs and reasonable attorney fees.

### III.   Claim III: Trademark Counterfeiting — 15 U.S.C. § 1114
(All Defendants)

126.     Goode incorporates by reference the allegations in paragraphs 1-125.

127.     The registrations embodying the SBA® and SPHERE BEING ALLIANCE® trademarks are in full force and effect and are entitled to protection under both federal law and common law.

128.     Defendants, without authorization from Goode, have used and are continuing to use spurious designations that are identical to, or substantially indistinguishable from, the SBA® and SPHERE BEING ALLIANCE® trademarks in interstate commerce.

129.     The foregoing acts of Defendants are intended to cause, have caused, and are likely to continue to cause confusion and to deceive consumers, the public, and the trade into believing that Defendants' aforementioned counterfeit products (the "Counterfeit Products") are genuine or authorized products of Goode.

130.     Upon information and belief, Defendants have acted with knowledge of Goode's ownership of its marks at issue in this case and have acted with deliberate intention or reckless disregard to unfairly benefit from the incalculable goodwill inherent in Goode's claimed marks.

131.     Defendants' acts constitute trademark counterfeiting in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114).

132.     Upon information and belief, Defendants have made and will continue to make substantial profits and gains to which they are not in law or equity entitled.

133.     Upon information and belief, Defendants will continue their infringing acts, unless restrained by this Court.

134.     Defendants' acts have damaged and will continue to damage Goode, and Goode has no adequate remedy at law.

135.     In light of the foregoing, Goode is entitled to and demands injunctive relief prohibiting Defendants from using the Goode Trademarks or any marks identical, substantially indistinguishable, and/or confusingly similar thereto for any purpose, and to recover from Defendants all damages, including attorneys' fees, that Goode has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a), attorneys' fees and treble damages pursuant to 15 U.S.C. § 1117(b), and/or statutory damages pursuant to 15 U.S.0 § 1117(c).

## IV.    <u>Claim IV: Colorado Common Law Trademark and Trade Name Infringement</u>
(All Defendants)

136.     Goode incorporates by reference the allegations in paragraphs 1-135.

137.     GES' Marks and its associated trade names are all trademarks and names used by Goode in connection with its goods and services, which names and marks are inherently distinctive.

138.     Defendants' (and/or Defendants' agents' or affiliates') unauthorized use of GES' trademarks and names for in connection with the same or similar products and services infringes upon Goode's common law trademark and trade name rights.

139.     As a result of aforementioned infringing conduct, Goode has suffered irreparable harm to its marks and the reputation and goodwill associated therewith, and will continue to suffer irreparable harm, for which there is no adequate remedy at law.

## V.     Claim IV: Colorado Common Law Unfair Competition
### (All Defendants)

140.     Goode incorporates by reference the allegations in paragraphs 1-139.

141.     As its fourth grounds for relief, Goode asserts violation of Colorado common law unfair competition.

142.     Defendants' (and/or Defendants' agents or affiliates) have made unauthorized and infringing use of Goode's trademarks and trade names, wrongfully and illegally took control of Goode's content causing Goode's information and favorable social media content to be associated with Defendants', clearly intending to benefit from the reputation and goodwill residing in Goode's, utilized Defendants' position as an advisor and/or colleague to gain access to Goode's existing and prospective customers with the intent of and undertaking actions and deceptive communications to create confusion and misperception and thereby diverting their business to Gaia.

143.     Defendants' (and/or Defendants' agents or affiliates) conduct as described above has led to confusion and deception of consumers with regard to the identity of the parties and the products offered by them.

144.     Defendants' (and/or Defendants' agents or affiliates) have, or have sought to, pass off their goods as those of Defendants' by virtue of use of Goode's trademarks and trade names, leading to actual confusion on the part of the consumer.

145.     Defendants' (and/or Defendants' agents or affiliates) have misappropriated and exploited Goode's business values.

146.     Goode has no adequate remedy at law for the damages caused by Defendants (and/or Defendants' agents or affiliates) and their common law unfair competition, conduct and activities, and Goode has been irreparably damaged thereby.

## VI.     Claim V: Colorado Consumer Protection Act
### (All Defendants)

147.     Goode incorporates by reference the allegations in paragraphs 1-146.

148.     Defendants' (and/or Defendants' agents or affiliates) engaged in deceptive trade practices in the course of business in violation of C.R.S. § 6-1-105 and otherwise in violation of Colorado law.

149.     Without limiting the generality of the foregoing paragraph, Defendants' (and/or Defendants' agents or affiliates) knowingly: (a) sought to pass off Defendants' products and/or services as being Goode products or otherwise affiliated with, controlled or approved by GES; (b) made false representations attributing the source, sponsorship, approval, or certification of Defedants' goods and/or services to GES; and (c) made false representations that Defendants and Defendants' goods and/or services are affiliated, connected, associated with, or certified by Goode.

150.     Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices occurred in the course of their occupation and business.

151.     Defendants' (and/or Defendants' agents' or affiliates') deceptive trade practices significantly impact the consumers of paper, clothing and educational and entertainment goods and services in the Conscious community as actual or potential consumers of Defendants' products and/or services who have been deceptively led to believe that Goode and its commitment to high-quality products and services underlies the products and/or services being offered and sold by Defendants when in fact this is false; consumers acting in reliance on Goode's stellar reputation and history of quality products in dealing with Defendants are unaware of the lack of this safety net and the risk being assumed to their detriment.

152.     In the course of its business, Goode has been and will continue to be injured as a result of Defendants' deceptive trade practices.

153.     Goode has suffered and will continue to suffer injury in fact to a legally-protected interest as a result of Defendants' deceptive trade practices.

154.     Goode has suffered and will continue to suffer actual damages as a result of Defendants' deceptive trade practices.

155.     Goode is entitled to injunctive relief to prohibit Defendants from continuing their deceptive trade practices pursuant to C.R.S. §§ 6-1-110(1) and 6-1-113(1).

## VII.   Claim VI: Breach of Contract
### (All Defendants)

156.     Goode incorporates by reference the allegations in paragraphs 1-155.

157.     Goode entered into contracts with Defendants governing the terms and conditions of his ongoing business relationships each individual defendant as well as contracts with all or some of the Defendants.

158.     Defendants' contracts had various provisions that required Defendants to include Goode in business decisions, monetary disbursements, and to use good faith and fair dealing in their courses of conduct.

159.     Defendants breached those contracts by failing to adhere to those provisions relating to business decisions.

160.     Defendants further breached that contract by failing to adhere to the compensation guidelines laid out in those contracts.

161.     Defendants further breached their contracts with Goode by acting in a manner contrary to the implied duty of good faith and fair dealing.

162.     Goode suffered damages as a result of Defendants' breaches of contract, in an amount to be proven at trial, together with restitution and disgorgement.

## VIII.   Claim VII: Fraudulent Misrepresentation
### (All Defendants)

163.     Goode incorporates by reference the allegations in paragraphs 1-162.

164.     On multiple occasions Defendants made misrepresentations regarding the contracts between Goode and Defendants that included compensation beyond what Gaia did in fact pay to Goode.

165.     Defendants knew such representations were false.

166.     Defendants knew Goode would rely—and in fact did rely—on such misrepresentations.

167.     Defendants induced Goode to enter these contracts by relaying said misrepresentations to Goode.

168.     The aforementioned acts or omissions by Defendants have caused harm or injury to Goode.

## IX.   Claim IX: Intentional Infliction of Emotional Distress Under Federal and Colorado State Law
(All Defendants)

169.      Goode incorporates by reference the allegations in paragraphs 1-168.

170.      Defendants' (and/or Defendants' agents' or affiliates') engaged in extreme and outrageous conduct.

171.      Defendants' (and/or Defendants' agents' or affiliates') did so recklessly or with the intent of causing Goode severe emotional distress.

172.      Defendants' (and/or Defendants' agents' or affiliates') conduct caused Goode severe emotional distress.

## X.   Claim X: Negligent Infliction of Emotional Distress Under Federal and Colorado State Law
(All Defendants)

173.      Goode incorporates by reference the allegations in paragraphs 1-172.

174.      Defendants' (and/or Defendants' agents' or affiliates') conduct is negligent.

175.      The aforementioned conduct created an unreasonable risk of physical harm that caused Goode to be in fear of his own safety.

176.     Goode suffered physical injury or was in the "zone of danger" created by the aforementioned negligent conduct. This fear had physical consequences or long-continued emotional disturbance.

177.     Defendants' (and/or Defendants' agents' or affiliates') conduct caused the aforementioned damage.

### XI.     Claim X: Extortion
(Defendant Richards and Kennedy)

178.     Goode incorporates by reference the allegations in paragraphs 1-177.

179.     Richards and Kennedy have made threats to Goode that they have damaging information related to Goode.

180.     Richards and Kennedy have said that if Goode does not give them money, rights, title and/or interest to various properties they will release alleged damaging information.

181.     Richards and Kennedy have threatened Goode, or his property or reputation, to induce Goode to act against his will to do an act or refrain from doing a lawful act.

182.     These threats are substantial threats.

## XII.   Claim XI: Slander Per Se
### (Defendant Richards)

183.     Goode incorporates by reference the allegations in paragraphs 1-182.

184.     Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, spoken statements (e.g., accusing Goode of a criminal act) purporting to be facts.

185.     These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

186.     Defendants did so intentionally—or, at the very least, negligently.

187.     Goode suffered damages because of the aforementioned defamatory statements.

## XIII.   Claim XII: Libel Per Se
### (Defendant Richards)

188.     Goode incorporates by reference the allegations in paragraphs 1-187.

189.     Defendants' (and/or Defendants' agents' or affiliates') made a multitude of false, written statements (e.g., accusing Goode of a criminal act) purporting to be facts.

190.     These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

191.     Defendants did so intentionally—or, at the very least, negligently.

192.     Goode suffered damages because of the aforementioned defamatory statements.

**XIV.   Claim XIII: Tortious Interference with a Business Expectancy**
(All Defendants)

193.     Goode incorporates by reference the allegations in paragraphs 1-192.

194.     Goode had a multitude of actual or prospective business contracts with the aforementioned Conferences and various entertainment agencies.

195.     Defendants knew of these actual or prospective business contracts and intentionally and improperly interfered with the performance of these contracts.

196.     The aforementioned interference with the aforementioned contracts resulted in monetary loss and harm and damage to Goode's reputation and goodwill.

**XV.    Claim XIV: Breach of Fiduciary Duty**
(Defendants Richards and Kennedy)

197.     Goode incorporates by reference the allegations in paragraphs 1-196 of this Complaint as fully set forth herein.

198.     Richards and Kennedy, as managers of Mr. Goode's finances and various businesses, owed fiduciary duties to Goode should have dealt in Goode's best interests.

199.     Richards and Kennedy breached those duties by, inter alia, mishandling company funds, forging documents, and engaging in fraudulent business contracts.

200.     Richards' and Kennedy's breaches have caused damages to Goode in an amount to be determined at trial.

## XVI.    Claim XV: Embezzlement and Fraudulent Procurement of Company Funds
(Defendants Richards and Kennedy)

201.     Goode incorporates by reference the allegations in paragraphs 1-200.

202.     Richards and Kennedy, as managers of Mr. Goode's finances and various businesses, had access to—and control over—SDS company funds.

203.     Richards and Kennedy covertly took those funds and placed them in his own account and the accounts of others.

204.     Richards' and Kennedy's breaches have caused damages to SDS in an amount to be determined at trial

FIRST VERIFIED COMPLAINT – Goode v Richards, Kennedy and Youngblood          35

### XVII.  Claim XVI: Declaratory Judgments of Ownership of DoD Trademarks

(Defendant Youngblood)

205.     Goode incorporates by reference the allegations in paragraphs 1-204.

206.     GES has suffered injury due to Youngblood's filing of the DoD Mark. GES has not been able to license the IP that it has poured countless hours, money and effort into building because Youngblood fraudulently filed the DoD Mark and claimed it as her own.

207.     This fraudulent filing has caused GES to lose out on licensing fees as well as further conferences.

208.     This harm is certain to be curtailed if this honorable Court determines the ownership of the DoD Mark rests with GES.

### REQUEST FOR PRELIMINARY INJUNCTION

(Defendant Richards)

209.     The preceding paragraphs and information in this Complaint is incorporated herein.

210.     On March 6, 2020, Richards sent to Goode and his counsel an email threatening to approach friends, family, business associates and his followers to disclose information (some true, some false) that would be egregiously harmful to Mr. Goode, his family and his business.

FIRST VERIFIED COMPLAINT – Goode v Richards, Kennedy and Youngblood          36

211.     This information did, in part, necessitate my filing of the instant and include lawsuit.

212.     Mr. Goode requests this honorable Court hereby specifically issue a preliminary injunction barring Richards from doing the above-described acts.[4]

## CONCLUSION AND PRAYER FOR RELIEF

CONSIDERING THE HEREIN DESCRIBED, GES and Mr. Goode pray this Court consider the facts allegations contained hereby:

A. An injunction against, specifically, Mr. Roger Richards against carrying out any of the above-described items that he threatened to undertake through an email communication sent by himself on March 6, 2020;

B. Enter judgment against Defendants for all aforementioned claims;

C. Enter an injunction barring Defendants from any and all of the aforementioned harmful conduct;

D. Ordering an accounting of all bank and financial accounts at issue;

E. Find that all individual Defendants are liable individually for their transgressions;

F. Order Defendants to pay all actual damages suffered by Goode as a result of Defendants' fraudulent and harmful activities;

G. Order Defendants to give Goode all right and title to any materials at issue;

H. Order Defendants to pay for additional damages Goode has and will incur from reliance on Defendants' false representations;

---

[4] Mr. Goode can provide a copy of the email to this Court should it desire, to be filed under seal and/or inspected in camera.

I.   Grant Goode special damages, due to the willful, reckless, wanton, egregious, unfair, unethical, deceptive and unscrupulous conduct of Defendants;

J.   Engaging in any other activity constituting unfair competition with Goode, or acts and practices that deceive consumers, the public, and/or trade, including without limitation, the use of designations and design elements associated with Goode;

K.   Grant Goode an award of attorneys' fees;

L.   And grant Goode all monetary and other relief available at law and in equity.

Date: April 3, 2020.                    Respectfully submitted,

Valerie Yanaros, Esq.
Texas Bar No. 24075628
Admitted to Practice in the District
Court of Colorado
Yanaros Law, P.C.
5057 Keller Springs Rd, Suite 300
Addison, TX, 75001
Telephone: (512) 826-7553
valerie@yanaroslaw.com

**ATTORNEY FOR PLAINTIFFS**

## **VERIFICATION**

I, James Corey Goode, declare as follows:

1.  I am a Plaintiff in the present case and the Owner of Goode Enterprise Solutions.

2.  I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Injunctive Relief, and if called on to testify I would competently testify as to the matters stated herein.

3.  I have personal knowledge of Roger Richards, his actions to extort and harm myself and my business, including those set out in the foregoing Verified Complaint for Declaratory and Injunctive Relief, and if called on to testify I would competently testify as to the matters stated herein.

4.  I have documentary evidence that, if this honorable Court so desires, I can submit to be filed under seal and/or in camera review by this Court that consists of the email from Roger Richards wherein he threatens to approach friends, family, business associates and my followers and disclose information (some true, some false) that would be egregiously harmful to myself, my family and my business. This information did, in part, necessitate my filing of the instant and include lawsuit.

5.  I verify under penalty under the laws of the United States of America that the factual statements in this Complaint concerning myself, my activities, and my intentions are true and correct.

Signed this day, April 3, 2020:

_____

Mr. James Corey Goode, Owner of Goode Enterprise Solutions