## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| JAMES COREY GOODE, individually, | § | |
| and GOODE ENTERPRISE SOLUTIONS | § | |
| INC. | § | |
|     Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 1:20-cv-00947-DDD |
|     v | § | |
| | § | |
| ROGER RICHARDS RAMSAUR, | § | JURY TRIAL DEMANDED |
| LEON ISAAC KENNEDY, | § | |
| and ADRIENNE YOUNGBLOOD | § | |
|     Defendants. | § | |

## SECOND AMENDED COMPLAINT

**COMES NOW**, Mr. James Corey Goode ("Mr. Goode") and Goode Enterprise Solutions, Inc. ("GES", collectively "Goode") for their claims against defendants Roger Richards aka Roger Ramsaur ("Richards"), Leon Isaac Kennedy ("Kennedy"), and Adrienne Youngblood ("Youngblood") (each a "Defendant" and collectively, "Defendants"), and respectfully prays and alleges as follows:

## INTRODUCTION

Underlying this lawsuit are years of trust that were built between Mr. Goode and each one of the Defendants. It is not a suit brought lightly, but after much attempted engagement on the side of Plaintiffs and their counsel in an attempt to protect Goode's business associates and investors as well as his brand and name. These attempts to settle the disputes were unfortunately met with threats of extortion and personal and business-related counterattacks by the Defendants through various channels. The professional and personal relationships that were built between Mr. Goode and Mr. Richards, Mr. Kennedy and Ms. Youngblood were cast aside by Defendants due to greed

SECOND AMENDED COMPLAINT – Goode v Richards, Kennedy and Youngblood      1

and in an attempt to cover up shoddy, careless and—in some circumstances—downright fraudulent business practices through their own actions.

## NATURE OF THE ACTION

1.   This is an action at law and in equity against Defendants for various claims of breach of fiduciary duty, embezzlement, trademark infringement, counterfeiting, unfair competition, breaches of contract, fraudulent misrepresentation, and tortious interference arising from a desire to steal from, convert, and embezzle property and monetary gain from, as well as tarnish and misappropriate the character, goodwill and work of Mr. James Corey Goode ("Mr. Goode") and that of his company, GES.

2.   Mr. Goode is a Colorado resident of Broomfield, Colorado having a business address of 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020. Mr. Goode is an educational and motivational speaker, influencer, author and media figure and is well-known and respected in the Conscious Community.[1]

3.   GES is a Colorado corporation based out of Broomfield, Colorado and formed by Mr. Goode and his wife, Stacy Renee Goode ("Mrs. Goode"). GES produces educational, spiritual, health and entertainment goods and services geared towards the Conscious Community. GES' address is 1140 US Highway 287 Suite 400-266, Broomfield, Colorado, 80020.

---

[1] The "Conscious Community" is a group of people focused on bettering and furthering their research and experiences in topics such as spirituality, health, wellness, the cosmic and metaphysical. *See* http://consciouscommunitymagazine.com/ [last accessed March 17, 2020] for an example of a publication catered to the Conscious Community.

SECOND AMENDED COMPLAINT – Goode v Richards, Kennedy and Youngblood          2

4.   Upon information and belief Richards is an Oregon resident that may be served at his place of residence at 900 Northeast 81st Avenue, Unit 102, Portland, Oregon 97213, or wherever he may be found.

5.   Upon information and belief, Kennedy is a California resident and may be served at his place of residence at 10587 Cushdon Avenue, Los Angeles, California 90064 or wherever he may be found.

6.   Upon information and belief, Youngblood is a California resident and may be served at her residence at 2036 Nevada City Hwy. #305 Grass Valley, California 95959 or place of business at 227 Prospect Street, Oak View, California 93022.

## JURISDICTION AND VENUE

7.   Goode files this action against Defendants for claims arising under the Lanham Act, 15 U.S.C. 1143(a) et seq. (the "Lanham Act") thus granting this Court federal question jurisdiction under 28 U.S.C. §§1331 and 1338.

8.   This Court also has jurisdiction over this matter under 28 U.S.C. §§1337 because the parties are diverse and the amount in controversy is over $11,000,000.00—well over the jurisdictional limit.

9.   This Court may exercise supplemental jurisdiction over Goode's common law and state law claims of defamation, deceptive trade practices, breaches of contract, promissory estoppel, misrepresentation and tortious interference pursuant to 28 U.S.C. §§1367 because these claims are

so related to the claims within the Court's original jurisdiction, they form part of the same case or controversy under Article 3 of the U.S. Constitution.

10. This Court has personal jurisdiction over Defendants because they have availed themselves of the benefits and protections of this District and have substantial contacts with this forum through business activities such as hosting and attending conferences, making and performing under contracts, specifically directing business activities at this forum, and otherwise.

11. Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this District. Further, the property and financial institutions connected to the action reside in this District.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

12. Mr. Goode is a motivational speaker, influencer, author, producer and public figure. Since about 2014, Mr. Goode has been publicly sharing the story of his life experiences to the world and garnering the attention of scientists, researchers and media personalities across the globe. Mr. Goode professes a message of light and love for everyone and encourages others to focus on living a life of service to others and raising their consciousness of the world around us.

13. Mr. Goode's charisma and positivity attracts a following that spans the spectrum of race, religion and nationality. For the most part, those that follow his journey are of the same mindset: that we should all, as a whole, lift each other up and be kind and loving towards one another. The

Defendants named in this action profess—or, at one time, *did* profess—the same or similar messages.

14. The above-described messages and belief in love and light are qualities that Defendants sought to take advantage of Mr. Goode's easygoing and trusting nature in order to capitalize on the business, following and brand that he built.

15. GES was formed by Mr. Goode and holds all right, title and interest to the intellectual property ("IP") and goodwill that he formed and developed in addition to other work and projects he undertakes, including classes, movies, comic books and other goods and services tied to his branding and story.

<u>**The Beginning: Mr. Goode Comes Forward with His Experiences Tied to the Secret Space Program**</u>

16. When Mr. Goode first came forward with his stories and experiences as a government insider it was not as a person in the spotlight—in fact, it was his intention to stay "under the radar" but to get his experiences and information out to researchers and scientists in order to promote an understanding of the greater picture and the worlds existing beyond those that we know on a day-to-day basis.

17. Through Mr. Goode's recounting of his experiences and various events, the "Sphere Being Alliance®" ("SBA®") and its progeny came to fruition. Mr. Goode, starting as early as 2008, began to recount memories, stories and experiences involving angelic beings that he called the "Blue Avians™" that preached a love for light, inclusion and understanding of everyone and accepting of all things positive. In connection with this, he shared his story of what he termed the "20 and Back™" missions that the Secret Space Program—a top-secret military project focused

on travel beyond the confines of our Earth—undertook and developed a narrative of which the Conscious Community began to quickly take notice.

18. During the early years of Mr. Goode's public dissemination of his story and testimony, he became close friends with an author and researcher by the name of David Wilcock. The two shared their experiences, knowledge and love for advanced technologies and ancient histories alike and began to work together to bring their stories to humanity.

19. After a sudden turn of events thrust him into the forefront of the "Disclosure" movement[2], Mr. Goode garnered the attention of the movie and television network by the name of Gaia television network dedicated to programming targeted towards the Conscious Community.

**Mr. Goode's Testimony Launches the Show "Cosmic Disclosure" on Gaia**

20. In June of 2015, Gaia approached Mr. Goode and Mr. Wilcock with a proposal to star on a show premised on Mr. Goode's testimony by the name of "Cosmic Disclosure". The two agreed and the hit show took off for a roaring three-year stint that doubled Gaia's worth and brought hundreds of thousands of subscribers.

---

[2] The "Disclosure" movement is a movement geared towards bringing to light covert, clandestine and possibly harmful groups and ideas that control and contort mainstream media as well as bringing to the mainstream research evidence of interstellar travel and/or extraterrestrial existence.

21. While Mr. Goode was on Cosmic Disclosure, he spoke about the testimony that he had been sharing and developing prior to his involvement with any of the Defendants regarding the Blue Avians ™, 20 and Back ™, and SBA ®.

## Mr. Goode Meets Mr. Richards

22. Mr. Goode began working with Gaia on or around 2015. Over the next few years, he continued to share his story and build his presence and brand as an influencer and leader through various speaking engagements as well as through his television appearances.

23. Mr. Goode's notoriety grew due to, and based upon, Mr. Goode's story, name, goodwill and evolving brand that he was making for himself due to his recognition in the Disclosure Community.

24. Richards met Mr. Goode through an event at which Mr. Goode appeared and spoke in Mount Shasta, California in 2016. The two formed a friendship and Richards began to volunteer with Goode on various undertakings.

25. After a short while, Mr. Goode began to trust Richards, and because the two seemed to work well together, introduced Mr. Richards to various people at Gaia. Indeed, after a short while Richards had introduced himself to Ms. Goode and formed a bond with the Goode family and Mr. Goode's colleagues that quickly put him in a position as Mr. Goode's "right-hand man".

26. Mr. Goode and his family grew to trust Richards in a deep way, even welcoming him to live with them at their house in Broomfield, Colorado for extended amounts of time.

SECOND AMENDED COMPLAINT – Goode v Richards, Kennedy and Youngblood          7

27. Mr. Richards often worked in Colorado with Mr. Goode, Gaia and others in Colorado on projects such as CD and some of the conferences that he attended with Mr. Goode.

28. Mr. Goode was able to secure Richards a role as a writer for CD, a role that Richards fulfilled until Gaia received word that Mr. Goode had intentions not to renew his talent contract with Gaia.

29. Gaia ceased its contract with Richards on or around early 2018 due to Mr. Goode's departure as talent for CD, a move that both Richards and Mr. Goode agreed was the "right thing to do" due to hostile work environment issues.

## Mr. Goode Files to Protect His Trademarks

30. Just prior to Mr. Goode's departure from CD, he decided to make the wise business decision to protect his independent branding by filing for various federal trademarks with the United States Patent and Trademark Office ("USPTO").

31. Mr. Goode had worked autonomously on print, clothing and media goods and services tied to his arbitrary, protected phrases: Blue Avians ™, 20 and Back ™, Sphere Being Alliance ® and SBA® (the "SBA Marks"). The SBA Marks have acquired worldwide recognition and secondary meaning.

32. One of the goods Mr. Goode had created at that time was a graphic novel (or comic book, hereafter the "Graphic Novel") about his story and journey.

33. Mr. Richards was involved in the filing of the trademarks and in the production of the goods and services connected therewith, but because he had not been involved in the creation of them, did not have any ownership interests in the trademarks.

34. GES is the owner of the federal trademarks for which it filed in early 2018, as well as any and all subsequently filed trademarks.

35. Goode filed for Federal Trademark Registrations for BLUE AVIANS (Application No. 87821423), 20 AND BACK (Application No. 87821401), SPHERE BEING ALLIANCE (Application No. 87821504), and SBA (Application No. 87821495) in March of 2018.

36. Goode was granted federal trademark registrations for SBA® and SPHERE BEING ALLIANCE ® in November of 2018 and April of 2019, respectively. (*See* Exhibit A).

37. After BLUE AVIANS and 20 AND BACK were published for opposition, Gaia instituted proceedings with the Trademark Trial and Appeal Board ("TTAB") against the claimed marks despite Mr. Goode having sent various Cease and Desist and Demand Letters to Gaia instructing them to cease use of his protected phrases (as further explained below).

38. Richards assisted GES' counsel in the drafting of the aforementioned Cease and Desist Demand Letters in an effort to protect GES' interests in those trademarks.

39. Richards has disclaimed any and all (alleged) rights to any of the IP created by Goode. For example, in an email from Richards to Goode in early 2019, he stated:

"I will be stepping down and away from all things SBA related [sic] permanently from here on out. I gift with gratitude all my work on the SBA slate for Tracy, Above Majestic Sequels, the Graphic Novel, SBA events, and The SSP Book to you Corey [sic]. You are free to develop as you wish and reap the rewards as you wish, they are yours now."

40. For all relevant times (up until recently), Richards has acknowledged, supported, and helped enforce ownership rights belonging to GES.

**Richards Assists Mr. Goode and GES in Protecting their IP**

41. Just prior to Mr. Goode's departure from Gaia and CD, Gaia hired additional talent to take over Mr. Goode's role on the show.  Individuals like Jason Rice, Emery Smith and others appeared on CD and, to Mr. Goode's shock and dismay, proceeded to use Goode's protected phrases and testimony that copied his.

42. Richards stepped up, as he often did, to aid Mr. Goode in protecting his IP and brand.

43. In response, and in an attempt to prevent any dilution and tarnishment of his branding and goodwill, Goode sent out multiple Cease and Desist letters to Gaia and the talent that was appearing on Gaia utilizing Goode's protected IP. In response, Gaia's attorneys and talent (in an attempt to turn the Conscious Community against Goode) launched an attack on Mr. Goode for attempting to protect his business assets.

44. Again, as usual, Richards was right by Mr. Goode's side to defend against any defamatory allegations that Gaia or its associates had made against Goode.

45. In fact, Richards put together a lengthy "open letter" and video about "who he is and where he came from" accessible at https://www.facebook.com/FDN.DIRECTOR/videos/348105275592596 (last accessed April 1, 2020, hereafter "Richards' Open Letter Video").

46. In that letter, Richards admitted that the Graphic Novel was not his, but Mr. Goode's creation:

The idea of doing a Graphic Novel based on Coreys testimony was not my idea. I was asked to help organize the artist volunteers interested in participating. I saw a beautiful opportunity come together to share in the creation of art while also getting the message out there. In the time I have been asked to help organize these volunteers I have spent hours getting to know them, working with them, being humbled by their talents and honored to help. These are women and men from all over the world ranging in age from their early 20's to late 60's.
Again the notion that this group is behind some sinister plan is nothing short of a tabloid story. These are some of the most amazing people I have had the pleasure of knowing in my life.

In the past year I have spent time getting incredibly close to Corey. I have found him to be honest, shy, sincere, awkward, direct, humorous, impatient and undoubtedly human. Regarding his testimony I have seen no evidence that has lead me to feel he is being dishonest, in fact to the contrary I am continually amazed at the moments that lead me to feel he is telling the truth as he knows it? I cant explain this nor will I try. I will say that Coreys testimony triggers alot of people in this community, it calls into question their own belief systems at times and can come with an uneasy feeling. I would ask that if you have resistance to Coreys testimony it may be beneficial to look at why? What is being triggered there. If you really just felt like he was full of it why would you give him so much attention? What crusade of your own beliefs are you trying to run under the guise of "saving people" from Coreys "Agenda". If you dont like bananas dont eat them, what gives you the right to go around on an anti banana campaign? Dont give me the line either that your trying to save people from the "Banana agenda", people have the right to decide on their own, your not saving anyone, your just trying to get everyone to believe bananas taste terrible.

*Id*.

47. Additionally, Richards recounted the great joy he received from working with Mr. Goode and went to great lengths to show his support the cause they both loved so dearly.

48. Throughout their time working together, Goode and Richards entered into numerous written and verbal agreements together, wherein Richards agreed to perform certain duties or work for Goode and Goode either paid Richards in cash and/or ownership interest in various entities and/or projects (e.g., an entity called "SBA Media Enterprise, LLC" hereafter "SBA Media") for his performance of certain duties or work.

49. SBA Media was set up to handle all business dealings tied to the Graphic Novel. Richards, and later Kennedy, were entrusted with the oversight and management of the production and distribution of the Graphic Novel, which was set to be finished and distributed in 2018.

50. Due to various setbacks under Richards', and later Kennedy's, management of the Graphic Novel project, which Goode discovered later was in part because of funding issues created by Richards using Graphic Novel funds to fund other projects of his own choosing, the Graphic Novel's release was pushed to 2019.

51. After terminating the business relationship with Goode, Richards made claims to various individuals accusing Mr. Goode of fraudulent business practices both in person and through various social media platforms.

## **Enter Leon Isaac Kennedy**

52. On or around July of 2018, Mr. Goode met Mr. Leon Kennedy through Mr. Wilcock. Kennedy purported to be Mr. Wilcock's "manager" and insisted on taking over any communications between the two regarding any ongoing, past or potential business deals.

53. Kennedy began to insert himself into Goode's business dealings as well, and specifically positioned himself as the point of contact for anyone who was in an advisory position with Mr. Goode.

54. Kennedy also inserted himself into the position of correspondent between Mr. Goode, Mrs. Goode (and, by virtue of both of their involvement and because of the nature of the issues, GES), Richards and any investor, advisor, or business contact that existed at that time or in the future.

55. Kennedy cautioned Goode against any involvement of financial advisors, legal counsel, or other business advisor, promising that he in fact had the experience and knowledge to supplant all of the aforementioned. Through this act, Kennedy placed himself as a fiduciary to Goode by inviting Goode to place his trust in him for his advice and counsel on business matters. Goode trusted Kennedy's guidance and advice.

56. Specifically, with regard to Goode's IP strategy that had been meticulously planned out and executed, Kennedy insisted on abandoning any type of legal or court-involvement with respect to protecting Mr. Goode's brand and IP. As such, Goode engaged in certain business deals and relationships that harmed him for lack of protection in said contracts related to Goode's IP.

57. In fact, Mr. Goode—on several occasions—begged Kennedy to seek the advice of attorneys and accountants and was always told by Kennedy "we are not ready for accountants" and "attorneys ruin everything". Because competent legal and financial advice was supplanted by Kennedy's advice to disregard both, Goode has been harmed financially and legally through business deals with various media outlets.

58. Mr. Goode, at the time relying on Kennedy's claimed knowledge and experience, followed Kennedy's statements and advice.

59. Mr. Goode, Mrs. Goode, GES, and Richards as well as GES' investors came to place their trust in Kennedy, handing over the reins to any financial entities and any contract negotiations in reliance on his representations.

60. Specifically, Kennedy came to be the point of contact between Goode and The Orchard (now known as "1091")—a production company that signed a sizable contract with Mr. Goode tied to a movies that he had directed, produced and starred in titled "Above Majestic" and "Cosmic Secret".

### The Graphic Novel, Above Majestic and Cosmic Secret

61. Mr. Goode and Mr. Wilcock hired a group of talent (the "Media Team") headed up by Richards to work on the Graphic Novel, Above Majestic and Cosmic Secret.

62. Countless hours of writing, production and editing went into Above Majestic, Cosmic Secret and the Graphic Novel by Mr. Goode, Mr. Wilcock, Richards and the Media team.

63. All of the Media Team, including Richards, were compensated for their time.

64. Even Kennedy—once he was brought on, not long after Above Majestic was finalized and licensed to the Orchard/1091—was drawing a sizable sum for his role as "manager" in discussions with the Orchard/1091, Netflix and other companies that took an interest in the various projects stemming from Goode's IP.

65. At one point during the beginning of production of Above Majestic, Mr. Goode, Mr. Wilcock, Richards, and various other contributors of time, sweat and/or money all agreed to a percentage distribution for each once Above Majestic began to bring in revenue.

66. Mr. Kennedy, who fit himself into the team after Above Majestic had been finalized and licensed to the Orchard, made sure to include himself on any and all distributions of projects coming from Goode's IP, including—but not limited to—Cosmic Secret, Above Majestic and the Graphic Novel.

67. Concurrently, the Graphic Novel was in production.  Mr. Goode was responsible for—like with Above Majestic—guiding the expression of the story, the creation of the characters, the production of the drawings, and the majority of the "creative" aspects of the Graphic Novel.

68. During this time, Mr. Goode was not receiving compensation for his work and creation, but was, like most producers and directors, investing sweat equity into his IP and paying the Media Team and its heads for their work…all while continuing his speaking appearances and other engagements.

69. At one point, Kennedy and Richards agreed to take over the finalization of the Graphic Novel and Above Majestic—this included the management (or, rather, mismanagement) of the funding.

70. Above Majestic was released, but the Graphic Novel still remains to be finalized.

71. Richards was in charge of the money that was coming in from presales of the Graphic Novel and investors so that the projects could be finished.

72. Kennedy was involved in the management of the finances for Cosmic Secret. He was also involved in the distributions for the royalties from Above Majestic.

73. On information and belief, Kennedy and Richards used that power over the finances in order to embezzle funds for their own use.

74. Additionally, Kennedy used his connection (that was established through Goode via his somewhat self-delegated duty) to manage funds and finances with the Orchard to swindle funds from Goode and the investors to the tune of hundreds of thousands of dollars.

75. While Richards and Kennedy were turning the Graphic Novel into a complete logistical catastrophe, Mr. Goode and Mr. Wilcock had begun work on Cosmic Secret, in addition to working on the conferences that they had put together—including Dimensions of Disclosure.

76. Goode created the outline for Cosmic Secret around his own IP, Kennedy then took that outline and gave it to Richards. Richards subsequently claimed that Richards directed Cosmic Secret when the agreement actually was that Goode and Richards were co-directors.

77. Additionally, Richards misrepresented the contents of a contract for a movie deal he was negotiating on behalf of Goode and inserted himself—secretly—as IP owner.

78. Because of Richards' and Kennedy's mismanagement of Graphic Novel funds and abrupt departure from the working relationship between themselves and Corey, the Graphic Novel has yet to be finished or distributed, and Goode is now having to make reparations for the indiscretions by Richards by funding and managing the project on his own accord.

79. Goode has suffered monetary harm due to Richards' and Kennedy's mismanagement of the Graphic Novel project, specifically he has had to invest tens of thousands of dollars into finishing the Graphic Novel. Additionally, Goode has received hundreds of emails from individuals who purchased the Graphic Novel (and as explained below, the Above Majestic film) from Richards but never received a working copy, some received nothing at all.

80. Goode has also suffered harm to his goodwill and branding due to the issues related to the Graphic Novel.

81. Richards and Kennedy held fiduciary duties to Goode and SBA Media because they acted in a role created through trust and confidence, namely because they were in charge of the management and control of certain projects and entities through such activities as setting up said entities, managing finances and accounts and maintaining confidential information all for the benefit of Goode. Richards and Kennedy agreed to do so in exchange for valuable consideration such as pay, royalties and/or ownership interests.

82. Richards and Kennedy breached their fiduciary duties to Goode, SBA Media, and other entities owned by Goode because they failed to perform certain duties. Specifically, with regard to the Graphic Novel, he has not delivered on his promises to not only deliver Graphic Novels to those who ordered them, but to deliver them with additional merchandise.

83. In every aforementioned occasion, Richards and Kennedy deceived Goode until the last possible minute.

**Dimensions of Disclosure and Adrienne Youngblood**

84. Mr. Goode had met Youngblood back in 2017 at a conference for the Disclosure Community, and he and Mrs. Goode had developed a friendship and trust with her.

85. Youngblood owns a farm upon which she grows cannabis and had planned to start growing hemp.

86. Mr. and Mrs. Goode invested $15,000.00 with Ms. Youngblood into that hemp project.

87. Youngblood built three greenhouses and bought the plants with the money the Goodes supplied. Youngblood and Richards withheld any info about the status of the crops.

88. Between 2017 and 2018, Mr. Goode and Youngblood began to plan a conference that they would host and would take place in Loveland, Colorado called "Dimensions of Disclosure" ("DoD").

89. Throughout their time working together on DoD, Goode and Youngblood entered into numerous written and verbal agreements together tied to DoD wherein Goode and Youngblood each held a fifty (50) percent interest in DoD as well as other agreements related to distributions of compensation received.

90. Later, Richards and Youngblood told the Goodes at DoD that the whole hemp crop in which they invested died of a disease.[3]

---

[3] An expert later told the Goodes that a crop separated in three greenhouses should not share the same disease if separated properly and that no crop is a total loss due to disease, there is just a reduction in yield.

91. Youngblood never showed any evidence of this disease to Mr. or Mrs. Goode, nor has she returned the $15,000.00 to the Goodes.

92. Mr. Goode supplied most of the planning and infrastructure for DoD in 2018 and the following year in 2019. Both events saw great success and the DoD conference in 2019, held in California, sold out.

93. The DoD conferences pulled in close to $1,000,000.00 (one million dollars).

94. Mr. Goode never received the compensation that he should have received, nor has Youngblood ever shown him an accounting of the monies that were brought in by either DoD conference.

95. Mr. Goode should have received at the very absolute least $100,000.00 for the DoD conferences that he held. He did not receive anywhere near that. Had the DoD conferences gone forward on a yearly basis, they most likely would have continued for at least five to ten years.

96. To add insult to injury, Youngblood filed for a Trademark on DoD (the "DoD Mark") without any notice to Mr. Goode. (Exhibit B).

97. In that application, Youngblood signed a declaration that she is the only person with any right, title or interest to the DoD Mark.

98. Youngblood is not the only person with right, title or interest in the DoD Mark—Goode owns significant rights to the DoD Mark.

99. Youngblood's application for the DoD Mark is fraudulent because she knew that Goode owned right, title and interest to the mark but she did not apprise the USPTO of such.

100.     Since Youngblood's filing of the DoD Mark, Goode has attempted to engage in settlement discussions in order to set the matter right and make it so that DoD can continue to take place and bring in revenue.

101.     Counsel for Goode has spent dozens of hours negotiating the settlement only to have Youngblood renege on the settlement at the very last minute.

### Kennedy, Youngblood and Richards' Commingling of Funds, Tarnishment, Defamation and Extortion

102.     On information and belief, Kennedy and Richards have commingled funds meant to be separated for Above Majestic, the Graphic Novel, and Cosmic Secret.

103.     Kennedy and Richards have done this intentionally.

104.     Kennedy and/or Richards have engaged in shoddy management of sending the DVD's for Above Majestic and Cosmic Secret (Exhibit C) as well as management of various websites connected to any of the herein-described projects (Exhibit D).

105.     This shoddy management has tarnished Goode's name, branding and IP and caused them financial damages to the tune of millions of dollars.

106.     In retaliation to Mr. Goode asking for things such as accounting of the herein-described projects, Youngblood, Kennedy and Richards have engaged in defaming activities against Goode and his associates.

107.     Specifically, all three Defendants have made claims against Mr. Goode that accuse him of crimes such as fraud and improperly disseminating others' information. All three Defendants have made these claims in person to acquaintances of Mr. and Mrs. Goode as well as through Social Media postings and public forums.

108.     Additionally, Kennedy and Richards have sent emails containing threats that amount to extortion to Goode, his associates and counsel.

109.     This extortion demands hundreds of thousands of dollars from Mr. Goode. If he does not comply, Kennedy and Richards have threatened to testify falsely against him for Gaia in an ongoing business dispute between Goode and Gaia. Additionally, they have threatened to give information and misinformation to Vice Magazine in an attempt to tarnish his name and harm Mr. Goode's business, reputation and relationships with his family, friends and followers.

110.     Kennedy and Richards continue to use Goode's protected "SBA®" and "Sphere Being Alliance ®" trademarks and pending "Blue Avians ™" and "20 and Back ™" trademarks although they are no longer in a business relationship Goode and therefor are not authorized to do so.

111.     For example, when Kennedy and Richards send out DVDs to customers and followers of Goode that have purchased his "Above Majestic" movie they do so by using "SBA®" in their email address and mailing address.

112.     The shoddy quality of these packages that are sent out bearing Goode's IP, branding, trademarks and name have tarnished and harmed Goode's goodwill and image.

113.     Kennedy, Richards and Youngblood owe money to Goode that they have refused to pay back for various investments and mismanagement of funds.

114.     Upon information and belief, Defendants have gone behind Goode's back to various entities and individuals to defame and tarnish his name, branding and goodwill by making false accusations against him and disseminating confidential information they learned from working with Goode.

115.     The nefarious activities of each individual Defendant have taken a toll on Goode. Goode has for over a year tried every avenue to make things right outside of litigation, but has been forced to bring the issues in front of a tribunal that can hopefully lend some guidance.

### I.     Claim I: FEDERAL TRADEMARK INFRINGEMENT (Under 15 U.S.C. §§ 1114 and 1125(a))
(All Defendants)

116.     Goode incorporates by reference the allegations in paragraphs 1-115.

117.     GES is the owner of the valid and subsisting federal trademark registrations for the SPHERE BEING ALLIANCE® and SBA®, the federal registration documents attached hereto as "Exhibit A".

118.     GES is also the common law marks 20 AND BACK™ and BLUE AVIANS™, currently the subject of oppositions with the TTAB but have been stayed pending the determination of this action.

119.     Goode also holds common law rights in the "DIMENSIONS OF DISCLOSURE" mark, as discussed above.

120.     GES' paper, clothing and educational and entertainment goods and services are marketed and sold throughout the United States and globally. In offering and selling its products GES uses the marks SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ (the "GES Marks").

121.     GES has invested tremendous time, effort and financial resources in developing and promoting its products and services bearing the SPHERE BEING ALLIANCE ®, SBA®, 20 AND BACK ™ and BLUE AVIANS ™ marks (the "GES Goods and Services") with the marketing and sale of GES' goods in interstate commerce. The GES Marks have become, through widespread and favorable industry acceptance and recognition, an asset of substantial value symbolizing GES, its quality products and services and its goodwill.

122.     Consumers of paper, clothing and educational and entertainment goods and services in the Conscious community recognize the GES Marks as a source indicator for Goode.

123.     As evidenced by the valid and subsisting trademark registrations, the SPHERE BEING ALLIANCE ® and the SBA ® (the "SBA Marks") are inherently distinctive. The marks 20 AND BACK ™ and BLUE AVIANS™ (the "Pending GES Marks") are also inherently distinctive and entitled to trademark protection under the Lanham Act.

124.     As explained above, Defendants Richards and Kennedy wrongfully and illegally made use of GES Marks by wrongfully and illegally continuing to use the GES marks even though

they are no longer affiliated with Mr. Goode or GES. These activities were carried out without GES' or Mr. Goode's consent or knowledge up until the recent discovery of such activities.

125.     Similarly, Defendant Youngblood is wrongfully and illegally making use of the DIMENSIONS OF DISCLOSURE mark (the "DoD Mark") by failing to disclose to the USPTO that Goode owns a partial interest in the mark.

126.     For all relevant time periods, Richards knew and recognized the strength of Goode's brand and IP. In fact, he helped enforce Goode's IP rights up and until his separation from Goode's business.

127.     For all relevant time periods, Kennedy and Youngblood knew and recognized the strength of Goode's brand and IP. In fact, both profited off of the fame and notoriety that Goode's IP and branding had garnered throughout the United States and worldwide.

128.     Defendants Richards and Kennedy send existing and prospective Goode customers numerous emails and social media messages and marketing which represented that their products or services were offered under GES Marks when in fact they are not. These activities continue today.

129.     The wrongful and illegal attribution of the GES Marks with Defendants Richards and Kennedy and the DoD Mark with Defendant Youngblood have created a likelihood that consumers will be confused or deceived as to the source of the parties' products and any quality assurance with resulting substantial and irreparable harm to GES' Marks, reputation, and goodwill residing therein.

130.     Defendants' actions are knowing, intentional, willful, and carried out with clear intent to trade on the reputation and goodwill associated with GES' business and the GES and DoD Marks.

131.     Defendants' actions are knowing, intentional, willful, and carried out with clear intent to divert and harm Goode's business and convert the reputation and goodwill associated with Goode's names and GES' Marks.

132.     Defendants' have caused and are likely to continue to cause substantial injury to Goode's names and GES Marks, and are entitled to injunctive relief, recovery of Defendants' profits, GES' damages, enhanced damages, costs and reasonable attorney fees.

## II.     Claim II: False Designation of Origin and Federal Unfair Competition under 15 U.S.C. § 1125
(All Defendants)

133.     Goode incorporates by reference the allegations in paragraphs 1-132.

134.     As explained above, all three Defendants are involved in the Conscious Community entertainment market and thus compete with Goode for the same entertainment goods and services such as movies, graphic novels and conferences. All three Defendants have used Goode's various marks to derail monetary gain from Goode by using the GES Marks and/or the DoD Mark.

135.     Specifically, Youngblood has diverted funds owed to Goode for DoD through use of the mark and lack of attribution to Goode. Goode has been harmed to the tune of hundreds of thousands of dollars of lost revenue, both past and future.

136.     Similarly, Richards and Kennedy are both in the entertainment market and have used the GES Marks to sell movies and/or graphic novels. Goode has been harmed to the tune of tens of thousands of dollars in lost revenue as well as out of pocket costs to right the issues caused by Richards' and Kennedy's mismanagement of the Graphic Novel and Above Majestic projects.

137.     Defendants' made repeated representations about the source, origin, and nature of Defendants' products that have created the false and misleading impression that Defendants' goods or services are manufactured by Goode, affiliated with Goode, connected or associated with Goode, and/or endorsed, controlled, or approved by Goode when, in fact, they are not.

138.     Defendants' have made false representations, false descriptions, and false designations of origin regarding Defendants and Defendants' goods or services in violation of 15 U.S.C. § 1125(a), and such activities have caused, and unless enjoined, will continue to cause a likelihood of confusion and deception of members of the trade and the public and, additionally, injury and harm to GES' goodwill and reputation.

139.     Defendants' have caused and are likely to continue to cause substantial injury to the public and to Goode, for which Goode is entitled to obtain injunctive relief and to recover profits, actual damages, enhanced damages, and other damages as may be provided by statute. The knowing, willful, and continuing nature of Defendants' conduct makes this an exceptional case for which GES is entitled to recover its costs and reasonable attorney fees.

### III.   Claim III: Trademark Counterfeiting — 15 U.S.C. § 1114
### (Richards and Kennedy)

140.     Goode incorporates by reference the allegations in paragraphs 1-139.

141.     The registrations embodying the SBA® and SPHERE BEING ALLIANCE® trademarks are in full force and effect and are entitled to protection under both federal law and common law.

142.     Defendants Richards and Kennedy, without authorization from Goode, have used and are continuing to use spurious designations that are identical to, or substantially indistinguishable from, the SBA® and SPHERE BEING ALLIANCE® trademarks in interstate commerce.

143.     The foregoing acts of Defendants Richards and Kennedy are intended to cause, have caused, and are likely to continue to cause confusion and to deceive consumers, the public, and the trade into believing that Defendants' aforementioned counterfeit products (the "Counterfeit Products") are genuine or authorized products of Goode.

144.     Defendants Richards and Kennedy have acted with knowledge of Goode's ownership of its marks at issue in this case and have acted with deliberate intention or reckless disregard to unfairly benefit from the incalculable goodwill inherent in Goode's claimed marks.

145.     Defendants Richards' and Kennedy's acts constitute trademark counterfeiting in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114).

146.     Upon information and belief, Defendants Richards and Kennedy have made and will continue to make substantial profits and gains to which they are not in law or equity entitled.

147.     Upon information and belief, Defendants Richards and Kennedy will continue their infringing acts, unless restrained by this Court.

148.     Defendants Richards and Kennedy's acts have damaged and will continue to damage Goode, and Goode has no adequate remedy at law.

149.     In light of the foregoing, Goode is entitled to and demands injunctive relief prohibiting Defendants Richards and Kennedy from using the Goode Trademarks or any marks identical, substantially indistinguishable, and/or confusingly similar thereto for any purpose, and to recover from Defendants all damages, including attorneys' fees, that Goode has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a), attorneys' fees and treble damages pursuant to 15 U.S.C. § 1117(b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

IV.     **Claim IV: Colorado Common Law Trademark and Trade Name Infringement**
(All Defendants)

150.     Goode incorporates by reference the allegations in paragraphs 1-149.

151.     As explained herein as premised upon the same facts and circumstances laid out in claims I-III, GES' Marks,  including the DOD Mark, and its associated trade names are all

trademarks and names used by Goode in connection with its goods and services, which names and marks are inherently distinctive.

152.     Defendants' unauthorized use of GES' trademarks and names for in connection with the same or similar products and services infringes upon Goode's common law trademark and trade name rights.

153.     As a result of aforementioned infringing conduct, Goode has suffered irreparable harm to its marks and the reputation and goodwill associated therewith, and will continue to suffer irreparable harm, for which there is no adequate remedy at law.

### V.     Claim IV: Colorado Common Law Unfair Competition
(All Defendants)

154.     Goode incorporates by reference the allegations in paragraphs 1-153.

155.     As its fourth grounds for relief, Goode asserts violation of Colorado common law unfair competition premised upon the same facts and circumstances laid out in claims I-III.

156.     As explained herein, Defendants have made unauthorized and infringing use of Goode's trademarks and trade names, wrongfully and illegally took control of Goode's content causing Goode's information and favorable social media content to be associated with Defendants', clearly intending to benefit from the reputation and goodwill residing in Goode's, utilized Defendants' position as advisor and/or colleague to gain access to Goode's existing and prospective customers with the intent of and undertaking actions and deceptive communications to create confusion and misperception and thereby diverting their business to Defendants.

157.     Defendants' conduct as described above has led to confusion and deception of consumers with regard to the identity of the parties and the products offered by them.

158.     Defendants have, or have sought to, pass off their goods as those of Defendants' by virtue of use of Goode's trademarks and trade names, leading to actual confusion on the part of the consumer.

159.     Defendants have misappropriated and exploited Goode's business values.

160.     Goode has no adequate remedy at law for the damages caused by Defendants and their common law unfair competition, conduct and activities, and Goode has been irreparably damaged thereby.

## VI.     Claim V: Colorado Consumer Protection Act
### (All Defendants)

161.     Goode incorporates by reference the allegations in paragraphs 1-160.

162.     Defendants engaged in deceptive trade practices in the course of business in violation of C.R.S. § 6-1-105 and otherwise in violation of Colorado law. Specifically, this was accomplished through Youngblood's misattribution of the DOD mark in connection with conferences and through Richards and Kennedy's misuse of the GES marks in connection with entertainment services and products such as DVDs. In both instances consumers believed they

were purchasing an entertainment good or service stemming from, approved by, or affiliated with Goode due to Defendants' misrepresentations.

163.     Without limiting the generality of the foregoing paragraph, Defendants knowingly: (a) sought to pass off Defendants' products and/or services as being Goode products or otherwise affiliated with, controlled or approved by Goode; (b) made false representations attributing the source, sponsorship, approval, or certification of Defendants' goods and/or services to Goode; and (c) made false representations that Defendants and Defendants' goods and/or services are affiliated, connected, associated with, or certified by Goode.

164.     Defendants' deceptive trade practices occurred in the course of their occupation and business.

165.     Defendants' deceptive trade practices significantly impact the consumers of paper, clothing and educational and entertainment goods and services in the Conscious community as actual or potential consumers of Defendants' products and/or services who have been deceptively led to believe that Goode and its commitment to high-quality products and services underlies the products and/or services being offered and sold by Defendants when in fact this is false; consumers acting in reliance on Goode's stellar reputation and history of quality products in dealing with Defendants are unaware of the lack of this safety net and the risk being assumed to their detriment.

166.     In the course of its business, Goode has been and will continue to be injured as a result of Defendants' deceptive trade practices.

167.     Goode has suffered and will continue to suffer injury in fact to a legally-protected interest as a result of Defendants' deceptive trade practices.

168.     Goode has suffered and will continue to suffer actual damages as a result of Defendants' deceptive trade practices. Specifically, Goode has lost hundreds of thousands of dollars through lost revenue from DoD and the Graphic Novel.

169.     Goode is entitled to injunctive relief to prohibit Defendants from continuing their deceptive trade practices pursuant to C.R.S. §§ 6-1-110(1) and 6-1-113(1).

## VII.   Claim VI: Breach of Contract
### (All Defendants)

170.     Goode incorporates by reference the allegations in paragraphs 1-169.

171.     As explained above, Goode entered into contracts with Defendants governing the terms and conditions of their ongoing business relationships each individual defendant as well as contracts with all or some of the Defendants.

172.     Defendants' contracts had various provisions that required Defendants to include Goode in business decisions, monetary disbursements, and to use good faith and fair dealing in their courses of conduct.

173.     Defendants breached those contracts by failing to adhere to those provisions relating to business decisions.

174.     Defendants further breached those contracts by failing to adhere to the compensation guidelines laid out in those contracts.

175.     Defendants further breached their contracts with Goode by acting in a manner contrary to the implied duty of good faith and fair dealing.

176.     Goode suffered damages as a result of Defendants' breaches of contract, in an amount to be proven at trial, together with restitution and disgorgement.

## VIII.   Claim XI: Slander Per Se
(Defendant Richards)

177.     Goode incorporates by reference the allegations in paragraphs 1-176.

178.     Richards made spoken statements (e.g., accusing Goode of improper business activities) purporting to be facts.

179.     These statements were published or communicated to a third person (e.g., through any of Defendant's social media accounts).

180.     Defendant did so intentionally—in fact, Richards threatened to do so prior to making such statement in an email to Mr. Goode at the beginning of this year. After Mr. Goode did not succumb to said threat, Richards followed through with said threat, necessitating the filing of the instant action.

181.     Goode suffered monetary damages because of the aforementioned defamatory statements through, e.g., loss of subscriptions to his classes and/or financial support from potential investors into certain media projects.

## IX.     Claim XII: Libel Per Se
(Defendant Richards)

182.     Goode incorporates by reference the allegations in paragraphs 1-181.

183.     Richards made a multitude of false, written statements (e.g., accusing Goode of improper business activities) purporting to be facts.

184.     These statements were published or communicated to a third person (e.g., through any of Defendants' social media accounts).

185.     Defendants did so intentionally— in fact, Richards threatened to do so prior to making such statement in an email to Mr. Goode at the beginning of this year. After Mr. Goode did not succumb to said threat, Richards followed through with said threat, necessitating the filing of the instant action.

186.     Goode suffered damages because of the aforementioned defamatory statements through, e.g., loss of subscriptions to his classes and/or financial support from potential investors into certain media projects.

### X.     Claim XIII: Tortious Interference with a Business Expectancy
(All Defendants)

187.     Goode incorporates by reference the allegations in paragraphs 1-186.

188.     Goode had a multitude of actual or prospective business contracts with the aforementioned conferences and various entertainment agencies. Specifically, with DoD and other interested business investors.

189.     Defendants knew of these actual or prospective business contracts and intentionally and improperly interfered with the performance of these contracts by instructing those in charge of implementing such contracts not to engage with Goode and/or disseminating false information to persons associated with said conferences and/or entertainment agencies with the intent of interfering with the performance of those contracts.

190.     The aforementioned interference with the aforementioned contracts resulted in monetary loss and harm and damage to Goode's reputation and goodwill.

## XI.     Claim XIV: Breach of Fiduciary Duty
### (Defendants Richards and Kennedy)

191.     Goode incorporates by reference the allegations in paragraphs 1-190 of this Complaint as fully set forth herein.

192.     Richards and Kennedy, as managers of Mr. Goode's finances and various businesses, owed fiduciary duties to Goode and should have dealt in Goode's best interests.

193.     Richards and Kennedy breached those duties by, inter alia, mishandling company funds, (on information and belief) forging documents, and engaging in business contracts meant to circumvent and/or cut out Goode entirely.

194.     Richards' and Kennedy's breaches have caused damages to Goode in an amount to be determined at trial.

## XII.     Claim XV: Embezzlement and Fraudulent Procurement of Company Funds
### (Defendants Richards and Kennedy)

195.     Goode incorporates by reference the allegations in paragraphs 1-194.

196.     Richards and Kennedy, as managers of Mr. Goode's finances and various businesses, had access to—and control over—company funds for various companies belonging to Goode.

197.    Richards and Kennedy covertly took those funds and placed them in their own accounts and the accounts of others in violation of C.R.S. §18-4-405.

198.    Richards' and Kennedy's breaches have caused damages to Goode in an amount to be determined at trial.

### XIII.   Claim XVI: Declaratory Judgments of Ownership of DoD Trademarks

(Defendant Youngblood)

199.    Goode incorporates by reference the allegations in paragraphs 1-198.

200.    Goode has suffered injury due to Youngblood's filing of the DoD Mark. Goode has not been able to license the IP that it has poured countless hours, money and effort into building because Youngblood fraudulently filed the DoD Mark and claimed it as her own.

201.    This fraudulent filing has caused Goode to lose out on licensing fees as well as further conferences.

202.    This harm is certain to be curtailed if this honorable Court determines the ownership of the DoD Mark rests with Goode.

### CONCLUSION AND PRAYER FOR RELIEF

CONSIDERING THE HEREIN DESCRIBED, GES and Mr. Goode pray this Court consider the facts allegations contained hereby:

A.   An injunction against, specifically, Mr. Roger Richards against carrying out any of the above-described items that he threatened to undertake through an email communication sent by himself on March 6, 2020;

B.   Enter judgment against Defendants for all aforementioned claims in an amount equal to or greater than $11,000,000.00;

C.   Enter an injunction barring Defendants from any and all of the aforementioned harmful conduct;

D.   Ordering an accounting of all bank and financial accounts at issue;

E.   Find that all individual Defendants are liable individually for their transgressions;

F.   Order Defendants to pay all actual damages suffered by Goode as a result of Defendants' fraudulent and harmful activities;

G.   Order Defendants to give Goode all right and title to any materials at issue;

H.   Order Defendants to pay for additional damages Goode has and will incur from reliance on Defendants' false representations;

I.   Grant Goode special damages, due to the willful, reckless, wanton, egregious, unfair, unethical, deceptive and unscrupulous conduct of Defendants;

J.   Engaging in any other activity constituting unfair competition with Goode, or acts and practices that deceive consumers, the public, and/or trade, including without limitation, the use of designations and design elements associated with Goode;

K.   Grant Goode an award of attorneys' fees;

L.   And grant Goode all monetary and other relief available at law and in equity.

Date: September 14, 2020.                 Respectfully submitted,

                                            /s Valerie A. Yanaros

                                            Valerie Yanaros, Esq.
Texas Bar No. 24075628
Admitted to Practice in the District
Court of Colorado
Yanaros Law, P.C.
5057 Keller Springs Rd, Suite 300
Addison, TX, 75001
Telephone: (512) 826-7553
valerie@yanaroslaw.com

**ATTORNEY FOR PLAINTIFFS**