***CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER***

Page 218

1  (Video played.)
2  **Q.  So we talked a lot about today, and I've**
3  **heard a -- a -- a different -- you know, I've --**
4  **I've -- I've heard kind of a different approach**
5  **than -- to be honest, than what I expected.**
6  **And -- and it sounds to me that**
7  **you had originally, you know, wanted to -- wanted to**
8  **settle this, and unfortunately those -- that**
9  **information wasn't passed along from, you know, one**
10  **of your inter -- intermediaries.**
11  **But I think, you know, I -- and --**
12  **and my question that I was going to ask is probably**
13  **already answered.  But, I mean, is there -- do you**
14  **think that there's a -- there's a point to -- to**
15  **actually settle this and get it, you know -- get it**
16  **good between the parties?**
17  MR. WEBB:  Objection.  Improper
18  question.  It's not something you're supposed to ask
19  in a deposition.  You know that, Counsel.
20  But my client is probably going to
21  answer.
22  THE WITNESS:  Yes, I'd like to
23  answer.
24  MS. YANAROS:  Counsel, we already
25  spoke about that, but thank you for that.

Page 219

1  A.  I'd -- I'd -- I'd like -- I'd like to
2  answer.
3  Val, I would love to settle.  I
4  think that enough is enough.  I would like Corey to
5  go on and have a good life and a good career.  I
6  would hope that maybe at some point we could talk.
7  Like I said, I -- I had a great
8  love for him, and I have said in this deposition
9  over and over and over, I have seen his potential.
10  I said there's a good side and a dark side to Corey.
11  But that good side, if -- if it could just be
12  concentrated on and harvested, he's got so much to
13  offer to the world.  That's what I would like to see
14  happen.
15  If you saw one of my letters to
16  him, even when we were falling out, I wrote to him,
17  and at the end of the writing I said, and that good
18  side of Corey is the side that I love Corey, and I'd
19  like to see more of that side.
20  And, Val, maybe it's the -- the
21  ministry side of me.  I -- I really always try to
22  see the spirit of redemption, even with myself.
23  Val, I work on myself every day.  Part of my daily
24  prayer is, Lord, take this life and make it into
25  something worthwhile for you.  I -- I -- I say that

Page 220

1  every single day.
2  I am here to serve.  I am here
3  to -- to try and help people reach the higher side
4  of themselves.  So yes, I -- I would like to sit
5  down and work this out.
6  (Video played.)
7  **Q.  Sir, I just want to address the**
8  **criminally investigated for driving down stock.**
9  **Where -- where does that come from?**
10  A.  It came from different sources speaking.
11  It also came from Corey having an absolute delight
12  every time that Gaia's stock went down.  He would
13  let the team know that, and -- and get great
14  pleasure in it.
15  And I don't really want to talk
16  too much about it, Val, because I know that there's
17  another lawsuit, and so, therefore, I'd rather not
18  make any further comments.
19  **Q.  Okay.  So is there a criminal**
20  **investigation going on?**
21  MR. WEBB:  Objection.  Calls for
22  speculation.  Foundation.
23  Go ahead.
24  A.  As Lenden said, it's -- it's speculative,
25  but these are things that have been in the rumor

Page 221

1  mill.  There are other people that have said they're
2  surprised already that Corey hasn't ended up in
3  prison for a variety of things.
4  **Q.  Okay.  But as you sit here today, you --**
5  **you don't -- you haven't heard that from any law**
6  **enforcement, that that's -- that's actually**
7  **something that's going on?**
8  THE WITNESS:  What are you saying,
9  Lenden?  I saw you --
10  MR. WEBB:  You can answer that.
11  A.  I haven't talked to -- to law
12  enforcement.  As a matter of fact, people had talked
13  to me about going to the attorney general about
14  Corey because for the amount of money that has been
15  taken out of the funds here that should have gone to
16  the team, it hasn't amounted to a felony as far as
17  the amount.  I did not go to the attorney general.
18  There's a lot of things, Val, that
19  I could still do that I haven't done, and I'll just
20  leave it at that.
21  (Video played.)
22  **Q.  So we kind of already talked about this**
23  **earlier.  You know, with the -- with the cease and**
24  **desist that was sent out, you know, that was -- that**
25  **was something that was -- was done with David's**

***CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER***

Page 14

1 worked with each other before.  You can feel free to
2 call me Leon throughout the day.
3    Q.   Okay.  And -- and you can call me Val.
4    A.   Thank you.
5    Q.   Yes.  Thank you.
6         Okay.  So you reviewed the
7 exhibits.  Did you look at any of the -- at the
8 written discovery that we sent over?  Do you know
9 what I mean by that?
10   A.   I don't think I've seen that.
11   Q.   Okay.  Are -- are you familiar with the
12 term "discovery"?
13   A.   Yes.
14   Q.   Okay.  So the -- the request for
15 production and the interrogatories and that sort of
16 stuff?
17   A.   Yes, I am.
18   Q.   Okay.  Okay.  So in addition to looking
19 at the exhibits, did you take a look at any of the
20 other produced documents from -- from -- from my
21 client?
22   A.   No.  I -- I didn't have a lot of time, so
23 I just glanced at what you sent over.
24   Q.   Okay.  And sorry, I should have -- I
25 should have said this out the door.

Page 15

1        Can you please spell your name for
2 the record.
3    A.   L-e-o-n, and then Kennedy, like President
4 Kennedy, K-e-n-n-e-d-y.
5    Q.   Thank you.  Any aliases?
6    A.   Any what?
7    Q.   Aliases?  Do you go by any other names?
8    A.   No.
9    Q.   Okay.  And can you please give your
10 address for the record?
11        MR. WEBB:  And his address, he can be
12 reachable through my office.  You can send any
13 subpoenas or notices to my office, just because of
14 privacy concerns.
15        So I'm instructing him not to
16 answer on that question.
17   Q.   Okay.  How long have you lived at the
18 house that you're at right now, Mr. Kennedy?  I'm
19 sorry, Leon?
20        MR. WEBB:  Same -- same instruction.
21        MS. YANAROS:  About how long he's
22 lived at his house?
23        MR. WEBB:  Correct.
24        MS. YANAROS:  How is that a privacy
25 concern?

Page 16

1        MR. WEBB:  It -- we can meet and
2 confer off the record if you'd like, but I'm
3 instructing the witness not to answer on that one.
4    Q.   All right.  Mr. Kennedy, are you going to
5 follow your -- your attorney's instructions?
6    A.   I am.
7    Q.   I'm sorry, I -- I --
8        MS. YANAROS:  Did -- did you pick
9 that up?  Did anybody pick that up?
10   A.   I -- I -- can you hear me?
11   Q.   I can hear you now.
12   A.   Okay.
13   Q.   I couldn't hear you before.
14   A.   I was saying, I'm -- I'm going to follow
15 his instruction on that one.
16   Q.   Okay.
17        MS. YANAROS:  Does -- is it -- can
18 the videographer hear the -- the witness okay?
19        THE VIDEOGRAPHER:  It's cutting out
20 for me as well.  I'm pretty sure it's just the way
21 he's doing his audio.
22        MS. YANAROS:  Did you hear that,
23 Mr. Webb?
24        MR. WEBB:  Yep.  Yeah, I heard
25 everything.

Page 17

1        MS. YANAROS:  Okay.  Are we going to
2 fix the audio?  Because you know that's the most
3 important part of the deposition.
4        MR. WEBB:  Sure.  Let me see if I can
5 get it a little closer for him.
6        THE WITNESS:  1, 2, 1, 2.  Can you
7 hear me better now?
8        MS. YANAROS:  That's better.  Okay.
9        THE WITNESS:  Mr. --
10 Mr. Videographer, can you hear me better now?
11        THE VIDEOGRAPHER:  You're still
12 cutting out.  The -- the issue is the cutting out,
13 not the actual sound quality.
14        THE WITNESS:  Uh-huh.
15        THE VIDEOGRAPHER:  Your audio's
16 coming through on a cellphone; is that correct?
17        MR. WEBB:  No.  It's on a -- a
18 landline.
19        THE VIDEOGRAPHER:  On a landline.
20 Yeah, that's -- that's definitely why it's cutting
21 out.
22        It would definitely be more
23 prudent to have the audio come through the computer,
24 most likely, or a phone.
25        MS. YANAROS:  Let's --

Elliott Reporting, Inc.    719.434.8262 office@elliottreporting.com

***CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER***

Page 18

1  THE VIDEOGRAPHER: Not a landline,
2  but --
3  MS. YANAROS: Let's go off the record
4  for this, while we fix the -- the technical issues.
5  THE VIDEOGRAPHER: All right. The
6  time is --
7  MR. WEBB: Okay.
8  THE VIDEOGRAPHER: -- 9:36. We are
9  now off the record.
10  (Break from 9:36 a.m. to
11  9:40 a.m.)
12  THE VIDEOGRAPHER: The time is 9:40.
13  We are back on the record.
14  BY MS. YANAROS:
15  Q. Okay. All right. Mr. Kennedy, we were
16  speaking about how many -- I think you said you'd
17  been deposed before. How many times have been
18  deposed?
19  A. I think twice.
20  Q. Okay. And when was the last time you
21  were deposed?
22  A. Oh, many, many years ago. Maybe 15, 20.
23  Q. And what type of lawsuit was that for?
24  A. I -- I -- I really have to remember.
25  Q. It's --

Page 19

1  A. Can I come back to that? It's been so
2  long, I'm not really sure.
3  Q. It -- it's okay. We -- the -- the only
4  issue now is that we really can't hear you.
5  A. Can you hear me better now?
6  Q. Yes. Hopefully --
7  A. Okay.
8  Q. -- it stays like that.
9  A. What I'll do is -- is I'll just talk much
10  louder, if that will help. Does that help?
11  MS. YANAROS: Does that help,
12  Ms. Stellor? It's really staticy. I -- I don't
13  know if -- do you --
14  Mr. Webb, do you guys have another
15  computer that you can use?
16  THE WITNESS: I think he's checking.
17  MS. YANAROS: Oh, he's checking.
18  Okay.
19  Yeah, it's really staticy.
20  THE WITNESS: What did you use for
21  Adrienne yesterday?
22  MR. WEBB: Same one.
23  There might be static from another
24  line that's logged in. There's audio. And the only
25  other audio is Valerie and the court reporter, is

Page 20

1  the only other audio feeds. And the Internet is
2  fast. We have 60 download and 79 upload, so it's
3  fast there. (Inaudible) of 8.
4  THE WITNESS: Are you hearing Lenden
5  better than me?
6  MS. YANAROS: You all are both really
7  bad.
8  THE WITNESS: Okay.
9  MR. WEBB: So one other alternative
10  we can do is we can actually call in on a cellphone.
11  Let me -- let me try that. Do you have a call-in
12  number for the call-in line?
13  MS. YANAROS: Let' see.
14  MR. WEBB: I have --
15  VIDEOGRAPHER JONES: I'll -- I'll
16  interject. Oh, I'm sorry. We're still on the
17  record. Do you all want to go off the record for
18  this?
19  MS. YANAROS: Let's go off the off,
20  yeah.
21  MR. WEBB: We can go off the record.
22  THE VIDEOGRAPHER: I have an
23  agreement from counsel?
24  MS. YANAROS: Yes.
25  MR. WEBB: Yes.

Page 21

1  MS. YANAROS: Let me look over at my
2  e-mail.
3  THE VIDEOGRAPHER: The time is 9:43.
4  We are now off the record.
5  (Break from 9:43 a.m. to
6  10:17 a.m.)
7  THE VIDEOGRAPHER: The time is 10:17.
8  We are back on the record.
9  BY MS. YANAROS:
10  Q. Okay. Sorry about that, Mr. Kennedy. I
11  think we're good to go again.
12  So before we -- before we went off
13  the record, we were just talking about your prior
14  depositions. And I think you said you had had a
15  couple times?
16  A. Yes. And -- and since we had this break,
17  I had time to think about it.
18  The deposition was against -- with
19  an insurance company. I had a house that burned
20  down, and they were dragging their feet about paying
21  for the house. It certainly wasn't -- it burnt down
22  in a -- in a wildfire. It was public knowledge of
23  that neighborhood being burned up by the wildlife,
24  and yet that they dragged their feet in paying. So
25  that was the deposition.

Elliott Reporting, Inc.     719.434.8262 office@elliottreporting.com

***CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER***

Page 10
1  ask you to still answer the question, as long as he
2  doesn't instruct you not to answer.
3       I don't want to know any
4  privileged information.  If there is a conversation
5  you've had with your lawyers, I don't want to know
6  that.  If I ask -- ask a question that goes into
7  that sort of an area, please just answer to the
8  extent that it's not privileged information.
9       We're going to be on the -- on the
10  record for seven hours today.  Like I said, if you
11  need a break, go ahead and take a break.  Just make
12  sure that there's no question pending on the -- on
13  the -- on the table.
14       Do you have anybody else in the
15  room with you today?
16     A.   I do.
17     Q.   Okay.  And who is that?
18     A.   Maureen LaVette.
19     Q.   Okay.  And I -- I believe that's your
20  wife, correct?
21     A.   Yes.
22     Q.   Okay.  Anyone else besides Ms. LaVette?
23     A.   No.
24     Q.   Okay.  And -- and where are you located
25  today?

Page 11
1       THE WITNESS:  Lenden, do you want to
2  tell them?
3       MR. WEBB:  Yes.  He's located at my
4  office, which is 10509 Vista Sorrento Parkway,
5  Suite 450, San Diego, 92121.
6       MS. YANAROS:  Okay.  Thank you.
7     Q.   Okay.  Mr. Kennedy, have you spoken with
8  anybody prior to your deposition today, other than
9  your attorneys?
10       MR. WEBB:  Objection.  Vague.  Has he
11  spoken to anybody?  Yeah, he's spoken a lot to
12  people before that.
13       MS. YANAROS:  Okay.  Counsel, you can
14  make a proper objection and then be quiet so your
15  client can answer.  We are just starting.
16       MR. WEBB:  Okay.
17       MS. YANAROS:  My goodness.
18       MR. WEBB:  And -- and starting well.
19     Q.   Mr. Kennedy --
20       MR. WEBB:  Start -- starting --
21  starting, we're an hour --
22     Q.   -- you can answer the question.  You can
23  answer the question.
24     A.   No, I haven't spoken to anyone today.
25     Q.   Okay.  Thank you.

Page 12
1       Have you looked at any documents
2  prior to this deposition?
3       MR. WEBB:  Objection.  Overbroad.
4       You can answer.
5     A.   Okay.  I -- I don't understand your
6  question, Val.
7     Q.   Okay.
8       (Adrienne Youngblood joined
9       deposition.)
10     Q.   So in preparing for -- did you prepare
11  for your deposition today?
12     A.   I prepared for it, yes.
13     Q.   Okay.  And how did you prepare for this
14  deposition?
15     A.   Well, I've been preparing for quite some
16  time.  I've gone through, you know, over a year and
17  a half worth of texts and e-mails and paperwork and
18  on and on and on.  So it's taken a tremendous amount
19  of time to prepare for this, and Corey's deposition
20  also.
21     Q.   Okay.  So you stated that you looked at a
22  couple of different -- a couple of different things.
23  You said you spoke -- you looked at some texts.  Is
24  that -- was that within the last few days?
25     A.   Texts.  I've looked at what you sent over

Page 13
1  this morning.
2     Q.   Okay.  The -- the exhibits?
3     A.   Yes.
4       MS. YANAROS:  Mr. Webb, what are you
5  doing?  That's very --
6     A.   I think he was like -- he moved the
7  monitor so it -- it was a better -- a better
8  perspective --
9     Q.   Okay.
10     A.   -- of me looking at --
11     Q.   Okay.
12     A.   (Simultaneous speaking) at the same time.
13     Q.   Okay.
14       MS. YANAROS:  Videographer,
15  Mr. Video, is -- is that --
16       THE VIDEOGRAPHER:  It's all right
17  now.  It would definitely be best if we don't move
18  it much.
19       MS. YANAROS:  Okay.
20       THE VIDEOGRAPHER:  But the framing is
21  all right now.
22       MS. YANAROS:  Okay.
23     Q.   Okay.  Sorry about that, Mr. Kennedy.
24       Okay.  So you looked at the --
25     A.   Now, Val, we've known each other.  We