1   that's fine.

2           MS. YANAROS:  Okay.  But can I have your

3   representation that this isn't being broadcast

4   anywhere.

5           MR. WEBB:  I'm not going to make any

6   representations because it is being broadcast via

7   Zoom, so it is recorded.

8           THE WITNESS:  So it is recorded?

9           MS. YANAROS:  To whom?

10          MR. WEBB:  And it's being recorded.

11          MS. YANAROS:  Where is it being broadcast

12   via Zoom?

13          MR. WEBB:  There is my client on the line.

14          MS. YANAROS:  Okay.

15          MR. WEBB:  Both my law clerks --

16          MS. YANAROS:  Okay.

17          MR. WEBB:  -- are on the line.

18          MS. YANAROS:  And nobody else?

19          MR. WEBB:  Not that I'm aware of.  So...

20          MS. YANAROS:  Okay.  And can I have your

21   clients' representation that this isn't being

22   broadcast anywhere else.

23          MR. WEBB:  It's being recorded but it's not

24   being broadcast at this time, but my clients aren't

25   here to answer questions.  But as far as your

                                            Page 6

1    designation that -- I mean, it's a deposition.  A

2    deposition is a public proceedings.  This is not

3    Mother Russia.  So anyone can attend a deposition.

4            MS. YANAROS:  This is confidential though.

5            MR. WEBB:  To the extent you're marking is

6    confidential with the Court, we'll follow whatever

7    protective order the Court has in place right now.

8            MS. YANAROS:  So are you saying that this

9    is being broadcast somewhere?

10           MR. WEBB:  To Zoom, to my client and my two

11   law clerks.

12           MS. YANAROS:  And that's it.

13           MR. WEBB:  That's all that I'm aware of

14   that's on Zoom right now.  So if you want to check the

15   list of attendees, we can check.

16           MS. YANAROS:  Okay.

17           THE WITNESS:  It would be nice to keep that

18   up, too, visible.

19           MR. WEBB:  Sure, that's not a problem, but

20   I mean, is there -- so you're concerned with who's

21   watching or who's viewing?

22           MS. YANAROS:  Yes.

23           MR. WEBB:  Okay.  Well that --

24           THE WITNESS:  And who might receive the

25   recording.

Page 7

1   spouse?

2       A   Yes.

3       Q   Okay.  So 2007, filed bankruptcy.  When

4   you --

5       A   That's a guesstimate --

6       Q   Okay.

7       A   -- on the date.

8       Q   That's fine.  And I understand today it's

9   estimates.  I haven't given you instruction on

10  estimates.  Today -- you're human.  Even though, like

11  I said earlier, you're above-average intelligence, you

12  can't remember every single date, every dollar amount,

13  every person's name, but what I'm asking for today is

14  your best testimony.

15      A   Gotcha.

16      Q   What that means is you're not going to

17  remember the exact day in 2007 or 2008 when you filed

18  bankruptcy, but I appreciate what you did, which is

19  you gave me your best shot at what you remember.

20      A   I want to be accurate.

21      Q   Yep, and what accurate means is in front of

22  a judge or a jury I'm going to disallow anything then

23  that you remember that you don't now, or do my best

24  to.  So I need you to give me your best shot at

25  remembering things today because this is -- this is

Page 17

```
 1    closer to the time of the events that anything
 2    happened.
 3            So if you think, Hey, you know what, I have
 4    a bankruptcy, I think it was 2000, 2008 -- 2007, 2008,
 5    give me approximates today.  If you remember there's a
 6    male or two or three people you met with in California
 7    or in Palm Desert somewhere at some convention, or
 8    something, you know, just say, You know, I think there
 9    was about three or four people there.  I don't
10    remember exactly.  I don't remember all their names,
11    but one of them was named Billy, or one of them was --
12    you know -- you know, Contact Desert, something -- you
13    know, anything like that, just tell me your best shot.
14    Does that make sense?
15         A    Yes.
16         Q    Same thing for amounts and dates.  Even for
17    amounts, if you say, you know what, I don't remember
18    the exact dollar amount but it was between one hundred
19    to two hundred thousand dollars that was raised at
20    that event, that's fine.  Okay.  If even if you say,
21    you know what, it was probably under a million dollars
22    but more than 500,000, even a range that big is still
23    something that we want to understand what you know.
24    Does that make sense?
25         A    Yes.
```

Page 18

1    lawsuit and then quickly dropped it against us here in

2    the state of Colorado.  I forgot about that.

3         Q      Okay.  So that would be a fifth lawsuit.

4    They filed it and then they dismissed it later on.

5    Let me ask you, other than those five lawsuits, are

6    there any others that you might remember?

7         A      No, I don't think so, I mean, that's all I

8    can recall.  I forgot the Liz Lorie thing because it

9    was such a quick little blip.

10        Q      Okay.  And when you say quick little blip,

11   can you quantify what that means to you?

12        A      She filed a lawsuit and then when she was

13   informed that she'd probably lose her law license and

14   the lawsuit, she quickly withdrew it.

15        Q      What led you to believe that she would lose

16   her law license?

17             MS. YANAROS:  And I'm going to instruct the

18   client not to divulge any sort of attorney-client

19   privileged information.

20        Q      (BY MR. WEBB) Yeah, and any question I ask

21   today, if you learned that information from your

22   attorney, don't tell me, but if you learned outside of

23   your attorney or in addition to your attorney and you

24   confirmed that information with someone else, I am

25   entitled to that information.  Do you understand?

Veritext Legal Solutions
866 299-5127

1   Q    When you say she, you're talking about Liz

2   Lorie?

3   A    Liz Lorie.

4   Q    And she introduced herself in Hawaii as

5   someone who wanted to volunteer?

6   A    She was at one of our events -- not our

7   events, she was at Joan Ocean's event.

8   Q    Say that again, Joan?

9   A    Joan Ocean.

10   Q    Okay.

11   A    And she just briefly introduced herself,

12   gave me a card like this, and on the back it said that

13   she would like to help us in any way possible as a

14   volunteer.

15   Q    And what was your response?

16   A    I thanked her and then I believe we started

17   conversing through emails later.

18   Q    And when you say worked for us, who is the

19   us that she would work for?

20   A    Me and my wife.

21   Q    Okay.  Was there an entity that you and

22   your wife were running at the time that Liz Lorie

23   wanted to work for or volunteer for?

24   A    Is there a what?

25   Q    Entity?

Page 23

```
 1        A     Entity.

 2        Q     Yeah.

 3        A     Well our company --

 4              MS. YANAROS:  I'm sorry, this is getting

 5   into attorney-client privileged information.  It

 6   absolutely is.  If she was working for him as an

 7   attorney talking -- asking why -- who she wanted to

 8   work for and what she was going to do is

 9   attorney-client privilege.

10        Q     (BY MR. WEBB) Your attorney's citing

11   attorney-client privilege.  Are you choosing to follow

12   your attorney's instruction at this time and not

13   answer the question?

14        A     Yes.

15        Q     Okay.  Fair enough.  And do you understand

16   that if you -- if you chose not to answer a question

17   under attorney-client privilege and the court --

18              MS. YANAROS:  Counsel, I don't know why

19   you're trying to give my client legal advice.  I've

20   given you a lot of latitude up to this point, but if

21   you want to ask your questions, ask your question, but

22   stop giving him legal advice.

23              MR. WEBB:  Okay.  Counsel, I appreciate

24   your objections.  Can you wait until I finish my

25   question?  We'll take turns.  Happy to have you say
```

Page 24

```
 1    what you want to say on the record.  Is that fair?
 2              MS. YANAROS:  That's fair.
 3              MR. WEBB:  Okay.
 4              MS. YANAROS:  And please stop instructing
 5    my client.
 6         Q    (BY MR. WEBB) You understand that this
 7    is -- basically you're under summons, you're under
 8    court order to be here?
 9         A    I do.
10         Q    And you understand your client -- your
11    attorney has a right to tell you not to answer a
12    question?  You understand that, correct?
13         A    I do.
14         Q    And you understand you have a right to not
15    answer any question, but you understand there's a risk
16    that you may be asked to pay sanctions monetary and
17    come back again if that's not an attorney-client
18    issue?  You understand that?
19         A    I do.
20         Q    Okay.  Fair enough.
21              MR. WEBB:  Counsel, do you have anything
22    else you want to state for the record?  I'm to confer
23    with you off the record.
24              MS. YANAROS:  Actually, I do.  I recognize
25    Mr. Kennedy and Miss Youngblood, I do not recognize
```

Page 25

 1    the young lady at the end.  You stated that it was
 2    your clients that were here.
 3              MR. WEBB:  Yeah, my client's wife.
 4              MR. KENNEDY:  Maureen.
 5              MS. LAVETTE:  I'm Maureen --
 6              MS. YANAROS:  Oh, Maureen.
 7              MS. LAVETTE:  -- LaVette Kennedy, yes.
 8              MS. YANAROS:  Oh, okay.  All right.
 9    Gotcha.  Okay.  Good to meet you.
10              MS. LAVETTE:  We work together.  Thank you.
11              MS. YANAROS:  Okay.  Okay.
12              (Exhibit 1 was marked.)
13        Q     (BY MR. WEBB) Let me ask you, as far as
14    preparing for the deposition, did you receive the
15    deposition notice?  And I'm going to hand you what's
16    been marked as Exhibit 1.
17              MR. WEBB:  And, Counsel, do you have a
18    copy?
19              MS. YANAROS:  I do not.
20              MR. WEBB:  Okay.  I've got one for you.
21              MS. YANAROS:  Thank you.
22              MR. WEBB:  You're welcome.
23        Q     (BY MR. WEBB) Take a moment to review
24    Exhibit 1.  For the record, it is the notice of taking
25    deposition of Corey Goode.  It is --

                                        Page 26

```
 1   taking the steps that we took.
 2            We always try to take steps to solve things
 3   with Gaia.  We tried to work with them for three years
 4   and they filed suit before we did with the trademarks.
 5            So, you know, we are not litigious and easy
 6   to jump onto lawsuits, but then it comes to people
 7   violating our agreements and trying to completely
 8   destroy our ability to make any money in the spiritual
 9   community, which these people did -- did.  We can
10   prove it on paper, I mean, like $700,000 or more at
11   a -- you know, doing a course and then these jokers
12   come out and were making like 60,000 and people are
13   saying that they're not going to take our course
14   because of what these people said, and I see a smile.
15   They're very happy with what they did.
16       Q    Mr. Goode, just focus on me today.  I
17   understand all the parties have a right to be here,
18   but it's just a day for you and I to talk.  Is that
19   agreeable?
20       A    Uh-huh.
21       Q    Okay.  So you're saying there's $700,000
22   for a course, and you're saying there's monies that
23   aren't being accounted for, mismanaged, and you're
24   saying, Hey, I need a way to earn a living; is that
25   right?
```

Page 56

1    SBA entity, and that the same name had a different tax

2    identification number where the money was going?

3        A     I knew that he had created a mirror company

4    to mine, I knew he -- we had discussed it, the company

5    was based on my intellectual property, SBA, which is

6    my trademark.  He put that in his business name and

7    mirrored it exactly.

8            1091 didn't know what was going on -- going

9    on because the names are exactly the same.  They told

10   me they would never have allowed that type of

11   situation if they had known.

12       Q     Did you tell Leon you wanted the money to

13   be at the same company that was paying the taxes?

14       A     I didn't realize until later on that the

15   tax liability was on me.  I didn't realize the

16   liability of the situation at the time.

17       Q     And when was that time you signed all of

18   this?

19       A     During the time when we were signing the

20   agreements for the documentary with 1091.

21       Q     And approximately when was that?

22       A     I believe this was for the first one in

23   2017.  I'm -- guessing is really difficult on these

24   things.  It all blends together.

25       Q     And you understand guessing means you're

                                              Page 89

1    saying something that you knew nothing about, like you

2    telling me how many vacations I went on the last year.

3    You have no idea?

4         A    That's your definition of guessing?

5         Q    That's guessing.  Estimating is you have

6    some reason to know.  That's an estimate and so all

7    today is about is estimates.  I do want your best

8    estimate, but --

9         A    Okay.  If I can't give a best estimate,

10   then what do I tell you?

11        Q    You just say it was --

12        A    I don't know?

13        Q    No.  You say if you ever had a reason to

14   know.  For example, you know, you're saying probably

15   around 2017.  Like I said at the beginning of today,

16   you give me a range and say, You know, Mr. Webb, I

17   know it was more recent than 2016, but not so recent

18   as, like, 2019.  It's older than that.  So you give me

19   an estimate based on what you remember; is that fair?

20        A    It is.

21        Q    Okay.  So when you signed these tax

22   documents to have the money going to one account even

23   though the work was being done by the other mirror

24   company, approximately what year was that?

25        A    I believe it was it was 2017 or 2018.  I

                                           Page 90

1       A      That's not what I -- that's not what I --
2    you said social media.
3       Q      Okay.  Let me first stick with emails and
4    then we'll get to social media.
5       A      Okay.
6       Q      Do you believe there's ever been an email
7    from one of my clients where they sent it to you with
8    the intention of causing psychological intimidation
9    and pain?
10      A      Yes.
11      Q      Okay.  How many emails do you believe were
12   sent with that intention?
13      A      Dozens, but two were sent the absolute
14   malice and intent to cause it, obviously.
15      Q      Okay.  When you say two were sent with the
16   intention of causing pain obviously, what two are
17   those?  It sounds like you remember them?
18      A      Yes, never forget them.  Roger Richards
19   sent a resignation letter in it giving up all rights
20   to everything he's ever worked on with me, by the way,
21   accusing me of all sorts of things, being a terrible
22   father, accusing me of being a drunk and all this
23   other stuff, the same things he had accused his old
24   partner of being with when he came to work with me.
25      Q      Okay.  If someone accused me of being a

Page 95

```
 1    drunk I would kind of laugh because I'm not -- I don't
 2    drink much.
 3         A    Well, you're not --
 4              MS. YANAROS:  Objection.
 5              THE WITNESS:  -- a figure in the spiritual
 6    community.
 7         Q    (BY MR. WEBB) I understand.  So -- but did
 8    the accusation of a drunk, did it have any traction
 9    with you?
10         A    No.
11         Q    Okay.
12         A    No, it was the intent.  When we go over the
13    letter at some point it will be very obvious the
14    intent was to cause extreme upset and harm.
15              The 18 page extortion letter on the other
16    hand --
17         Q    Let me stick with the first letter.
18         A    Okay.
19         Q    That first one where you said, Hey, I want
20    to resign, give up all my rights, you're a terrible
21    father, you're a drunk --
22         A    It was just a bunch of insults.
23         Q    Bunch of insults.  Did that cause you harm?
24         A    Uh-huh.
25         Q    Is that a yes?
```

                                        Page 96

```
 1              So you send an email saying he can come
 2   spook the fold if he does these seven or eight or six
 3   things, right?
 4        A     Yes, I said he could slowly earn my trust
 5   back in if Leon is going to insist, which he did.
 6        Q     Okay.
 7        A     Leon basically said, I can't do this
 8   without Roger.  I need Roger, and they were like Fric
 9   and Frac.
10        Q     Wasn't there an incident though at the
11   Conscious Life expo where you were pretty inebriated
12   and you were in a car yelling, and what not?
13              MS. YANAROS:  Objection.
14              THE WITNESS:  No.
15        Q     (BY MR. WEBB) No?  You don't remember that?
16        A     No.
17        Q     Okay.
18        A     I did not get inebriated at these events.
19   Everyone else certainly did.
20        Q     Okay.  Or maybe just under the influence of
21   something?
22        A     I never yelled anything out of a car.
23        Q     Okay.
24        A     I don't know what you're talking about.
25        Q     Okay.  And do you believe that your persona
```

Page 101

```
 1              Correct?
 2      A       No.
 3      Q       No?
 4      A       No.
 5      Q       I thought you said they destroyed a
 6   multimillion --
 7      A       They did.
 8      Q       -- dollar operation?
 9      A       A multimillion dollar operation, the --
10      Q       Well how much were the profits, let's
11   say --
12      A       Hold on and listen.
13      Q       No, no.  Stick with my question.  I'm
14   asking the questions.  Not you.
15      A       Well you won't let me answer them.
16      Q       Was it 2018 when the destruction happened?
17      A       I can't recall the exact day.
18      Q       Approximately?
19      A       The destruction happened when they released
20   the videos.
21      Q       Okay.  And in the prior year, prior to
22   that, had you made multimillions off of your brand?
23      A       No.
24      Q       Then how could they destroy --
25      A       They --
```

Page 170

1   marriage counseling and all of the stuff that a normal

2   human does when they have a normal human experience

3   like that.

4        Q    Sure, and fixing it.  And so --

5        A    But that doesn't make a you serial abuser

6   of women that you need a class action lawsuit against

7   you, I mean, do I need to have a thick skin?

8        Q    Okay.  But you understand when someone

9   works for you and you're in a position of power that

10  is seen of abuse of that power, right?

11            MS. YANAROS:  Objection.

12       Q    (BY MR. WEBB) You understand that?

13       A    As seen by who?

14       Q    The law?

15       A    The law?

16       Q    Yes.

17       A    So if someone has a consensual relationship

18  that worked together?

19       Q    And were you the boss?

20       A    I -- yeah.

21       Q    Or was she boss?

22       A    I was the boss.

23       Q    Then that makes you in a position of power,

24  does it not?

25       A    Yes.

Page 190

1    Q    Okay.  Isn't any kind of relationship when
2  you're in a position of power not a good relationship?
3    A    No, it didn't -- it was just a physical
4  relationship that was over very quickly.  I don't
5  understand what you're --
6    Q    Okay.  So you don't understand at this
7  point why it would be okay to have a relationship with
8  someone who is on your payroll, right?
9    A    I -- it was -- everyone was dating everyone
10  in this community.
11    Q    Okay.
12    A    That's the way this --
13    Q    So as long as everybody else is doing it,
14  it's okay to do?
15    A    Well, I mean --
16    Q    That's the Corey Goode standard?
17    A    No, I'm saying that was the standard --
18    Q    That's what you just said.
19    A    No, I didn't.
20         MS. YANAROS:  Objection.
21         THE WITNESS:  I said in this community --
22  this is a good one.  When we were in -- at Conscious
23  Life expo when Adrienne was just starting to do work
24  for us we were up real late one night talking and she
25  puts her hand on my knee and she says, I'm always

Page 191

```
 1        Q      Like right now you've said, Hey, I don't
 2   understand that question about --
 3        A      Uh-huh.
 4        Q      -- and so we went through it step by step
 5   and piecemealed it out, right?
 6        A      Uh-huh.
 7        Q      Is that a yes?
 8        A      Yes.
 9               (Exhibit 6B was marked.)
10        Q      Okay.  So I'm going so show you what I'll
11   mark as 6B, as in Bravo.
12               MR. WEBB:  And we're omitting exhibit
13   numbers.  It's true.  Sorry, Madam Court Reporter.
14        Q      Is your email address emailangel@aol.com?
15        A      No, that's Leon.
16        Q      Okay.  Is your email --
17               MS. YANAROS:  Counsel, I don't see any
18   Bates numbers on this.  Where is this from?
19        Q      (BY MR. WEBB) -- Goodetech@Yahoo.com?
20               MS. YANAROS:  I'm sorry?  Counsel, where
21   are the Bates --
22               MR. WEBB:  Not my deposition, Counsel.
23               MS. YANAROS:  This is -- I'm not going to
24   have you question my client over something that hasn't
25   been produced.
```

Page 301

```
 1        Q       (BY MR. WEBB) Is your email address,
 2   goodetech@yahoo.com?
 3        A       Yes.
 4        Q       Okay.  And do you remember receiving emails
 5   in emailangel@aol.com in 2020 of February?
 6        A       I received constant emails from that email
 7   please address.  There's no way I could --
 8        Q       Okay.  I've handed you a document that's
 9   been -- it looks like it's 6B on the first page, it's
10   about five pages long.
11            On the first page looks like it's an email
12   to you, and halfway down the page it talks about -- it
13   says, Corey, as stated to you, 50,797 was sent through
14   1091 Orchard.  Do you remember receiving or sending --
15   having those monies sent on January 31 of 2020?  Do
16   you remember that's approximately the amount?
17            MS. YANAROS:  Counsel, if this hasn't been
18   produced to us and you're questioning my client over
19   it, we're going to move for sanctions today.
20            Has it been produced to us?
21            MR. WEBB:  It's not my deposition, Counsel.
22            Go ahead.
23            MS. YANAROS:  You're taking the deposition.
24            MR. WEBB:  Your client has this email,
25   ma'am.  This is his email address.
```

Page 302

1            MS. YANAROS:  So this was not produced to

2    us and you're now taking it out at the deposition

3    you're going to ask him -- I just want the record

4    clear.

5            MR. WEBB:  It's your client's email.

6            MS. YANAROS:  I just want the record clear.

7    How do you know it's -- he hasn't authenticated this

8    yet.

9            MR. WEBB:  Okay.

10      Q     (BY MR. WEBB) You ready?

11            THE WITNESS:  I don't know.

12            MR. WEBB:  Are you ready for him to answer

13    the next question, Counselor?

14            MS. YANAROS:  I'm telling you I need you to

15    answer my question first.  Has this been produced to

16    us?

17            MR. WEBB:  It's not my deposition, I'm

18    sorry.  So right now I'm asking questions about an

19    email.  It's an email that he said he doesn't delete

20    his emails.

21            MS. YANAROS:  There is no -- there's no

22    header, there's no footer.  There is absolutely

23    nothing that -- this is a picture that's put on a

24    piece of paper.

25            MR. WEBB:  Do you have any other objections

                                        Page 303

1    for the record, Counselor, before we ask our next

2    question?

3              MS. YANAROS:  I'm -- are you going to

4    answer my question?

5              MR. WEBB:  It's not my deposition today,

6    ma'am.  So are you going to allow him to answer the

7    next question, or not?

8              MS. YANAROS:  I'm not going to, no.  No.

9              MR. WEBB:  So you're going to suspend?

10             MS. YANAROS:  No, you can continue with

11   your deposition, but this is --

12             THE WITNESS:  We can all the judge.

13             MS. YANAROS:  You're refusing to

14   acknowledge whether or not this was -- if you're

15   pulling this out of thin air, then that's fine, but

16   just let us know.

17        Q    (BY MR. WEBB) Okay.  You ready to answer

18   some questions?

19        A    I don't know.

20        Q    Your email address is Goodetech@yahoo.com

21   as you said at the beginning of the email --

22             THE WITNESS:  Do I answer questions or do

23   you need to call the judge?

24             MS. YANAROS:  Do we?

25             MR. WEBB:  Go ahead if you need to.  If you

                                        Page 304

1    feel that you need to call the judge --

2           MS. YANAROS:  Are you not going to move

3    forward -- I'm not going -- until you answer my

4    question over whether or not this has been produced,

5    I'm not going allow him to answer questions over

6    something that doesn't have -- I mean, how do I know

7    that this is even a real email?

8           MR. WEBB:  Tell me when you're ready,

9    Counselor.

10          MS. YANAROS:  You can ask him over

11   something that has been produced.

12      Q    (BY MR. WEBB) Okay.  Do you remember

13   receiving an email from Jim Martin that outlined the

14   percentages regarding your ownership interest in the

15   distributions for 1091?

16      A    Did I receive an email of his understanding

17   of distributions?  I don't remember.

18      Q    Did you ever communicate with Jim Martin

19   from 1091 about the percentages on the distributions

20   for anything regarding to your IP and 1091?

21      A    I probably did.  I don't remember ever

22   speaking to him about it.

23      Q    Okay.

24      A    But that sounds like --

25      Q    So if I told you there's an email listing

                                              Page 305

1   that you have a 16.5 interest in distributions from

2   1091, would you disagree with that?

3       A    I -- I wouldn't disagree that that is Jim's

4   understanding, but Jim's understanding isn't

5   necessarily correct.  He's a third, fourth, fifth

6   party.

7       Q    Okay.  Did you ever correct him in an email

8   and say, Hey, Jim --

9       A    I don't remember receiving one -- I don't

10  remember receiving that email to begin with.

11      Q    Have you produced all of your emails to

12  your counselor --

13      A    Yes.

14      Q    -- that have to do anything with 1091?

15      A    Yeah, everything.  I sent everything to

16  her.

17      Q    And all those documents have been produced

18  to your attorney?

19      A    Yes.

20          MR. WEBB:  And all those documents have

21  been produced, counselor, from you to our office?

22          MS. YANAROS:  It's not my deposition.

23          MR. WEBB:  Okay.  Well if you want to call

24  the kettle black, let's talk about this email that he

25  -- your client says he doesn't delete.

Page 306

```
 1        A     They didn't even ask about it.  We were in
 2   there talking -- this is the entertainment industry.
 3   We're in there talking about entertainment contracts.
 4           Now the -- believe it or not, the -- this
 5   community, this disclosure community is a billion
 6   dollar industry, and I -- that's where I was making my
 7   money, is in the disclosure industry, and we can
 8   easily lay out -- I mean, Gaia, you know, 300 million
 9   years -- dollars in a -- 300 million dollars in a
10   year, they're getting that from the disclosure
11   community.
12        Q     Okay.
13        A     The disclosure community is a billion
14   dollar industry, and I was completely ruined within
15   that -- in that industry.
16        Q     Isn't it true --
17        A     I had to go to a completely different
18   industry.
19        Q     Isn't it true that a lot of people in the
20   industry are concerned about how litigious you are and
21   how many lawsuits you file?
22        A     I haven't had anyone mention to me that
23   they were worried about it.
24        Q     I've spoken to people that I know of in the
25   industry and they say they wouldn't touch you with a
```

Page 363