1  Lenden F. Webb (SBN 236377)
   Christian B. Clark (SBN 330380)
2  **WEBB LAW GROUP, APC**
   466 W. Fallbrook Ave., Suite 102
3  Fresno, CA 93711
   Telephone: (559) 431-4888
4  Facsimile: (559) 821-4500
   Email: LWebb@WebbLawGroup.com
5  Email CClark@WebbLawGroup.com

6
   Attorneys for Defendants
7  Leon Isaac Kennedy and Adrienne Youngblood

8                    **UNITED STATES DISTRICT COURT**

9                            **OF COLORADO**

10

11  JAMES COREY GOODE, individually, and     ) CASE NO. 1:20-CV-00947
                                             )
12  GOODE ENTERPRISE SOLUTIONS INC.,         ) **DEFENDANTS' ANSWER AND**
                                             ) **COUNTERCLIAM TO PLAINTIFFS'**
13            Plaintiff,                      ) **SECOND AMENDED COMPLAINT**
                                             )
14  v.                                       )
                                             ) **Judge: Hon. Judge Daniel D. Domenico**
15                                           )
    ROGER RICHARDS RAMSAUR, LEON             )
16  ISAAC KENNEDY and ADRIENNE               ) **JURY TRIAL DEMANDED**
    YOUNGBLOOD;                              )
17                                           )
             Defendants.                      )
18                                           )
                                             )
19                                           )
                                             )
20                                           )
                                             )
21                                           )
                                             )
22                                           )
                                             )
23                                           )
                                             )
24                                           )
                                             )
25                                           )
                                             )
26                                           )
                                             )
27

28

_____
**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND
AMENDED COMPLAINT**
- 1 -

Defendants LEON ISAAC KENNEDY and ADRIENNE YOUNGBLOOD (*hereinafter* "Defendants") hereby answer the Second Amended Complaint of Plaintiffs James Corey Goode and Goode Enterprise Solutions, Inc. ("GES"), (*hereinafter* "Plaintiffs"), as follows:

## INTRODUCTION

1. Defendants deny each and every allegation contained in the introduction of Plaintiffs' Second Amended Complaint.

## NATURE OF THE ACTION

2. Defendants deny, generally and specifically, the allegations contained in paragraph 1.

3. Defendants deny, generally and specifically, the allegations contained in paragraph 2.

4. Defendants deny, generally and specifically, the allegations contained in paragraph 3.

5. Defendants admit that they may be served wherever they may be found, as alleged paragraph 4.

6. Defendants admit that they may be served wherever they may be found, as alleged in paragraph 5.

7. Defendants admit that they may be served wherever they may be found, as alleged in paragraph 6.

## JURISDICTION AND VENUE

8. Defendants admit the allegation contained in paragraph 7.

9. Defendants admit the allegation contained in paragraph 8.

10. Defendants admit the allegation contained in paragraph 9.

11. Defendants admit the allegation contained in paragraph 10.

12. Defendants admit the allegation contained in paragraph 11.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

13. Defendants deny, generally and specifically, each and every allegation contained in paragraph 12.

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

14.  Defendants admit the allegation contained in paragraph 13.

15. Defendants deny, generally and specifically, the allegations contained in paragraph 14.

16. Defendants deny, generally and specifically, the allegation contained in paragraph 15.

### The Beginning: Mr. Goode Comes Forward with His Experiences Tied to the Secret Space Program

17.  Defendants deny, generally and specifically, the allegation contained in paragraphs 16.

18.  Defendants deny, generally and specifically, the allegations contained in paragraphs 17.

19. Defendants deny, generally and specifically, the allegations contained in paragraphs 18.

20. Defendants deny, generally and specifically, the allegation contained in paragraphs 19.

21. Defendants deny, generally and specifically, the allegations contained in paragraph 20.

22. Defendants deny, generally and specifically, the allegation contained in paragraph 21.

23. Defendants admit that Mr. Goode began working with Gaia on or around 2015. Defendants deny, generally and specifically, the remaining allegation contained in paragraphs 22.

24. Defendants deny, generally and specifically, the allegations contained in paragraph 23.

25. Defendants deny, generally and specifically, the allegations contained in paragraph 24.

26. Defendants deny, generally and specifically, the allegations contained in paragraph 25.

27. Defendants admit that Mr. Richards resided at the Goode's family home for extended period of time as alleged in paragraph 26. Defendants deny, generally and specifically, the remaining allegations.

28. Defendants admit the allegation contained in paragraph 27.

29. Defendants deny, generally and specifically, the allegations contained in paragraph 28.

30. Defendants deny, generally and specifically, the allegations contained in paragraph 29.

31. Defendants admit that Mr. Goode filed for various federal trademarks with the United States Patent and Trademark Office ("USPTO") but deny the remaining allegations in paragraph 30.

32. Defendants admit that the SBA Marks have acquired worldwide recognition and secondary meaning. Defendants deny, generally, the remaining allegations in paragraph 31, and deny specifically that any products have been sold in the trademark categories awarded for the terms "20 and Back" and "Blue Avians."

33. Defendants admit that Goode collaborated on the project of creating the Graphic Novel, as a part of a partnership through SBA Media Enterprise, as alleged in paragraph 32.

34. Defendants deny, generally and specifically, the allegation contained in paragraph 33.

35. Defendants admit that the trademarks were created by GES, under the verbal agreement that "all existing work created collectively on the brands would be under single license use for project to project," as alleged in paragraph 34.

36. Defendants admit the allegations contained in paragraph 35.

37. Defendants admit the allegations contained in paragraph 36

38. Defendants admit the allegations contained in paragraph and 37.

37. Defendants deny, generally and specifically, the allegation contained in paragraph 38.

38. Defendants deny, generally and specifically, the allegation contained in paragraph 39

39. Defendants deny, generally and specifically, the allegation contained in paragraph 40.

40. Defendants deny, generally and specifically, allegations contained in paragraph 41.

41. Defendants admit Mr. Richards aided Mr. Goode in protecting "his IP and brand," alleged in paragraph 42, only if "his IP and brand" refers the work that Defendant Richards and other professionals created in partnership with Goode, through SBA Media Enterprise.

42.  Defendants deny, generally and specifically, the allegations contained in paragraph 43.

43. Defendants admit the allegations contained in paragraph 44.

44. Defendants admit the allegations contained in paragraph 45.

45. Defendants admit the allegations contained in paragraph 46.

46. Defendants admit the allegations contained in paragraph 47.

47. Defendants deny, generally and specifically, the allegations contained in paragraph 48.

48. Defendants deny, generally and specifically, the allegations contained in paragraph 49.

49. Defendants deny, generally and specifically, the allegations contained in paragraph 50.

50. Defendants deny, generally and specifically, the allegations contained in paragraph 51.

### Enter Leon Isaac Kennedy

51. Defendants deny, generally and specifically, the allegations contained in paragraph 52.

52. Defendants deny, generally and specifically, the allegations contained in paragraph 53.

53. Defendants deny, generally and specifically, the allegations contained in paragraph 54.

54. Defendants deny, generally and specifically, the allegations contained in paragraph 55.

55. Defendants deny, generally and specifically, the allegations contained in paragraph 56.

56. Defendants deny, generally and specifically, the allegations contained in paragraph 57.

57. Defendants admit the allegation contained in paragraph 58.

58. Defendants deny, generally and specifically, the allegation contained in paragraph 59.

59. Defendants admit in part that Mr. Kennedy became to be the point of contact between Goode and The Orchard (now known as "1091") but defendants deny, generally the remaining allegations and deny specifically that Mr. Goode "directed, produced and starred in titled 'Above Majestic' and 'Cosmic Secret,'" as alleged in paragraph 60.

### The Graphic Novel, Above Majestic and Cosmic Secret

60. Defendants deny, generally and specifically, the allegations contained in paragraph 61. 62, and 63.

61. Defendants deny, generally and specifically, the allegations contained in 62.

62. Defendants deny, generally and specifically, the allegations contained in 63.

63. Defendants admits the allegation contained in paragraph 64.

64. Defendants deny, generally and specifically, the allegations of paragraph 65.

65. Defendants deny, generally and specifically, the allegations contained in 66.

66. Defendants deny, generally and specifically, the allegations contained in 67.

67. Defendants deny, generally and specifically, the allegations contained in 68.

68. Defendants deny, generally and specifically, the allegations contained in 69.

69. Defendants admit the allegations contained in paragraph 70.

70. Defendants deny, generally and specifically, the allegation contained in paragraph 71.

71. Defendants admit the allegations contained in paragraph 72.

72. Defendants deny, generally and specifically, the allegations contained in paragraph 73.

73. Defendants deny, generally and specifically, the allegations contained in paragraph 74.

74. Defendants deny, generally and specifically, the allegations contained in paragraph 75.

75. Defendants deny, generally and specifically, the allegations contained in paragraph 76.

76. Defendants deny, generally and specifically, the allegations contained in paragraph 77.

77. Defendants deny, generally and specifically, the allegations contained in paragraph 78.

78. Defendants deny, generally and specifically, the allegations contained in paragraph 79.

79. Defendants deny, generally and specifically, the allegations contained in paragraph 80.

80. Defendants deny, generally and specifically, the allegations contained in paragraph 81.

81. Defendants deny, generally and specifically, the allegations contained in paragraph 82.

82. Defendants deny, generally and specifically, the allegations contained in paragraphs 83.

**Dimensions of Disclosure and Adrienne Youngblood**

83. Defendants deny, generally and specifically, the allegations contained in paragraph 84.

84. Defendants deny, generally and specifically, the allegations contained in paragraph 85.

85. Defendants deny, generally and specifically, the allegations contained in paragraph 86.

86. Defendants deny, generally and specifically, the allegations contained in paragraph 87.

87. Defendants deny, generally and specifically, the allegations contained in paragraph 88.

88. Defendants deny, generally and specifically, the allegations contained in paragraph 89.

89. Defendants deny, generally and specifically, the allegations contained in paragraph 90.

90. Defendants deny, generally and specifically, the allegations contained in paragraph 91.

91. Defendants deny, generally and specifically, the allegations contained in paragraph 92.

92. Defendants deny, generally and specifically, the allegations contained in paragraph 93.

93. Defendants deny, generally and specifically, the allegations contained in paragraph 94.

94. Defendants deny, generally and specifically, the allegations contained in paragraph 95.

95. Defendants deny, generally and specifically, the allegations contained in paragraph 96.

96. Defendants admit the allegation contained in paragraph 97.

97. Defendants deny, generally and specifically, the allegations contained in paragraph 98.

98. Defendants deny, generally and specifically, the allegations contained in paragraph 99.

99. Defendants deny, generally and specifically, the allegations contained in paragraph 100.

100. Defendants deny, generally and specifically, the allegations contained in paragraph 101.

**Dimensions of Disclosure and Adrienne Youngblood**

101. Defendants deny, generally and specifically, the allegations contained in paragraph 102.

102. Defendants deny, generally and specifically, the allegations contained in paragraph 103.

103. Defendants deny, generally and specifically, the allegations contained in paragraph 104.

104. Defendants deny, generally and specifically, the allegations contained in paragraph 105.

105. Defendants deny, generally and specifically, the allegations contained in paragraph 106.

106. Defendants deny, generally and specifically, the allegations contained in paragraph 107.

107. Defendants deny, generally and specifically, the allegations contained in paragraph 108.

108. Defendants deny, generally and specifically, the allegations contained in paragraph 109.

109. Defendants deny, generally and specifically, the allegations contained in paragraph 110.

110. Defendants deny, generally and specifically, the allegations contained in paragraph 111.

111. Defendants deny, generally and specifically, the allegations contained in paragraph 112.

112. Defendants deny, generally and specifically, the allegations contained in paragraph 113.

113. Defendants deny, generally and specifically, the allegations contained in paragraph 114

114. Defendants deny, generally and specifically, the allegations contained in paragraph 115.

### I.   Claim I: FEDERAL TRADEMARK INFRINGEMENT

### (Under 15 U.S.C. §§ 1114 and 1125(a))

(All Defendants)

115. Paragraph 116 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

116. Defendants admit the allegations contained in paragraph 117.

117. Defendants admit the allegations contained in paragraph 118.

118. Defendants deny, generally and specifically, the allegation contained in paragraph 119.

119. Defendants admit the allegations contained in paragraph 120.

120. Defendants admit the allegations contained in paragraph 121.

121. Defendants deny, generally and specifically, the allegation contained in paragraph 122.

122. Defendants admit the allegations contained in paragraph 123.

123. Defendants deny, generally and specifically, the allegations contained in paragraph 124.

124. Defendants deny, generally and specifically, the allegations contained in paragraph 125.

125. Defendants deny, generally and specifically, the allegations contained in paragraph 126.

126. Defendants deny, generally and specifically, the allegations contained in paragraph 127.

127. Defendants deny, generally and specifically, the allegations contained in paragraph 128.

128. Defendants have insufficient information at this time to admit or deny the allegation contained in paragraph 129, and therefore denies the same.

129. Paragraph 130 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

130. Paragraph 131 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

131. Paragraph 132 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

## II. Claim II: False Designation of Origin and Federal Unfair Competition under 15 U.S.C. § 1125

(All Defendants)

132. Paragraph 133 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

133. Defendants deny, generally and specifically, the allegations contained in paragraph 134.

134. Defendants deny, generally and specifically, the allegations contained in paragraph 135.

135. Defendants deny, generally and specifically, the allegations contained in paragraph 136.

136. Defendants deny, generally and specifically, the allegations contained in paragraph 137.

137.  Paragraph 138 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

138. Paragraph 139 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

### III. Claim III: Trademark Counterfeiting – 15 U.S.C. § 1114

(Richards and Kennedy)

139. Paragraph 140 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

140. Paragraph 141 is a legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

141. Defendants deny, generally and specifically, the allegations contained in paragraph 142.

142. Defendants deny, generally and specifically, the allegations contained in paragraph 143

143. Defendants deny, generally and specifically, the allegations contained in paragraph 144.

144. Paragraph 145 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

145. Paragraph 146 is a legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

146. Defendants deny the allegation contained in paragraph 147.

147. Paragraph 148 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

148. Paragraph 149 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

### IV. Claim IV: Colorado Common Law Trademark and Trade Name Infringement

(All Defendants)

149. Paragraph 150 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

150. Defendants admit that GES' Marks, including the DoD Mark, and its associated trade names are all trademarks and names used by Goode in connection with its goods and services. Defendants deny, generally and specifically, the remaining allegation of paragraph 151.

151. Paragraph 152 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

152. Paragraph 153 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

### V. **Claim V: Colorado Common Law Unfair Competition**

(All Defendants)

153. Paragraph 154 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

154. Paragraph 155 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

155. Defendants deny, generally and specifically, the allegations contained in paragraph 156.

156. Defendants have insufficient information at this time to admit or deny the allegation contained in paragraph 157, and therefore denies the same.

157. Defendants deny, generally and specifically, the allegations contained in paragraph 158.

158. Paragraph 159 is a legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

159. Paragraph 160 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

### VI. **Claim VI: Colorado Consumer Protection Act**

(All Defendants)

160. Paragraph 161 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

161. Paragraph 162 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

162. Defendants deny, generally and specifically, the allegations contained in paragraph 163.

163. Defendants deny, generally and specifically, the allegations contained in paragraph 164.

164. Defendants deny, generally and specifically, the allegations contained in paragraph 165.

165. Defendants deny, generally and specifically, the allegations contained in paragraph 166.

166. Paragraph 167 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

167. Defendants deny, generally and specifically, the allegations contained in paragraph 168.

168. Paragraph 169 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

## VII. <u>Claim VII: Breach of Contract</u>

(All Defendants)

169. Paragraph 170 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

170. Defendants need not admit or deny the allegations in paragraph 171 as they are no longer operative following the Court's Dismissal.

171. Defendants need not admit or deny the allegations in paragraph 172 as they are no longer operative following the Court's Dismissal.

172. Defendants need not admit or deny the allegations in paragraph 173 as they are no longer operative following the Court's Dismissal.

173. Defendants need not admit or deny the allegations in paragraph 174 as they are no longer operative following the Court's Dismissal.

174. Defendants need not admit or deny the allegations in paragraph 175 as they are no longer operative following the Court's Dismissal.

175. Defendants need not admit or deny the allegations in paragraph 176 as they are no longer operative following the Court's Dismissal.

## VIII. <u>Claim VIII: Slander Per Se</u>

(Defendant Richards)

176. Paragraph 177 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

177. Defendants admit the allegation of paragraph 178 insofar as it relates to Mr. Richards making statements to Mr. Goode about improper business transactions. Defendants deny generally remaining allegations.

178. Defendants admit the allegation of paragraph 179 insofar as it relates to Mr. Richards making statements to Mr. Goode about improper business transactions. Defendants deny generally remaining allegations.

179. Defendants admit that Defendant Richards intentionally conveyed his knowledge of Mr. Goode's unfair business activities, purporting to be fact, to Goode himself, and then subsequently to third parties. Defendants deny the remaining allegations contained in paragraph 180. Paragraph 181 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

## IX. <u>Claim IX: Libel Per Se</u>

### (Defendant Richards)

181. Paragraph 182 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

182. Defendants deny, generally and specifically, the allegation contained in paragraph 183.

183. Defendants deny, generally and specifically, the allegation contained in paragraph 184.

184. Defendants deny, generally and specifically, the allegation contained in paragraph 185.

185. Paragraph 186 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

## X. <u>Claim X: Tortious Interference with a Business Expectancy</u>

### (All Defendants)

186. Paragraph 187 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

187. Defendants admit the allegation contained in paragraph 188.

188. Defendants deny, generally and specifically, the allegations contained in paragraph 189.

189. Paragraph 190 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

### XI. Claim XI: Breach of Fiduciary Duty

(Defendants Richards and Kennedy)

190. Paragraph 191 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

191. Defendants admit the allegation contained in paragraph 192.

192. Paragraph 193 is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

193. Defendants have insufficient information at this time to admit or deny the allegation contained in paragraph 194, and therefore denies the same.

### XII. Claim XII: Embezzlement and Fraudulent Procurement of Company Funds

(Defendants Richards and Kennedy)

194. Paragraph 195 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

195. Defendants deny, generally and specifically, the allegations contained in paragraph 196.

196. Defendants deny that Richards and Kennedy covertly took funds and placed them in their own accounts as alleged in paragraph 197. The remaining allegation is a statement of law or legal conclusion and not a material fact capable of being admitted or denied, thus, no response is required.

197. Defendants have insufficient information at this time to admit or deny the allegation contained in paragraph 198, and therefore denies the same.

### XIII. Claim XIII: Declaratory Judgments of Ownership of DoD Trademarks

(Defendants Youngblood)

198. Paragraph 199 is solely a statement incorporating by reference the prior paragraphs and not a material fact capable of being admitted or denied such that no response is required.

199. Defendants deny the allegation contained in paragraph 200.

200. Defendants deny the allegation contained in paragraph 201.

201. Defendants have insufficient information at this time to admit or deny the allegation contained in paragraph 202, and therefore denies the same.

## AFFIRMATIVE DEFENSES

Pursuant to California Code of Civil Procedure § 431.30(b), Defendant asserts and alleges the following affirmative defenses.  By asserting these defenses, Defendant does not assume any burden of proof that she would not otherwise bear.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1)      The allegations of Plaintiffs' Second Amended Complaint for failure to state a claim against this answering Defendants upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Waiver and Estoppel)

2)      Each and every cause of action in the Complaint if barred by the doctrine of estoppel and waiver, due to the Plaintiffs' own ratification of the actions of the answering Defendants, thereby estopping Plaintiffs from complaining of damages, if any.

## THIRD AFFIRMATIVE DEFENSE

### (Unclean Hands)

3)      Defendants allege that each cause of action of the Second Amended Complaint is barred by virtue of Plaintiffs' contributory willful misconduct and/or negligence in causing or contributing to the damages alleged therein under the doctrine of unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

### (Laches)

4)      Each and every cause of action in the Second Amended Complaint is barred by the Doctrine of Laches

## FIFTH AFFIRMATIVE DEFENSE

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

- 14 -

**(Fraud)**

5)      Each and every cause of action in the complaint is barred by the doctrine of Fraud as Plaintiffs falsely represented material facts, with knowledge of its untruth, with an intent to deceive Defendants. Defendants allege they relied on the representations Plaintiffs made and therefore, Defendants had no intention of entering into various agreements alleged in the Second Amended Complaint.

<u>**SIXTH AFFIRMATIVE DEFENSE**</u>

**(Fraud in Factum)**

6)      Each and every cause of action in the complaint is barred by the doctrine of Fraud in the Factum as Plaintiffs possibly obtained the alleged contract via a disparity between the instrument to be executed and the instrument actually executed. Therefore, the Defendants had no intention of entering into this particular alleged contract.

<u>**SEVENTH AFFIRMATIVE DEFENSE**</u>

**(Duress)**

7)      Each and every cause of action in the Second Amended Complaint is barred because with respect to any alleged intentional or negligent acts, these answering Defendants was acting under duress.

<u>**EIGHTH AFFIRMATIVE DEFENSE**</u>

**(Parole Evidence/Statute of Frauds)**

8)      Each and every cause of action is barred by the parole evidence rule.  The writings are a complete representation of the final written understanding between the parties, and as such, cannot be contradicted or modified by any oral statements or extrinsic agreements that are inadmissible in a court of law.  Each and every cause of action is barred on the ground that, it was not reduced to writing and signed by the party to be charged, as required by Section 1624 (a) of the Civil Code and Section 1971 of the California Code of Civil Procedure.

<u>**NINTH AFFIRMATIVE DEFENSE**</u>

**(Accord and Satisfaction)**

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

9)      Each and every cause of action is barred under the doctrine of accord and satisfaction. Plaintiffs agreed to accept, as complete satisfaction of the contract, performance different from that originally due under the contract.

## TENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

10)     Each and every cause of action in the Second Amended Complaint is barred either in whole or in part by operation of the applicable statutes of limitations including, but not limited to, those contained in California Code of Civil Procedure sections 337, 338, 339, 340, 343, 359 and California Government Code sections 12960 and 12965.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Fraud in the Inducement)

12)     Each and every cause of action is barred on the ground that, if any contract between Defendant and Plaintiff existed, which Defendant denies, Plaintiff fraudulently induced Defendant into entering into the contract, and Defendant would not have entered into the contract but for Plaintiff's fraudulent inducement.

## TWELFTH AFFIRMATIVE DEFENSE

### (Undue Influence)

13)     Each and every cause of action is barred on the ground that, if any contract between Defendant(s) and Plaintiff(s) existed, which Defendant(s) deny, Defendant(s)' consent to the contract was obtained by virtue of undue influence.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Nonperformance)

14)     Each and every cause of action is barred on the ground that, if any contract between Defendant(s) and Plaintiff(s) existed, which Defendant(s) deny, Plaintiff(s) failed to fulfill his/her obligations under the contract.

## FOURTEENTH AFFIRMATIVE DEFENSE

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

- 16 -

**(Mistake of Fact)**

15)      Each and every cause of action is barred on the ground that, if any contract between Defendant(s) and Plaintiff(s) existed, which Defendant(s) deny, Defendant(s) entered into said contract under a unilateral mistake as to the underlying facts.

## FIFTEENTH AFFIRMATIVE DEFENSE

**(Latent Ambiguity/Unilateral Mistake)**

16)      Each and every cause of action is barred on the ground that, if any contract between Defendant(s) and Plaintiff(s) existed, which Defendant(s) denies, said contract contains a material latent ambiguity, not obvious to Defendant(s) at the time the contract was entered into.

## SIXTEENTH AFFIRMATIVE DEFENSE

**(Privilege in Relation to an Inference with Contract or Prospective Business Advantage Claim)**

17)      The answering Defendants were privileged in relation to an inference with a contract between defendant(s) and Plaintiff(s) in doing any/or all of the prospective business advantage acts alleged in the Second Amended Complaint.

## SEVENTEENTH AFFIRMATIVE DEFENSE

**(Proximate Cause)**

18)      Defendants assert the defense of comparative fault and allege that the damages and injuries alleged in Plaintiffs' Second Amended Complaint were legally or proximately caused in whole or in part by the negligence, fault, negligence per se, assumption of the risk, misuse and culpable conduct of Plaintiffs or other persons or parties, over whom Defendants did not exercise control or have legal responsibility, who failed to exercise the same degree of care and caution, as well as common sense, for their safety, as would have been exercised by persons using ordinary care, caution, and common sense in the same or similar circumstances, barring some or all recovery herein.  Such damages and injuries were not caused by the acts or omissions of Defendants.

## EIGHTEENTH AFFIRMATIVE DEFENSE

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

- 17 -

**(Due Care)**

19)     Defendants allege that they at all times acted with due care and in compliance with all statutory and contractual responsibilities and did not breach any legal duties owed to Plaintiffs.

## NINETEENTH AFFIRMATIVE DEFENSE

**(Attorney's Fees)**

20)     The Plaintiffs' claim for Attorney's Fees or Cost of Suit is not authorized by statute or by contract, and is therefore improper

## TWENTITETH AFFIRMATIVE DEFENSE

**(Absolute Privilege)**

21)     The answering Defendants were privileged in doing any/or all of the acts alleged in the Second Amended Complaint.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

**(Reservation of Right to Assert Additional Affirmative Defenses)**

22) The Second Amended Complaint and each cause of action contained therein is stated in conclusionary terms and, therefore, this answering defendant cannot fully participate all of the affirmative defenses that may be applicable to this action.  Accordingly, the answering Defendants reserve their right to add additional affirmative defenses as may be appropriate.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

**(Uncertainty)**

23) The Plaintiffs' Second Amended Complaint was uncertain.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

**(Good Faith)**

25)     The Defendants allege that it acted in good faith and did not directly or indirectly perform any acts or failed to perform any acts whatsoever which would constitute a violation of duty or breach of duty, if any was owed to the Plaintiffs by the Defendants sounding in either contract or tort.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Indefiniteness)

26)　　Each and every cause of action is barred on the ground that, if any contract between the parties existed, which the answering Defendants deny, the terms of the alleged contract are too indefinite to be enforced.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Performance of Contract Excused)

27)　　Defendants allege that their performance of any contract alleged in the Second Amended Complaint was excused, prevented, and/or hindered by the action(s) or omission(s) of the Plaintiffs.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (No Promises, Warranties, or Representations)

28)　　Defendants allege that at no time mentioned in Plaintiffs' Second Amended Complaint did Plaintiffs rely on any promises, warranties, express or implied, or representations which may have been made by Defendants, its agents, servants, representatives, or predecessors in interest, in connection with the matters alleged in Plaintiffs' Second Amended Complaint.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

29)　　Defendants allege that Plaintiffs failed to mitigate damages, which they contend they suffered and is therefore barred from recovery.

## TWENTY-EIGTH AFFIRMATIVE DEFENSE

### (Condition Precedent, Concurrent, or Subsequent)

30)　　These answering Defendants allege that Plaintiffs' operative Second Amended Complaint and each cause of action therein is barred in whole or in part because of the failure to perform a necessary condition precedent, concurrent, or subsequent.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Substantial Truth)

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

31)   The Plaintiffs' operative Second Amended Complaint and each cause of action therein is barred in whole or in part because of the presence of knowing and or reckless falsity that renders Plaintiffs' statements to be not substantially true.

## COUNTERCLAIM

Defendants and Counterclaimants Leon Isaac Kennedy and Adrienne Youngblood (*hereinafter* "Defendants" *collectively*) hereby assert their Counterclaim against Plaintiffs and Counterclaim Defendants James Corey Goode and Goode Enterprise Solutions, Inc. (*hereinafter* "Plaintiffs" *collectively*).

## PARTIES

1.   Defendant and Counterclaimant Leon Isaac Kennedy (*hereinafter "Kennedy" individually)* is an individual residing in the state of California.

2.   Defendant and Counterclaimant Adrienne Youngblood *(hereinafter "Youngblood" individually)* is an individual residing in the state of California.

3.   Plaintiff and Counterclaim Defendant James Corey Goode *(hereinafter "Goode" individually)* is an individual residing in the state of Colorado.

4.   Plaintiff and Counterclaim Defendant Goode Enterprise Solutions, Inc., *(hereinafter "GES" individually)* is a Colorado corporation with a listed principal place of business in Broomfield, Colorado.

## FACTUAL ALLEGATIONS

5.   All Counterclaimants and Counterclaim Defendant Goode are contributors to the "Full Disclosure" movement and community, a niche community of conspirators within the greater "Truther" movement and community.

6.   The "Truther" movement encompasses a largely online global community consisting of millions of individuals who believe in the truth and accuracy of various conspiracy theories. "Truthers" collectively aim to investigate and expose the truth behind these conspiracies that have been shielded to the public and covered by other false narratives.

7.   Counterclaimants have specifically committed much of their efforts to the narrower "Full Disclosure" movement and community, which is often also referred to more broadly as "Ufology." The "Full Disclosure" community is comprised of fellow conspirators who believe that extraterrestrial existence and human contact, along with the related discovery of advanced technologies, has been suppressed via government and/or corporate corruption. The "Full Disclosure" movement is dedicated to the revealing of these hidden truths with the goal of investigating, exposing, and educating others about the suppression and deprivation of this information and technology that likely would become greatly beneficial to mankind and modern society if utilized.

8.   Counterclaim Defendant Goode had also long been an avid conspiracy theorist and "Truther" within the greater "Truther" movement. Goode was frequently active in posting his opinions and theories on popular online conspiracy forums such as "OneTruth" and "Project Avalon." Eventually, Goode began focusing his "Truther" efforts on the conspiracy theories behind the "Full Disclosure" movement.

9.   Goode purports to have been involved with highly confidential government programs that discretely traveled to outer space and interacted directly with extraterrestrial beings. Moreover, Goode projected and continues to project himself within the "Full Disclosure" community as the self-proclaimed whistleblower responsible for publicly exposing the existence of and experiences resulting from these alleged highly secretive government space programs.

10. In brief, Goode's exposure story is that at the age of seventeen (17), he began traveling to other planets of the solar system where he lived and worked with extraterrestrial beings and learned of their advanced technologies while an active member of the secret government programs. Goode claims that his trips to outer space would last for periods of approximately twenty (20) years at a time; upon returning to Earth, however, he found himself in the same moment of time as when he initially departed to outer space as if time on Earth had stood still throughout his journeys. Goode further claims that the extraterrestrial beings he interacted with,

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

which resemble blue chickens standing over eight (8) feet tall that he has termed "Blue Avians," continue to visit and communicate with Goode consistently on Earth since he decided to cease further space travel.

11. Goode initially began "recounting" his story via video interviews on the most popular YouTube channel of the Truther community, "Project Avalon." Bill Ryan and Kerry Kassidy, two (2) individuals responsible for managing and operating this YouTube channel, have asserted that Goode's testimony of these space journeys was the product of Goode's misappropriated use of various ideas and concepts taken from other content on the Project Avalon forums.

12. Through his activity and testimony on Project Avalon, Goode became acquainted with an individual named David Wilcock. Mr. Wilcock is a leading talent, author, and video host within the Truther community that is best known for his former work as a host and producer of the cable television series "Ancient Aliens" on the History Channel. Mr. Wilcock also hosted and produced the television shows "Wisdom Teachings" and "Disclosure" on the digital network Gaia TV.

13. Mr. Wilcock took an interest in Goode's testimony to the Full Disclosure community. Wilcock approached Jirka Rysavy and Jay Weidner of Gaia TV with a proposal for broadcasting a new television series on the network. The show, titled "Cosmic Disclosure," would be based in part upon Goode's disclosure testimony and would be hosted by Mr. Wilcock with Goode being featured as a leading personality and talent in certain episodes.

14.  Thereafter, in 2015, Gaia TV and Goode entered into a talent contract for the purposes of appearing in Wilcock's Cosmic Disclosure television series. The series became relatively popular among Truthers. Thus, Goode had finally found an opportunity for the spotlight and heightened attention within the Full Disclosure community that he long craved.

15. On information and belief, Counterclaimants allege that at the time Goode entered into the business arrangement with Gaia TV, Goode was receiving income largely through unemployment and disability benefits. On information and belief, Counterclaimants further

allege that out of a desire to continue receiving these benefits while working as a leading talent for Gaia TV, Goode formed a Colorado corporation, Counterclaim Defendant "Goode Enterprise Solutions, Inc." *(hereinafter "GES")*, in order for the entity to receive the compensation earned through Goode's role on Cosmic Disclosure and with Gaia TV. On information and belief, Counterclaim Defendant Goode and his wife Stacey Goode are the sole named members of Counterclaim Defendant GES.

16. Goode did not hesitate to exploit his newfound popularity and heightened reputation within the Full Disclosure community. Through "whistleblower donation drives" and other social media fundraising efforts, Goode began to accumulate charitable donations from Full Disclosure followers; however, Goode only partially utilized these funds for promoting his whistleblower testimony and exposing the truth to the public, the true purpose for which they were donated. On information and belief, Counterclaimants allege that Goode utilized GES to facilitate the receipt of these funds with Goode thereafter apportioning much of the raised money for his personal use.

17. In late 2015, Counterclaimants understand that Defendant Richards became interested in the Full Disclosure movement and began actively participating within the online Ufology community. Richards and Goode met online in early 2016 after Defendant Richards reached out to Goode in response to Goode's social media posts. The online posts announced Goode's intention to create the "Full Disclosure Project," which focused on fostering public awareness of suppressed technologies that could benefit the world, and further sought to recruit other Ufologists interested in volunteering their time and services to the new project.

18. Although Goode publicly holds the "Full Disclosure Project" out as a legal entity with non-profit status that collects charitable donations from the public, on information and belief, Counterclaimants allege that no such non-profit entity has ever been legally formed or existed. Rather, Goode simply utilized GES as the entity and account for the accumulation and rerouting of these funds.

19. Counterclaimants understand that Richards's expertise lies in graphic design and video editing, but Richards also had prior experience working in direct action activism coordinating the logistics and networking among volunteers. After connecting with Goode, Richards offered his skills and services to the Full Disclosure Project efforts and began volunteering hundreds of hours of his time. Due to Richards's skills in video and graphics, Richards was offered a behind the scenes role in the production of "Cosmic Disclosure" by Goode and Wilcock and thereafter Richards contracted with Gaia TV to assist in the production of the television series.

20. Counterclaimants allege that Richards soon began to realize that Goode was not truly the savvy individual he held himself out as publicly and discovered that Goode completely lacked the organization, vision, and leadership required for the Full Disclosure Project that he had created. Over time, Richards found himself effectively serving as Goode's "right hand man" and leader of operations for the Full Disclosure Project.

21. Shortly after beginning the work, Richards continuously felt pressured to take on additional unexpected responsibilities. In addition to extensive time spent handling the graphic design and video editing responsibilities for various content, Richards soon also began handling the full scope of creative digital media projects from script drafting through production. Under pressure from Goode, Richards felt obligated to take on the bulk of responsibility in developing the direction of their movement, planning fundraising and event efforts, and creating content for the Full Disclosure Project. Richards further found himself responsible for managing and coordinating the logistics between dozens of volunteers. Richards was initially happy to do so because of his deep passion for the movement's purpose, but this changed over time after the true nature and intentions of Goode slowly came to light.

22. After beginning his work with Goode, Richards also unexpectedly discovered that Goode had created an army of online enemies within the Ufology community. Most of these "enemies" were passionate Ufologists that claimed Goode as a fraud with the sole intention of prospering financially from the community of genuine Ufologists.

23. Unfortunately, due to his newfound role with Goode, Richards subsequently became a new target for these critics. Once Richards's role with the Full Disclosure Project had become better known, Richards was aggressively slandered and harassed online for spearheading further projects with Goode that were thought to be harmful to the greater movement.

24. The extensive cyberbullying that ensued not only damaged the online reputation of Richards, but also served to negatively impact Richards's personal business and cause severe distress and anguish to Richards and his family. At one point in 2016, due to the aforementioned harassment coupled with the unexpected responsibility and commitment of time and energy, Richards raised his concerns to Goode and even offered his resignation from further assistance with the Full Disclosure Project.

25. Goode refused this attempt to cut ties and begged Richards to continue his work, insisting that the online smear campaigns were actually part of a coordinated agenda by a rogue evil faction of the "Cabal," an extraterrestrial species, that opposed human disclosure. Richards was extremely passionate about the Full Disclosure movement and sincerely believed that the release of suppressed technology to humanity would save the environment and provide radical medical advancements; Richards therefore ultimately agreed to continue working for Goode despite his concerns.

26. Like Richards, Counterclaimant Youngblood had already been a passionate participant and active follower of the Full Disclosure or Ufology movements prior to becoming involved with Goode. Counterclaimant Youngblood became formally involved as an activist for the Full Disclosure Project in February of 2017 after eagerly accepting an invitation to join the team being managed and facilitated by Richards and Goode.

27. Counterclaimant Youngblood initially served as a general contributor. Youngblood regularly participated in the online group meetings that deliberated over and decided on potential strategies that would raise capital for the mission and spread the project's message. In the beginning of Youngblood's work for the Full Disclosure Project, Youngblood would assist in facilitating these efforts by lending her assistance in whatever capacity the group needed at a

---

given time. For example, she would design and produce Full Disclosure Project merchandise for fundraising. Over the next several months, Youngblood was asked to take on additional responsibilities and leadership for putting on various fundraising events and conferences for the disclosure community.

28. Richards had created the idea for a fundraising event called "Eclipse of Disclosure" and initiated the planning of this event. Goode formed the entity Goode Media Publishing, LLC, *(hereinafter also "GMP, LLC")* in 2017 for the purposes of creating events. "Eclipse of Disclosure" would be put on by GMP, LLC and would take place in McCloud, California during the great American eclipse.

29. GMP, LLC, is currently a defunct company with an agreement around it that was made by Richards, Youngblood and Stacey Goode in which Richards holds twenty-five (25) percent ownership, Stacey Goode holds twenty-five (25) percent ownership and Youngblood holds fifty (50) percent ownership. GMP, LLC put on Dimensions of Disclosure 2018 in Loveland, Colorado, and it is currently the entity which holds the ownership rights to two (2) educational courses titled "Master Quest" and "Accelerating Ascension."

30. During the crucial planning period in the months leading up to "Eclipse of Disclosure", much of the group, including Richards, was forced to divert their efforts towards defending against a new onslaught of social media attacks that targeted the Full Disclosure Project as a satanic cult. Without the necessary time and resources for putting on the event, Richards and Goode urgently relied upon Youngblood to step in and save the "Eclipse of Disclosure" fundraising event as a volunteer.

31. Despite the "Eclipse of Disclosure" event in August 2017 being a fundraising failure financially, Youngblood impressed her peers by putting on an amazing gathering with such short notice that featured six (6) keynote speakers and excellently promoted the group's message to all attendees.

32. By late 2017, the combination of extensive workload for the Full Disclosure Project and damage to Richards's professional reputation from the online harassment had increased to such

extent that it was destroying his personal business and therefore his livelihood. As such, Richards made an additional attempt to either withdraw from the project as a whole or drastically reduce his involvement and informed Plaintiff Goode of this intention.

33. In response, Goode offered Richards the promise of creating a new business venture that would be a partnership between Goode and Richards with Goode holding a fifty-one (51) percent interest and Richards holding a forty-nine (49) percent interest. Under Goode's promise, Richards would operate as the Chief Creative Officer and as the Producer and Director of various creative media projects based upon Mr. Goode's space travel testimonial. These projects included but were not limited to movie and television scripts, video productions, graphic novels, documentaries, events and presentations, books, and online courses. Goode, along with his wife Stacey Goode, would serve in the capacities of Chief Executive Officer and Chief Financial Officer of the future partnership.

34. Richards accepted the terms of Goode's oral proposal and "Disclosure, Inc." was subsequently formed as a Colorado corporation in the year 2017. This entity was later renamed to "SBA (Sphere Being Alliance) Media Alliance, LLC." The corporation was thereafter again renamed to its current operating title, "SBA (Sphere Being Alliance) Media Enterprise, LLC" *(hereinafter "SBA Media, LLC")*.

35. After entering the agreement, Richards desired and requested that the terms of their agreement be put in writing and expected that an express contract would be filed as an Operating Agreement upon formation of the new partnership; however, Goode consistently refused to do so. Upon every attempt of Richards to follow up on the written document, Goode insisted that he had been advised not to do so after being visited on Earth by "the Anshar," an extraterrestrial society from the future. Goode claimed to Richards that the "Anshar" informed him to not enter a written agreement because Richards would soon succumb to multiple traumatic events over the following years which would require Goode to take over control of the company.

36. Richards regularly felt under the duress of Goode since joining his team and had further fell victim to Goode's manipulation and "brainwashing". But Richards had grown to trust Goode's intentions over time as fellow Truthers in pursuit of the same ultimate mission. For these reasons, Richards opted to trust Goode's claimed experiences with Anshar rather than fight with Goode over the written versus oral nature of the partnership's clearly expressed terms.

37. Richards therefore began to aggressively pursue the creative media projects that had previously been briefly discussed with Goode. Richards, largely in his sole capacity but with some assistance from other contributors to the Full Disclosure Project including Goode, created multiple profitable creative products that were based upon certain aspects of the content from Goode's disclosure testimony of his alleged space travel experiences.

38. Richards's completed projects, which are now held by SBA Media, LLC, but that are rightfully the creative product of Richards, included both the "Return of the Guardians" comic book and the "20 and Back" graphic novel *(hereinafter the "Graphic Novel")*. Richards's work product currently held by SBA Media, LLC, further included and still includes the rights to the collaboration and shopping agreements for the scripts and screenwriting of the "20 and Back" feature film and television series and for the scripts and screenwriting of the "Blue Avian" docuseries.

39. Over the years following Goode's and Richards's entering of this partnership agreement, Richards consistently upheld his obligation and expectations under contract by performing as the creative mind and as the Producer and Director of the aforementioned projects and products, and additionally of the film projects "Above Majestic" and "Cosmic Secret" that will be further addressed below. Goode, on the other hand, never remotely held up his end of this bargain, as Goode and his wife Stacey drastically failed to uphold any of their responsibilities as Chief Executive Officer and Chief Financial Officer.

40. Richards felt he had no recourse but to continuously press Goode to accomplish even the bare minimum of his expected responsibilities and input to this business partnership. In

most cases, Goode simply ignored his responsibilities, forcing Defendant Richards to step in and ensure completion of Goode's general CEO and CFO responsibilities to the partnership. Goode frequently blamed these lapses in responsibility on his recurring episodes of traumatic reflection that resulted from his self-proclaimed post-traumatic stress disorder stemming from the space travel experiences and related pressure of confidentiality.

41. Goode took this manipulation and influence over Richards even further by regularly inducing Richards to come spend extended periods of time working at the Goodes's residence in Colorado. While the general success and popularity of Richards's creative work products related to the Full Disclosure Project is a tale of creative intellectual achievement, the journey of extensive work hours committed and necessary for completing these high-quality creative works as an individual (not to mention the added pressure from Mr. Goode) was far from an enjoyable process for Richards. Of importance, Richards and also all other contributors including the other named Defendants were largely uncompensated for their commitment of time to the common mission of the Full Disclosure Project, which was in reality a commitment to the underlying intentions of Mr. Goode.

42. In addition to the added stress to Richards and his family that would result from any extended and continuous work trips, Richards's extended work stays at the Goode residence demanded by Goode were far more stressful than a standard business trip. The home environment of Goode was a tumultuous and unpredictable accommodation at best.

43. During regular stays at the Goode residence, Richards would frequently be told by Goode that the home was on a "red alert" and would require that Richards sleep with loaded firearms next to his bed in the guest room. Goode would further exert his manipulation and influence over Richards by stating that the futuristic "Anshar" and another extraterrestrial ancient Mayan species visited the house regularly at night and that he would therefore be being watched. The repeated nature of this type of conduct and behavior from Goode resulted in Richards's suffering of extreme paranoia and emotional distress.

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

44. Despite this distress, Richards continued his creative work, and was in the process of creating the scripts and screenwriting for what would eventually become the most successful of his creative projects: the feature film titled "Above Majestic" and its sequel feature film "Cosmic Secret." While some assistance in the creation of an entire feature film is obviously necessary and there were multiple interest holders in the film's profit distributions, Richards was the creator, writer, and by far the majority contributor throughout the directing and production process.

45. Goode is a minor profit participant, meaning he owns 16.5% of the "Cosmic Secret". In reality his total "sweat equity" spanned a mere 5 hours of filming in one afternoon, compared to the hundreds of hours put in by Richards to direct and produce and then provide post-production for a professional documentary. Goode was not mentally nor physically capable of putting in the concentrated time and intense labor that such projects warrant.

46. The only involvement from Goode in the creation of "Above Majestic" and "Cosmic Secret" was one outline submitted by Goode. Only 5% of that outline was utilized in the final documentary. Good did one (1) day of filming, which was for five and a half hours for his onscreen segment. Additionally, Goode participated in promotional efforts for the documentaries, largely through social media platforms. Goode made the suggestion of the title "Above Majestic," which Richards and his fellow producer Jordan Sather both found appealing and decided to use for the film. The "Cosmic Secret" was the product of a culmination of seven (7) different outlines drafted by Richards. Goode submitted a list of ideas for him to talk about in the "Cosmic Secret," ninety-five (95) percent of which were omitted from Richard's final product. This is easily ascertainable upon viewing the finalized documentary versus Goode's outline.

47. Wilcock was not involved in the writing or producing of the "Cosmic Secret" documentary. He was handed a shooting script upon arriving for filming which consisted of questions and segments that he was to answer and expound upon on-camera. Little input, if any, was taken from Wilcock or Goode in the development, writing, or production of the film.

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Wilcock provided one and a half days of on-camera filming and one pick up day to correct a sound problem. In total, Wilcock's contribution was less than three days, compared to the hundreds of ours that Richards put in for pre-production, filming, producing, and post-production.

48. Just before "Cosmic Secret" was to be delivered to the distributor, Goode threatened to stop delivery, which would have resulted in forfeiture the payment of a one hundred thousand dollars ($100,000) from the distributor of 1901, unless Richards gave him a co-director and executive producer credit. In the very last minute, Goode's name was added in the credits as co-director, and he was given artificial credit where credit was not due. Although Richards felt that they were completely violating every working moral of actual filmmakers by succumbing to pressure and giving Goode the title, a business decision was made that prioritized the collective mission, the SBA Media, LLC brand, and the success of the film, all of which depended on prompt delivery. Additionally, being a public figure, Goode's name undeniably carried some value, which was one of his only useful contributions to the project.

49. While the creative media projects were being filmed and produced, the Full Disclosure Project remained involved in hosting events, attending conferences, and pursuing social media engagements to raise funds and promote their mission of the disclosure of extraterrestrial and celestial truth.

50. In March of 2018, Counterclaimants Youngblood and Richards entered into an oral agreement with Goode and his wife Stacey for the planning and production of future large-scale events for fundraising and discovering other Truthers for content in future media projects. Under the parties' agreement, Youngblood, with the assistance of Richards, would be responsible for creating, planning, and putting on these events that would feature Goode and other Truthers as guest speakers. The parties agreed that Youngblood would be compensated up to $5,000 a month but only as funds were available because all parties were aware this may not always be feasible. In addition to the physical appearances and speaking, Goode along with his

wife Stacey were expected to manage the income streams and financial accounting responsibilities for these events.

51. Youngblood was thereafter made an additional signer with Goode and his wife on the bank accounts of GMP, LLC, which is where all funds for ticket sales and revenue from the events would be deposited.

52. Youngblood and Richards thereafter created and produced six (6) different successful events over the course of 2018. Most notably, Youngblood created one particularly successful event, which she coined "Dimensions of Disclosure" *(hereinafter "DoD")*, that drew hundreds of attendees.

53. For all of these events, Youngblood handled all of the planning, organization, and logistics and Richards assisted by handling all of the technical production and infrastructure engineering that would be needed for the entertainment and speakers. Neither Richards nor Youngblood received any distributions from the success of DoD nor any of the other events.

54. By late-2018, Goode's unpredictable and unstable behavior had begun to take a drastic turn for the worse, which began to cause multiple disruptions and delays in the team's projects and the completion of "Above Majestic." On information and belief, Goode began using the steroid Anivar, began consuming massive doses of edible marijuana, and began consuming alcohol on a daily basis. The combination was resulting in increasingly shoddy performances at his guest speaking appearances that was in turn drastically affecting the group's credibility within the Truther community. Due to unprofessional behavior, Goode was dropped from being a keynote speaker by all of the major conferences. In response, Goode asked his remaining fans to then protest the conferences, indicating that Goode was a victim and was unjustly removed. Goode further attempted to manipulate and persuade David Wilcock that Wilcock should no longer appear at such conferences.

55. Moreover, Goode had aggressively ramped up his online doxing (revealing of personal information and contact information of others online), slandering, and intimidation tactics to both his critics and to his former fans and followers within the Ufology community that

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

questioned his behavior and the accuracy of his space travel testimony. Goode's doxing, intimidation, and manipulation become so disruptive and negative that it caused one of Goode's main contributors, Theresa Yanaros, sister of Goode's attorney Ms. Valerie Yanaros, to take a hiatus from the Full Disclosure movement after she decided to take the initiative to confront Goode about his cyberstalking of a group of particularly obsessive followers.

56. Also in late 2018, as things started to deteriorate as a result of Goode's doxing practices and unstable behavior, Youngblood was unexpectedly removed as a signer from the GMP, LLC bank accounts, which, in part, she interpreted as a confirmation the termination of their oral agreement.

57. David Wilcock introduced Kennedy to Goode and Richards, stating that the latter two needed help with getting some of their projects produced, mainly the "20 and Back" TV series and the "20 and Back" movie project. Wilcock further indicated to Kennedy that Goode and Richards needed help in their business decisions.

58. Kennedy was the perfect candidate for this responsibility. First, as a devoted member of the clergy with a deep-rooted commitment to a higher purpose that has spent over twenty (20) years ministering across the country and serving as a member of the Los Angeles Police Clergy Committee, Kennedy has a clear reputation for being trustworthy, honest, moral, and responsible. Second, Kennedy has a vast record of fifty (50) years' worth of professional business experience in the film entertainment industry, performing as a writer, producer, director, and star actor in major Hollywood films.

59. Counterclaimant Kennedy was thereafter introduced and included as a new member of the Full Disclosure Project team in December of 2018. By this time, the Graphic Novel was already in production and the "Above Majestic" documentary was already completed, with the contract already negotiated and signed before Kennedy began working with Richards or Goode. Therefore, Defendant Kennedy was not involved in the financing, funding or production of these two projects. Kennedy was however in control of and responsible for the distribution of the royalties for "Above Majestic."

60. In addition to Kennedy's assistance with the responsibilities outlined above, Kennedy was jointly asked in trust by Goode, Richards, and Wilcock to form a single-member entity that would hold all interests related to "Above Majestic" and eventually for the sequel film "Cosmic Secret." Kennedy would serve as the sole member responsible to avoid further conflict among the interest holders. The entity would therefore serve as the intermediary vehicle for all accounting and profit distributions resulting from the "Above Majestic" film and also eventually for the "Cosmic Secret" sequel film. Kennedy therefore formed the entity "SBA Entertainment, LLC" as a single-member entity for this purpose in late 2018.

61. SBA Entertainment, LLC was created, in late 2018, as a neutral entity holder for "Above Majestic" and later, "Cosmic Secret" digital distribution agreements with The Orchard/1091. The "Above Majestic" point holders are Richards, who owns twenty-five (25) percent, Goode, who owns twenty (20) percent, Wilcock and Jordan own fifteen (15) percent, and Kennedy with five (5%) percent, along with other minority interest holders, Brian Barth and Lidia Escobar each owning five (5%) percent. In 2019, SBA Entertainment, LLC became the "Cosmic Secret" entity holder for digital distribution agreements with The Orchard/1091. The point holders for the "Cosmic Secret" are Richards (15%), Goode (16.5%), Wilcock (16.5%), Jordan (7%), Kennedy (10%), Graham (7.5%), Everhart (7.5%), Maureen LaVette (5%), and Liz Lorie (5%).

62. Kennedy entered into an understanding with Richards and Goode in which he was to be given five (5) percent of the back-end profits from the "Above Majestic" documentary to be the neutral steward and to payout the profit percentage disbursements that were disbursed by The Orchard/1091. Defendant Kennedy did not manage the business negotiations with The Orchard/1091, when it was agreed that he would accept the offer made by Richards and Goode, the "Above Majestic" Documentary and the contract with The Orchard/1091, that governed the distribution of the documentary had already been completed. At the time Kennedy was brought onto the team the five (5) percent interest that was offered to him was speculative as no one knew whether the documentary would be successful or even make a profit. Kennedy was

originally offered ten (10) percent of "Above Majestic" profit participation, as a form of compensation, however, after revieing their various company expenses and obligations, Kennedy generously opted out of taking the larger 10% share, because he believed the company needed a certain percentage for overhead and expenses. Thus Kennedy opted to receive only 5% of profits for the documentary, "Above Majestic".

63. On information and belief, during the relevant time period, Goode had a continual and ongoing financial need.

64. It is documented in Defendant's financial records that Kennedy extended numerous financial advances to Goode before his profits had been actualized. For example, on December 5, 2018, out of compassion for Goode and his family, when Goode was desperate and destitute, Defendant Kennedy went out, secured and co-signed as a guarantor a fifty thousand dollar ($50,000.00) personal loan for Goode from Brian Barth. Additionally, Defendant Kennedy's company lent Goode over twenty thousand dollars ($20,000.00) to keep him afloat and to pay ongoing expenses. Kennedy also secured donations worth thirty-five thousand dollars ($35,000.00) so that Goode's two (2) children could attend private schooling.

65. Through Kennedy's extensive contacts and relationships, he also set up meetings for the team's "20 and Back" projects. Through his relationships, the team had meetings which brought to fruition a subsequent contract with Tracey Edmonds and her company, Edmonds Entertainment; meetings with the movie studio, STX; the movie and television company, JJ Abrams; the Williams Morris, WME Agency for representation; and top executives at Netflix. Kennedy then presented the projects to A-List director, Antoine Fuqua, A-List writer, Jim Hart, Jamie Foxx's Manager, A-List actor Terrence Howard, as well as Kevin Hart's team.

66. The Orchard/1091, is a distribution company who owns the digital rights to the licensing rights for seven (7) years for the films of "Above Majestic" and "Cosmic Secret". The Orchard/1091 makes payments for the profits of the films to SBA Entertainment, LLC. The profit royalties were typically made on a monthly basis after which, SBA Entertainment would

send out profit participation disbursements to each profit participant usually within 1 week of the funds being deposited.

67. In March 2020, Goode decided that he would commandeer all of the finances sent by the distributor 1091, which were the team's profits for the documentaries, "Above Majestic" and "Cosmic Secret". Goode sent a memorandum through his attorneys, Liz Lorie, and Valarie Yanaros, demanding that Kennedy send over all incoming finances to Goode's bank account, instead of distributing the funds to the previously mentioned legal profit participants. It should be noted that these profit participants had been patiently waiting for two and a half months for 1091 to release collected disbursements. The memorandum included a forty-eight (48) hour ultimatum in attempt to bully, intimidate and extort Defendant Kennedy.

68. Throughout all of 2019, Kennedy had been performing his designated roles as the neutral steward of the profit disbursements. All profits were made transparent and were disbursed within two (2) weeks after being received from the distributor 1091. Goode only owned a 16.5% interest in the documentary and was a minor participant. Goode had no legal authority to make such a demand and was therefore going against the original purpose of why SBA Entertainment, LLC was originally set up, which was to collect and have the profits fairly distributed through and by Kennedy to all of the rightful profit participants. Therefore, Kennedy defied Goode's demand and distributed that month's profits to the rightful participants. Goode also received his proper profit disbursements for that month. For defying Goode, Kennedy was roped into this lawsuit after not adhering to Goode's plan to seize the team's earned monies, and not caving into Goode's attorney Liz Lorie's forty-eight (48) hour ultimatum. In that year, none of the participants had any complaints with Kennedy's methods of distributing the profits. Moreover, it is ironic that in December 2019, Kennedy received a text from Goode thanking him for "his good work in disbursing the team's profits."

69. Defendants have yet to hear from Goode's accounting firm regarding alleged the accounting that was supposed to take place now over three years ago. Despite Goode's attorneys, Liz Lorie and Valerie Yanaros, representing that there would be complete

transparency of all of the accounting for SBA Entertainment, LLC, when Kennedy attempted to contact Goode's accountant around August 2020, he was surprised that the accountant was no longer working for Goode and that all of the relevant paperwork had been forwarded to a new accountant. It should be noted that in these three years, no information as to names, numbers, or email addresses were ever provided by Goode or his attorneys to the legal profit participants, leaving them no information on how to contact any new accountant retained by Goode.

70. In these three years, the other profit participants, who owned eighty-four (84%) percent of the profits have yet to receive a dime for their interests from either Goode or his representative counsel. An audit was expected to have been completed within ninety (90) days. It should be noted that this embezzlement of funds occurred during the Covid-19 pandemic. Due to the global shutdown, there were no other opportunities to the profit participants to seek alternative employment opportunities. Therefore, Goode's seizure of the funds created an even greater hardship upon the Defendants and their families.

71. In the interim, Goode has taken over the Orchard/1091 dashboard which was provided so that top team members could keep track of sales and incoming revenue. However, Kennedy is the sole member of SBA Entertainment. Goode falsely signed as the agent and member of SBA Entertainment, LLC, with The Orchard/1091, to reroute monies to his unnamed LLC, even though he was never a member of SBA Entertainment.

72. Goode formed an unnamed LLC, where he has redirected all incoming funds from The Orchard/1091. It is unknown at this time where the funds have been directed to. Goode has withheld the monies from all partners of the films for over three years now.

73. From the profit participant payouts and other income that was paid to Goode, Defendant Kennedy can personally attest that Goode was paid more than one hundred and fifty thousand dollars ($150,000) in 2019. However, Goode has still not repaid Brian Barth the fifty thousand dollars ($50,000.00) that he still owes him from the personal loan obtained for him by Kennedy in 2018.

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

74. In 2019, Tracey Edmonds and Kennedy worked diligently to obtain meetings with the Senior Department Heads of the movie and television departments at Netflix to pitch the "20 and Back" projects. Netflix indicated interest but wanted Kennedy to bring in elements including A-list actors, directors, and writers.  In response, Kennedy again contacted Antoine Fuqua and Jim Hart. Hart is a renowned writer, having produced scripts for Steven Spielberg and films such as "Contact" and "Bram Stoker's Dracula". Kennedy then introduced Goode to Hart over a conference call and even set up a lunch meeting between the two. Prior to said meeting though, Goode began his takeover of the documentary profits. During this time, Kennedy supported Richards and the rest of the documentary team, eventually being sucked into a falling out of the parties and a lawsuit. Following this, Kennedy would not pursue any deals with Goode or set him up through Kennedy's Hollywood connections. Without Mr. Kennedy's introduction, Hart would not be aware of Goode and would likely not have agreed to take his call. However, Goode then attempted to schedule a meeting with Hart on February 23, 2020, without informing Kennedy. In an email, Goode lied to Hart claiming that Kennedy was let go from Goode's company, going so far as to alleging that Kennedy had engaged in embezzlement, fraud, extortion, and other baseless lies. Goode even stated that he had sued Kennedy and Kennedy had defaulted in such lawsuit, seeking to have meetings with Hart on his own in the future. In reality, no such suit was filed against Kennedy, further evidencing Corey Goode's perpetual behavior of lying and manipulation.

75. In March of 2019, Defendant Richards began to recognize Goode's behaviors that demonstrated a pattern of targeting him personally. Richards was at his breaking point, he wanted out of everything, he wanted the constant stress to end. One day while Richards was under duress and experiencing a severe health issue, he wrote a letter that turned over all of his ownership of all projects to Goode. The following day Goode asked Kennedy to convince Richards to come back. Richards agreed to come back after Kennedy promised that he would watch over and protect him. Subsequently, they all agreed that Richard's previously written

letter was to be considered void, Goode immediately asked Richards to start working on all of the projects again, and he did.

76. Around March 2019, Goode and SBA Media, LLC decided that there were not enough resources to fund another DoD Conference in that year. But Defendant Youngblood was optimistic that there was still an opportunity to continue the mission and gather the community for a conference. Therefore, with Goode's, Richard's, and Kennedy's blessing, she took ownership of and produced DoD 2019 on her own.

77. She began by forming Full Disclosure Collaborative LLC, *(hereinafter "FDC")* in 2019, thereby making herself the sole member and authority. Through FDC she solely produced, and seed funded DoD 2019, accepting every risk and liability as her own. FDC is the financial and legal entity that holds the DoD trademarks and URLs.

78. Defendant Youngblood crafted every nuance of thought and made every final decision that went into the creation of DoD 2019. Goode, Richards, and Kennedy, as members of SBA, and Youngblood agreed that DoD 2019 was her sole responsibility. But it was more than that to Youngblood, it was also her absolute passion and love as she worked diligently on planning, infrastructure and detail of the conference for the majority of the year that led up to its execution. The vision of DoD 2019 was of hers alone, which she was able to execute with technical support from Richards.

79. Youngblood was ecstatic when, legend in the community, David Icke agreed to be the only Keynote Speaker and Headliner of DoD 2019. Youngblood expected a full house because Icke had recently released a new movie, and her event was the only conference that he would be appearing at in the US that year. She additionally expected the live stream audience to be in the tens of thousands, if not the hundreds of thousands because of Icke's fame and respect in the conscious community. Icke was contracted to do two days of five to six (5-6) hour sessions each, and Youngblood invited other speakers, including Goode, to be showcased at the event for the remaining portions.

80. Leading up to DoD 2019, Goode was being accused of doxing several members in the community and of being responsible for directing others to do so. He was engaging with the ongoing social media battles with social media content creators who criticized him. He was also involved in ongoing and public negative drama with Gaia TV producer, Jay Weidner. In the Spring of 2019, Goode was not invited to the other big conferences taking place in 2019, which a team of his more "dedicated" volunteer fans, attributed to Good being blacklisted from these events as well as by other certain radio personalities.

81. After weeks of planning and advertising, the increasing allegations against Goode poisoned Icke's commitment. Youngblood was informed that Icke's management had received incriminating information about Goode, from Icke's good friend, Jay Weidner. Upon receiving this information, Icke's management made the decision to renege on his contractual agreement with Youngblood, Icke was no longer going to speak at DoD 2019.

82. Without Icke's participation, Youngblood knew that DoD 2019 was going to take a huge blow financially and operationally. With the help of Kennedy, Youngblood shifted gears and pitched a desperate and generous offer to David Wilcock. Not only was Wilcock never a creator of DoD in any capacity, he also attempted to back out of his contract several times and scarcely promoted the event.

83. Goodes involvement in the event was limited as well. Youngblood consulted with many different people on certain decisions that she ultimately made. She started and maintained several group chats for the purpose of collaboration, one of which Goode was placed in, where he checked in every now and then. Youngblood received adive and communications from several invited speakers, including Goode, however, Goode was never an integral part of creating, leading, or producing any part of DoD 2019 aside from his own speaking. When Youngblood asked Goode how he would optically like to present himself, he did not respond. Youngblood was accustomed to this behavior from Goode as he often was unresponsive and unreliable. It is upon information and belief, from all Defendant's personal experiences, that

---

Plaintiff Goode intentionally does not respond in attempt to afford himself options/loopholes in the future.

84. In April 2019 Youngblood began the process of trademarking DoD to protect the entity that she had taken full ownership of and had been shepherding for the past three (3) years. Youngblood produced an extensive multi-cinematic camera, multi-room livestream to make up for ticket sales as well as to create content for future use, subsequent to losing Icke as a talent. This "Livestream Experience" that Youngblood envisioned and produced, by negotiating with and hiring a team of professionals, would be seen around the world, therefore, the logo/brand needed the protection a trademark offered.

85. Three (3) weeks prior to the conference, Kennedy negotiated Goode's Speaker Fee of $8,000 thereby creating an oral contract regarding Goode's performance at DoD 2019. Youngblood asked Goode on numerous occasions to clarify his expectations around compensation for the conference, but no contract was signed.

86. Youngblood paid Goode his Speaker Fee by walking the monies into his bank for him directly after the conference. A few weeks later she received a call from Kennedy regarding Goode requesting more money from DoD, outside of any existing contract between Youngblood and Goode. Goode had found out that Wilcock's contract included fifteen (15) percent as a streaming fee, and he argued that he deserved the same amount of compensation that Wilcock received.

87. Generously, Youngblood agreed to send Goode an additional offering of fifteen (15) percent of the profits, which totaled an additional eleven thousand seven hundred and eighty-nine dollars ($11,789.00), the same amount was provided to Wilcock for his performance.

88. Youngblood sent Kennedy a profit and loss statement from DoD 2019, because he negotiated the Speaker Fees for both Goode and Wilcock. After removing Goode and Wilcock's percentages, the total gross profits from DoD 2019 were about fifty-five thousand dollars ($55,000.00).

89. In September 2019, Youngblood was contacted by Goode's lawyer, Liz Lorie regarding the trademark for DoD. Youngblood felt hurt by the impersonal contact she received, instead of being contacted by Goode himself, given their history. To this day Youngblood has never communicated with Goode directly regarding the trademark. But, open to discussing partnerships of DoD at the time, Youngblood entered into the process of a "settlement agreement" through Lorie.

90. Youngblood quickly realized that she was essentially being bullied into relinquishing everything that she had created with her business through DoD. In the formulation of the "settlement" Youngblood was asked to sign an agreement that contained a completely false narrative that included a cascading series of untrue statements, including statements that eliminated Richards from the last 3 years of collaboration and partnership together. Lorie and Goode asked Youngblood to hand over her templates and rolodex and sign an extensive NDA. It was clear that the goal of the "settlement agreement" was not to create a mutual agreement, but to remove Youngblood and Richards entirely.

91. When Youngblood brought this to Lorie and Goode's attention that the narrative was inaccurate, Goode told Youngblood she needed to produce a contract, or something in writing, that could support her assertion of what she knew to be true. Goode knew that his request was not possible because he knew that there were never any signed contracts between them, which he made sure was the case. Throughout the settlement agreement process Youngblood witnessed the sheer manipulation Goode was infamous for. Moreover, in the middle of negotiations, Goode stated to Kennedy that Goode and Liz Lorie were forming their own company to plan conferences similar to DOD. At this time, Lorie was representing Goode and simultaneously was engaged in DOD negotiations with Youngblood, indicating a clear conflict of interest. Thereafter, Lorie would venture out to produce and promote conferences of her own, along with a public statement to produce films and documentaries of the metaphysical world.

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

92. When Youngblood refused to agree to the false narrative Lorie and Goode had crafted, they retreated back to an original offer extended in the beginning by Youngblood but was denied by Goode because it respected Richards' involvement. The offer entailed sharing the entity at a 33% split between Goode, Richards and Youngblood. At this point, Goode saw that a percentage of the DoD trademark is all that he was entitled to, however, Youngblood had been so mistreated by Goode, she did not want to be involved in working on the project with him in the future. Settlement discussions ended when Youngblood countered to Lorie that Goode could make an offer for the trademark and domain name only, so that he could put on DoD conferences on his own. Instead of making Youngblood an offer for the trademark and URL's, relinquishing her of working with Goode again, Goode filed this lawsuit and Youngblood was consequently folded into this dispute.

93. Youngblood had a business relationship with Goode, Richards, and Kennedy outside of DoD. In January of 2019 Goode became one of several investors that invested in the project of growing hemp for CBD products that would carry the SBA brand name. The project began on a plot of land in Nevada County, where Youngblood resided with her husband, Richard Soto. A return on investment (ROI) agreement and written, but unsigned, informal agreement was entered into. Disclaimers were made concerning possible loss scenarios, including acts of god and unforeseen legal issues.

94. After the hemp was growing for a few months, Nevada County issued an emergency moratorium ban on growing hemp which classified hemp as illegal and declared that no further production could take place. Therefore, no legal product could be made, and all investments were lost- Youngblood's ranch took the greatest loss. The crop was already damaged due to an unusually wet season that resulted in mold disease, but it was illegal and needed to be destroyed completely.

95. After the hemp crop resulted in a 100% loss, Youngblood offered, to all investors of the failed venture, opportunities in another project, with the hopes that the investors would eventually see a return. Goode was initially planning to be involved in the new project but any

developments on that particular business relationship have since halted by the emergence of the instant lawsuit.

96. Youngblood informed all investors, including Goode, of all updates and developments pertaining to the project as they arose. In August of 2019, at DoD 2019, Youngblood's husband attempted to discuss the project with Goode and possible recouping of the investment, but Goode would not engage in a conversation with him. Neither Youngblood nor Richards had a conversation with Goode at DoD 2019 regarding the failed crop or anything else related to the situation. Each investor understood they made a speculative investment that could be lost, but Goode was the only on demanding a return of the initial investment.

97. Around this time in early 2019 Defendant Richards noticed that Goode and Wilcock were claiming ownership publicly of property that they did not have any part in creating other than being a talent and marketing resource. Richards watched them attempt to assert exaggerated ownership over the "Above Majestic" documentary, the "Cosmic Secret" documentary, DoD, the "20 and Back" film/series, and the Graphic Novel. Richards' intuition was later confirmed by Kennedy, who Goode conveyed his intention to stall his partner collaboration agreements with Richards with these projects in order to leverage Richards and other partners out of them entirely. It was Goode's scheme to intentionally not move ahead with negotiations on the "20 and Back" movie or TV series project until after the Collaborative Contract with Rciahrds, Brandon Graham, Dave Everhard, and Kennedy had expired. Thus, Goode thought he would own one hundred percent of these projects. In fact, Goode stated to Kennedy while on a conference call with Jim Hart that he could not "make any deals until October", as the Collaborative Contract was due to expire in October.

98. Around this time, Richards was finally beginning to recognize Goode's tried and true pattern of fabricating evidence in order to manipulate and harass those around him in order to gain an advantage. On information and belief Richards began receiving more information regarding Goode's past legal issues, including arrests under different names and Goode's previous employer's restraining order against him. On information and belief, Richards also

found a significant amount of people claiming that Goode stole their stories that had been posted online and was now projecting their stories as his own personal story narrative. Bill Ryan and others from Project Avalon had confronted Goode and Stacey Goode for data mining the Project Avalon archives, finding it suspicious that chunks of information previously contained in their archives were now being retold by Corey Goode as a part of "20 and Back", bringing Goode notoriety and income. It is a documented fact that true to his M.O. of perpetuating fear tactics and manipulation on those that oppose him, Goode not only hired, but gave instructions to the new hire on how to specifically stalk and intimidate Bill Ryan.

99. At this point Richards decided to officially step down from working with Goode and ask for resolution. First, he confronted Goode regarding the countless grievances that he had accumulated while working with him over the years. Richards confronted Goode about many things that he witnessed that displayed a pattern of criminal behavior and ruthlessness. Richards' grievances stemmed from Goode's constant manipulation of volunteers, investors and obsessed fans; disingenuous representations, stealing parts of other people's personal stories and representing them as his own; stealing of credits through intimidation and threats, and more. He further confronted Goode regarding what Defendant Richard's believed to be Goode's premeditated plan to not only leave Gaia, but to sabotage Gaia on his way out with allegations of satanism in order to trigger Goode's fans into leaving Gaia with him. On information and belief, Defendant Richards believed that the ultimate goal of their plan was for Goode and Wilcock to create their own channel and to bring this mass exodus of their followers to a new channel that Wilcock would set up.

100. Goode engineered a social media campaign backed by some of his zealous followers to bombard Gaia with negativity. Goode set up GEM as a fictitious "Gaia Employee Movement" organization perpetrating an exodus of unhappy, abused Gaia employees. In reality, none of these allegations were true, but Goode had listed thousands of negative comments perpetuating dissatisfaction with Gaia.

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

101.     Richards offered Goode a deal that allowed Goode to take the lion's share of the work that Richards had contributed to the various projects. The offer entailed Richard taking full ownership of his two films "Above Majestic" and "Cosmic Secret" in exchange for Richards surrendering his rights to the "20 and Back" film/series, the Graphic Novel, comic book, teaching courses, and the SBA Media, LLC, and Full Disclosure Project social media brands.

102.     It has been shown that Goode's "Light Warrior Legal Fund" was established mainly for Goode to solicit and collect donations from the public. Goode cleverly solicits that he is the "Defender of the Light" and "Defender of the Truth." Anyone who disagrees with this position is accused of being "The Cabal", "Illuminati", "The Dark Force", or "Satanists." The donations are to be used for Goode's legal defenses and to fight for the good of humanity. However, an examination will show that there is no such Cabal or Illuminati after Goode, as each lawsuit he is a party is initiated by Goode. Goode does not wish for these lawsuits to end as he lives off of the donations.

103.     Consequently, Defendant Richards became the most prominent target of the instant lawsuit that Goode filed. Upon information and belief, Goode has a history of filing lawsuits such as the current one, as PR/smear campaigns in order to manipulate Goode's audience into attacking those in opposition to Goode, and to garner more donations to, on information and belief, Goode's fraudulent donation fund.

104.     Additionally, Goode launched a ruthless social media attack against Defendant Richards. Goode began doxing Richards through his various social media platforms thereby manipulating public attacks from his hundreds of thousands of followers against Richards. Through these platforms Goode spread false rumors that Richards was being investigated by the FBI and the police for criminal charges of extortion, embezzlement and more. In his posts, Goode never referred to any real investigation, he only referred to the lawsuit that he filed himself. In an attempt to intimidate and silence Richards, Goode posted the aforementioned on his various social media pages along with, what he believed to be, Richards current address. To

this day, Richards has not been served with a criminal investigation or charges that Goode alleged to all of his followers. Goode also claimed publicly on social media that Richards and Kennedy were not willing to negotiate because they would not do an audit.

105.     Goode alleged in his Second Amended Complaint that Richards was fraudulently selling DVDs, when Goode is a minor percentage holder and does not own the DVDs to "Above Majestic" or "Cosmic Secret". Goode owns twenty (20) percent interest in "Above Majestic DVD sales and sixteen and a half (16.5) percent interest in "Cosmic Secret" DVD sales.

106.     Defendant Kennedy was never involved with DVD sales, nor did he collect or receive any monies from the DVD sales. Additionally, the total DVD sales brought in less than ten thousand dollars ($10,000.00).

107.     As a result of Goodes accusation, Richards placed orders of DVD sales on hold (while such sales were his only income at the time) and was in the process of issuing refunds through PayPal while trying to monitor the damage Goode was causing with this lawsuit. Then, Goode turned around and posted on social media claiming that DVD sale orders were being taken and not fulfilled. This was another one of Goode's ploys to tarnish Richard's name, credibility, and to halt his remaining income and instead redirect the revenue stream to his newly created site. Directly following Goode's social media post, Richards gave the drop shipper the release to ship all DVDs ordered on June 14, 2020, regardless of Goode's threats. Defendant Richards additionally sent DVDs to those who had requested and received refunds already. All DVDs sent to customers by Defendant Richards was a DVD copy of the original documentary, from the original creator, writer, and producer of the documentary.

108.     Since, Goode has set up a new website from which he sells the same DVDs of the documentaries, without sharing collected revenues, thereby seizing and taking over the team's profits, even though as previously stated, Goode is only a minority profit holder.

109.     On information and belief, Goode has a long history of doxing and pursuing litigious behavior. One by one he has systemically gone after anyone who either challenges the

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

veracity of his claims, had a similar story to his own, or were perceived to be an obstacle to his agenda. Goode has publicly stated through social media that he will make an example out of Richards, Youngblood, and Kennedy.

110.     This is a partial list of individuals and companies in the metaphysical community who Corey has tried to sue, send a cease and desist, suppress/attack/silence/or shame within the community. Prestigious conferences, such as Contact In The Desert, New Living Expo, Conscious Life Expo, all of whom gave Goode prestigious platforms before multiple thousands. The Gaia TV Network, who took a nobody and spent hundreds of thousands to Brand and promote his name. His TV Co-Host David Wilcock who gave him his start and TV Co-Host Emery Smith. Individuals who have worked and been respected in the metaphysical community for over thirty plus years, such as Dr. Stephen Greer, thirty plus years respected prestigious Investigative Reporter Linda M. Howe, frequent TV Commentator and Lecturer Richard Dolan, longtime pillars of the Metaphysical Community Bill Ryan and Kerry Cassidy, big time syndicated radio personality Jimmy Church, other individuals who had a story similar to Goode's story and Goode decided that he didn't want the competition and set out to destroy them, Toney Rodriguez, Randy Cramer. Others that Goode determined to suppress, attack and manipulate, Teresa Yanaros, Derrick Faust, Dark Journalist, Elena Kapulnick, James Ring, Aug Tellex, Dylan Monroe, Duncan O'Finnian, Shane the Ruiner, Miles Johnston." There are many websites that speak of Goode's character. A few of the many keywords used are "Lying", "Divisiveness", "Manipulative", "Plagiarism", "Egotistic", and "Slander."Goode first targeted Richards by trying to gain control over his two films, the Graphic Novel, and the 20 & Back Film/Series. Goode then targeted Kennedy with the same methods of targeting and harassment in order to gain control over the funds from the films, and lastly, he targeted Youngblood regarding the ownership and funds of DoD.

111.     Richards and Youngblood never worked for Goode, but worked as volunteers for a greater movement, and as business partners with Goode when oral contracts were entered into between the parties. Goode promised percentages for the ideas and extensive work of

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

others and then he consistently reneged on those promises. Richards and Youngblood were working for the Disclosure community that they love respect and believed in only.

112.     On information and belief, every member of Goode's original team has resigned due to Goode's mistreatment, abuse, theft, and fraud. Richards, Kennedy and Youngblood refuse to permit Goode's attempted takeover of all of the team's projects.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (By Defendants Kennedy and Youngblood Against James Corey Goode)

113.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

114.     As described throughout the instant Answer, Defendants entered into numerous oral contracts with Plaintiff Goode regarding the conditions of their ongoing business relationships.

115.     The oral contracts required that Plaintiff Goode take various actions throughout the business relationship.

116.     Plaintiff Goode breached these contracts by failing to adhere to the terms of each of the contracts, including but not limited to, failure to follow disbursement and compensation guidelines per the contracts, failure to pay outstanding loans per the contracts, and intentionally interfering with Defendants' business expectations in violation of the oral contracts.

117.     For example, SBA Entertainment, LLC was created, in late 2018, as a neutral entity holder for "Above Majestic" and later, "Cosmic Secret" digital distribution agreements with The Orchard/1091. The "Above Majestic" point holders are Richards, who owns twenty-five (25) percent, Goode, who owns twenty (20) percent, Wilcock and Jordan own fifteen (15) percent, and Kennedy, along with other minority interest holders. In 2019, SBA Entertainment, LLC became the "Cosmic Secret" entity holder for digital distribution agreements with The Orchard/1091. The point holders for the "Cosmic Secret" are Richards, Goode, Wilcock,

Jordan, Kennedy, Graham, and Everhart. Yet despite this agreement regarding how distribution should be made, and regarding the point distribution, Plaintiff Goode has attempted to divert full ownership, profits, and control to himself as described in the instant Answer.

118.     Additionally, Defendant Kennedy's company lent Goode over twenty thousand dollars ($20,000.00) to keep him afloat and to pay ongoing expenses.

119.     Additionally, around March 2019, Goode and SBA Media, LLC decided that there were not enough resources to fund another DoD Conference in that year. But Defendant Youngblood was optimistic that there was still an opportunity to continue the mission and gather the community for a conference. Defendants Youngblood was told she could take ownership  Richards and Kennedy' blessing, she took ownership of and produced DoD 2019 on her own. This was specifically done after Goode and Youngblood had already agreed that DoD 2019 was her sole responsibility. Yet, Plaintiff Goode breached this agreement by thereafter reneging and claiming part ownership of DoD.

120.     Further, Kennedy entered into a contract with Richards and Goode in which he was to be given five (5) percent interest in SBA Entertainment, LLC, to be the neutral steward and to payout the profit percentage disbursements that were disbursed by The Orchard/1091. However, Plaintiff Goode has breached this contract by failing to make payments to Mr. Kennedy per the oral agreement, and by attempting to improperly take sole control, ownership, and profits of the business generally.

121.     Plaintiff Goode further breached each of the oral contracts by failing to utilize good faith and fair dealing throughout their business dealings.

122.     Defendants suffered significant monetary damages as a result of Plaintiff's breaches of contract in amount to be proven at trial.

## **SECOND CAUSE OF ACTION**

### **Breach of Fiduciary Duty**

### **(By Defendants Kennedy and Youngblood Against James Corey Goode)**

123.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

124.     Defendants entered into a fiduciary relationship with Plaintiff Goode when they became business partners in the various ventures described throughout the instant Answer.

125.     Plaintiff Goode breached the fiduciary relationship to Defendants in numerous ways, such as by making fraudulent claims to Defendants, embezzling and misappropriating funds from the joint ventures Defendants entered into with Plaintiff Goode, and by fraudulently claiming ownership of the various intellectual properties Defendants developed.

126.     Plaintiff Goode's breach of fiduciary duty caused Defendants significant damages.

127.     Defendants have suffered significant monetary damages in an amount to be proven at trial as a result of Plaintiff Goode's breach of fiduciary duty.

## THIRD CAUSE OF ACTION

### Fraud

### (By Defendants Kennedy and Youngblood Against James Corey Goode)

128.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

129.     Plaintiff Goode made numerous fraudulent misrepresentations to Defendants regarding with respect to their business dealings. For example, Plaintiff Goode fraudulently misrepresented to Defendant Kennedy and Youngblood that he could not write down anything related to their business dealings and contracts due to warning he received from alien beings.

130.     Additionally, in March 2020, Goode sent a memorandum of extortion to Kennedy, through Lorie, demanding him to send over all of the finances to Goode's personal account, instead of distributing them to the team who had been waiting for their disbursements for two and a half months. The memorandum included a forty-eight (48) hour ultimatum in a fraudulent attempt to bully, intimidate and extort Defendant Kennedy.

131.     Additionally, Goode falsely signed as the agent and member of SBA Entertainment, LLC, with The Orchard/1091, to reroute monies to his unnamed LLC, even though he was never a member of SBA Entertainment, despite representing to Defendants that the funds would be distributed per the terms of the oral contracts the parties had entered into.

132.     Plaintiff Goode knew these various misrepresentations were false at the time he made them, and did so with the specific intent to take advantage of Defendants in their business dealings.

133.     Defendants were ignorant of the falsity of the various fraudulent claims described herein at the time they were made, and believed the Goode intended to carry out their business dealings in good faith.

134.     As a result of Plaintiff Goode's fraudulent misrepresentations, Defendants suffered significant monetary losses.

## FOURTH CAUSE OF ACTION

### Defamation

### (By Defendants Kennedy and Youngblood Against James Corey Goode)

135.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

136.     As described in the instant Answer, Plaintiff Goode has made, and continues to make, improper false written statements and spoken statements regarding Defendants to various third parties.

137.     For example, on or around February 23, 2020, Goode sent an email to Hollywood A-List individual, Jim Hart, regarding Kennedy, in which he alleged that Kennedy has engaged in embezzlement, fraud, extortion and other baseless lies. This was one of Goodes attempts to character assassinate Defendant Kennedy, the kind of language contained therein was of the slanderous nature that kills a career.

138.     Plaintiff Goode has also published, and on information and belief continues to publish, false and defamatory statements regarding Defendants on his social media accounts in an attempt to turn his followers against Defendants.

139.     Plaintiff Goode made these written and oral defamatory statements intentionally in order to harm Defendants.

140.     Defendants have suffered severe monetary damages as a result of these defamatory statements in an amount to be proved at trial.

**FIFTH CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(By Defendants Kennedy and Youngblood Against James Corey Goode)**

141.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

142.     As described in the instant Answer, Plaintiff Goode acted extremely and outrageously and did so with the specific intent to cause Defendants severe emotional distress.

143.     Plaintiff Goode's conduct, through his constant bullying, intimidation, threats, and fraudulent practices frequently caused Defendants to fear for their own safety.

144.     Plaintiff Goode's conduct has caused Defendants severe emotional distress.

145.     Defendants have suffered severe emotional distress, and damages stemming therefrom in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**Negligent Infliction of Emotional Distress**

**(By Defendants Kennedy and Youngblood Against James Corey Goode)**

146.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

147.     As described in the instant Answer, Plaintiff Goode acted extremely and outrageously and did so with the specific intent to cause Defendants severe emotional distress.

At the very least, Plaintiff Goode acted negligently on numerous occasions throughout the various business dealings between the parties.

148.     Plaintiff Goode's conduct, through his constant bullying, intimidation, threats, and fraudulent practices frequently caused Defendants to fear for their own safety.

149.     Plaintiff Goode intentionally placed Defendants in danger by doing things like doxing Defendants, and inciting his followers to harm Defendants.

150.     Defendants have had ongoing emotional distress as a result of Plaintiff Goode's conduct.

151.     Plaintiff Goode's conduct is the cause of the Defendants damages.

152.     Defendants have suffered severe emotional distress, and damages stemming therefrom in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Embezzlement and Fraudulent Procurement of Funds

### (By Defendant Kennedy Against James Corey Goode)

153.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

154.     Plaintiff Goode, as a partner in many of the business dealings described herein, had access to some of the funds that were supposed to be distributed to all relevant parties per the contracts between the parties.

155.     As described in the instant Answer, Plaintiff Goode took funds and placed them in his own accounts in violation of C.R.S. §18-4-405.

156.     Plaintiff Goode has caused significant damages to Defendants through his improper embezzlement of funds in an amount to be proven at trial.

## EIGTH CAUSE OF ACTION

### Tortious Interference with a Business Expectancy

### (By Defendants Kennedy and Youngblood Against James Corey Goode)

---

**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

157.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

158.     Defendants had numerous actual or prospective business contracts with various parties and entertainment agencies as described throughout the instant Answer. For example, Defendant Youngblood had a prospective contract with David Icke for the DoD 2019 event.

159.     Plaintiff Goode knew of these actual or prospective business contracts and intentionally and improperly interfered with the performance of these contracts by instructing those in charge of implementing such contracts not too engage with Defendants, by making defamatory statements about Defendant, and by disseminating false information about Defendants with the intent of interfering with these contracts.

160.     Plaintiff Goode's interference resulted in monetary loss and harm to Defendants brands, intellectual properties, goodwill, and reputation.

161.     Defendants have suffered significant monetary damages in an amount to be proven at trial as a result of Plaintiff Goode's conduct.

## NINTH CAUSE OF ACTION

### Declaratory Judgment

### (By Defendants Kennedy and Youngblood Against James Corey Goode)

162.     Defendants re-allege and incorporate herein and by reference each and every previous and subsequent allegation as though fully set forth herein.

163.     Defendants have suffered significant damages due to Plaintiff Goode's improper claim to the various intellectual properties and trademarks described in the instant Answer, including but not limited to DoD, Above Majestic, Cosmic Secret, and 20 and Back.

164.     A true and actual controversy exists regarding the legal rights and duties of the respective parties to these various intellectual properties and trademarks based upon the numerous oral contracts described throughout the instant Answer.

165.     Defendants respectfully request that these rights and duties be adjudged by this honorable court.

## **PRAYER FOR RELIEF**

CONSIDERING THE HEREIN DESCRIBED, Defendants Leon Isaac Kennedy and Adrienne Youngblood pray this Court consider the fact allegations contained and hereby:

A. Enter judgment against Plaintiffs for all aforementioned claims in an amount to be determined at trial;

B. Enter an injunction barring Plaintiffs from any and all of the aforementioned harmful conduct;

C. Find the Plaintiffs liable for their transgressions;

D. Order Plaintiffs to pay all actual damages suffered by Kennedy and Youngblood as a result of Plaintiffs' fraudulent and harmful activities;

E. Order Plaintiffs to pay for all additional damages Kennedy and Youngblood have and will suffer from reliance on Goode's false representations;

F. Grant Defendants special damages due to the willful, reckless, wanton, egregious, unfair, unethical, deceptive, and unscrupulous conduct of the Plaintiffs;

G. Grant Defendants and award of attorneys' fees'

H. Grant Defendants all monetary and other relief available at law and in equity.

Dated: October 13, 2023                                **WEBB LAW GROUP, APC**

By: /s/ ___Christian Clark_____
Lenden F. Webb
Christian B. Clark
Attorneys for Defendants

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

_____
**DEFENDANTS' ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

## CERTIFICATE OF SERVICE

I, Raza N. Khan, am a citizen of the United States and am at least eighteen years of age. My business address is 10509 Vista Sorrento Pkwy., Suite 450, San Diego, CA 92121.

I am not a party to the above-entitled action. I have caused service of:

**I.    DEFENDANTS' KENNEDY AND YOUNGBLOOD'S ANSWER AND COUNTERCLAIM TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

along with all associated documents on all the counsel of record and interested parties by electronic email service and electronically filing the foregoing with the Clerk of the U.S. District Court using its CM/ECF System.

I hereby certify that on this eighth day of February 2023, a true and correct copy of the foregoing were served electronically and via U.S. Mail to:

Valerie Yanaros, Esq.
Yanaros Law, P.C.
8300 Douglas Avenue Suite 800
Dallas, Texas 75225
*Telephone:* (619) 238-1010
*Facsimile:* (619) 238-1981
*Email:* Valerie@YanarosLaw.com
*Email:* Admin@YanarosLaw.com
*Attorney for James Corey Goode and*
*Goode Enterprise Solutions, Inc.*

Mr. Roger Richards Ramsaur
1928 NE 40th Avenue
Portland, OR 97212
Telephone: (323) 376-8705
Email: Seckey@ProtonMail.com
*Defendant*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: October 13, 2023

Raza N. Khan

WEBB LAW GROUP, APC
10509 Vista Sorrento Pkwy., Suite 450
San Deigo, California 92121